## No. 12-1461

### IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

---

### UNITED STATES OF AMERICA,

APPELLEE,

V.

### TAREK MEHANNA,

DEFENDANT-APPELLANT.

---

### ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

---

### REPLY BRIEF OF DEFENDANT-APPELLANT TAREK MEHANNA

Sabin Willett, No. 18725
Susan Baker Manning, No. 1152545
Julie Silva Palmer, No. 1140407
**BINGHAM McCUTCHEN LLP**
One Federal Street
Boston, Massachusetts  02110-1726
617.951.8000
sabin.willett@bingham.com

J. W. Carney, Jr., No. 40016
**CARNEY & BASSIL**
20 Park Plaza, Suite 1405
Boston, Massachusetts  02116
617.338.5566
jcarney@CarneyBassil.com

---

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

A.    Summary. ...........................................................................1

B.    Objects Of The "Conspiracy" Included Constitutionally Protected Speech And Legally Impossible Theories Of Criminal Liability. ...........................................................................4

    1.    Material Support Through Translation. ....................................4

        a.    *Statutory Framework.* ............................................4

        b.    *The "Conspiracy" Evidence.* .........................................8

    2.    Abuse of the Law of Conspiracy. ............................................17

        a.    *Abuse of the Co-Conspirator Exception.*........................17

        b.    *The Variance Problem.* ..............................................20

        c.    *Conspiracy Law in the First Amendment context.* . ......23

    3.    The Government's Legally Impossible Theories of Material Support ..................................................................30

        a.    *Section 956.* .................................................................30

        b.    *Section 2332.* ..............................................................33

C.    Other Problems at Trial Warrant Reversal........................................35

    1.    Inflammatory Material So Prejudiced the Trial that the Convictions on All Counts Must Be Reversed ......................35

    2.    The Court's "Coordination" Instructions Were Erroneous. ..............................................................................39

    3.    The Court Erred In Excluding Mehanna's Expert Rebuttal Witnesses.................................................................40

    4.    The *Brady* Ruling.................................................................42

    5.    The Government Could Not Prove Materiality as to Count VI..............................................................................42

    6.    In the Alternative, Mehanna is Entitled to Resentencing. .......44

A/75511824.1

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Bachellar v. Maryland*,
　397 U.S. 564 (1970)...........................................................................1, 2

*Brandenburg v. Ohio*,
　395 U.S. 444 (1969)......................................................................7, 28, 29

*Brogan v. United States*,
　522 U.S. 398 (1998)............................................................................43

*Daubert v. Merrell Dow Pharm., Inc.*,
　509 U.S. 579 (1993)............................................................................41

*DeCato v. United States*,
　51 Fed.Appx. 888 (1st Cir. 2002) ...........................................................45

*Freeman v. Package Mach. Co.*,
　865 F.2d 1331 (1st Cir. 1988)................................................................22

*Griffin v. United States*,
　502 U.S. 46 (1991)..............................................................................1

*Holder v. Humanitarian Law Project*,
　130 S.Ct. 2705 (2010) ("*HLP*")....................................................*passim*

*Kotteakos v. United States*,
　328 U.S. 750 (1946)...........................................................................20

*NAACP v. Claiborne Hardware Co.*,
　458 U.S. 886 (1982)...........................................................................24

*Pasquantino v. United States*,
　544 U.S. 349 (2005)...........................................................................30

*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling*,
　161 F.3d 77 (1st Cir. 1985)...............................................................40, 41

*Snyder v. Phelps*,
　131 S.Ct. 1207 (2011)......................................................................2, 28

A/75511824.1

*Sorrell v. IMS Health Inc.*,
  131 S.Ct. 2653 (2011)...............................................................................29

*Stromberg v. California*,
  283 U.S. 359 (1931)................................................................................1, 2

*United States v. Abu-Jihaad*,
  630 F.3d 102 (2d Cir. 2010) .................................................................36, 37

*United States v. Al-Moayad*,
  545 F.3d 139 (2d Cir. 2008) .................................................................35, 39

*United States v. Bailey*,
  405 F.3d 102 (1st Cir. 2005)...................................................................30

*United States v. Bagdasarian*,
  652 F.3d 1113 (9th Cir. 2011) ................................................................29

*United States v. Boots*,
  80 F.3d 580 (1st Cir. 1996)...................................................................30, 35

*United States v. Bunchan (I)*,
  580 F.3d 66 (1st Cir. 2009)....................................................................23

*United States v. Capozzi*,
  486 F.3d 711 (2006).............................................................................1

*United States v. Casas*,
  356 F.3d 104 (1st Cir. 2004)...................................................................19

*United States v. Cruzado-Laureano*,
  404 F.3d 470 (1st Cir. 2005)...................................................................44

*United States v. Dellosantos*,
  649 F.3d 109 (1st Cir. 2011)................................................................20, 23

*United States v. Drougas*,
  748 F.2d 8 (1st Cir. 1984).....................................................................21

*United States v. Edgar*,
  82 F.3d 499 (1st Cir. 1996)...................................................................43

iii

*United States v. El-Mezain*,
    664 F.3d 467 (5th Cir. 2011) .......................................................................29, 36

*United States v. Flaherty*,
    668 F.2d 566 (1st Cir. 1981)...................................................................................21

*United States v. Flores-de-Jesús*,
    569 F.3d 8 (1st Cir. 2009)......................................................................................19

*United States v. Franco-Santiago*,
    681 F.3d 1 (2012).....................................................................................................21

*United States v. García–Torres*,
    280 F.3d 1 (1st Cir. 2002).......................................................................................21

*United States v. Hammoud*,
    381 F.3d 316 (4th Cir. 2004) .................................................................................36

*United States v. Hassoun*,
    476 F.3d 1181 (11th Cir. 2007) ............................................................................32

*United States v. Innamorati*,
    996 F.2d 456 (1st Cir. 1993)..................................................................................44

*United States v. Jayyousi*,
    657 F.3d 1085 (11th Cir. 2011) ............................................................................32

*United States. v. Jones*,
    674 F.3d 88 (1st Cir. 2012)....................................................................................21

*United States v. Mubayyid*,
    658 F.3d 35 (1st Cir. 2011)....................................................................................36

*United States v. Petrozziello*,
    548 F.2d 20 (1st Cir. 1977)..............................................................................18, 23

*United States v. Salameh*,
    152 F.3d 88 (2d Cir. 1998) ....................................................................................36

*United States v. Sebbagala*,
    256 F.3d 59 (1st Cir. 2001)...............................................................................42, 43

iv

*United States v. Sepulveda,*
    15 F.3d 1161 (1st Cir. 1993) .............................................................................18

*United States. v. Shay,*
    57 F.3d 126 (1st Cir. 1995) .............................................................................41

*United States v. Shinderman,*
    515 F.3d 5 (1st Cir. 2008) ...............................................................................23

*United States v. Siddiqui,*
    699 F.3d 690 (2d Cir. 2012) ............................................................................33

*United States v. Spock,*
    416 F.2d 165 (1st Cir. 1969) .......................................................................2, 23

*United States v. Stevens,*
    130 S.Ct. 1577 (2010) .....................................................................................28

*United States v. Tavares,*
    705 F.3d 4 (1st Cir. 2013) ...............................................................................36

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003) ..............................................................................33

*United States v. Zafiro,*
    945 F.2d 881 (7th Cir. 1991) ..........................................................................20

*Yates v. United States,*
    354 U.S. 298 (1957) ...............................................................................1, 2, 30

**FEDERAL STATUTES**

18 U.S.C. § 956 ...........................................................................................*passim*

18 U.S.C. § 2332 .........................................................................................4, 33

18 U.S.C. § 2339A .......................................................................................*passim*

18 U.S.C. § 2339B .......................................................................................*passim*

**RULES**

Fed R. Evid. 403 ...............................................................................................36

A/75511824.1

Fed. R. Evid. 702 ............................................................................18, 19

Fed. R. Evid. 801 .............................................................................9

**OTHER AUTHORITIES**

DAVID DANIEL, WILLIAM TYNDALE, A BIOGRAPHY (1994) ...................................27

MARK TWAIN, THE ADVENTURES OF HUCKLEBERRY FINN (1885)...........................34

THE QUR'AN ..........................................................................................27

A/75511824.1

# ARGUMENT

## A.    Summary.

Mehanna does not raise a sufficiency challenge under *Griffin v. United States,* 502 U.S. 46, 59-60 (1991). *See* Gov't.Br. 61-62. *Griffin* upheld a general verdict where the government alleged a routine criminal conspiracy with multiple objects, and proved fewer than all of them. Here the government tried to base a general verdict on constitutionally-protected, and legally-impossible objects. A line of authority including *Stromberg v. California*, 283 U.S. 359 (1931) (reversing a conviction under general verdict that may have been based on an unconstitutional ground), and *Yates v. United States*, 354 U.S. 298 (1957) (general verdict in First Amendment context must be reversed where possibly based on legally-impossible object crime theory), requires reversal in such cases. *See United States v. Capozzi*, 486 F.3d 711, 719 (2006) ("[*Griffin*] distinguished *Yates* and … *Stromberg* … as dealing with general verdicts in which there were legal or constitutional (but not merely evidentiary) defects in one of several charged means that may have supported the jury's verdict."). The jury's general verdict is the very thing that requires reversal. *Bachellar v. Maryland*, 397 U.S. 564, 569-71 (1970) (conviction should be reversed where record did not reveal which of multiple grounds was basis for verdict and one violated First Amendment). Instead of winning if the record shows evidence of any of the objects alleged, as in *Griffin*, the government

1

must lose if even a single "object" of the conspiracy is constitutionally protected, or legally impossible, as in *Stromberg, Bachellar, and Yates*.[1]

The problem at trial was that a jury awash in Mehanna's speech and political views, and the hearsay speech of others, could not fairly try a discrete controversy, heavily disputed, about whether the government had proved criminal purpose, beyond a reasonable doubt, in Mehanna's uneventful visit to Abu Dhabi and Yemen in 2004. The government might have mitigated the problem by alleging a discrete conspiracy concerning Yemen, or through special questions to the jury, but when Mehanna proposed the latter, it objected, App.1893-1904, and its objection was sustained. App.0192. This was not inadvertent, for the Yemen visit was transitory and "feckless," as the trial judge put it. App.1973. While the government amasses its best case on criminal intent as to Yemen, there were major problems in the evidence, Opening Br. 29-30, which was based largely on the testimony of a practiced and admitted liar. *Id*. at 11. The parties to the "agreement" all demonstrated by their conduct that they had very different ideas about what to do, and Mehanna himself twice showed his proclivity not to engage in martial or criminal conduct—when he returned home then, and two years later,

---

[1] This is consistent with the general rule that in any prosecution involving speech (whether the crime charged is conspiracy or anything else), an appellate court must independently review the whole record, and ensure that no aspect of the verdict trenches on First Amendment rights. *Snyder v. Phelps*, 131 S.Ct. 1207, 1216 (2011); *United States v. Spock*, 416 F.2d 165, 172-73 (1st Cir. 1969).

2

when he declined a request to come fight in Somalia.  Gov't.Br. 10, 18, 29.  There is no gainsaying that Mehanna's return home was voluntary, and that after return, he engaged only in speech.  The jury had to wrestle with the question whether his intent was as the government suggested, or whether something else was going on: an adolescent was flirting with ideas, but maturing in the process, and opting by his unforced conduct for a life of vigorous speech and intellectual activism, in which, as he once said himself, "the only way I can attack and humiliate the enemies of Allah and mine is through writing."  App.0702.

The government's threefold purpose in conflating ten days from February 2004 into a decade of the intellectual and religious activism was to attack that very writing (which, standing on its own, was protected by the First Amendment), sidestep problems of proof as to Yemen, and provoke in the jury an irresistible emotional response. This remains the government's approach even today, when it devotes so many pages to religious and political views whose savor has never been contested.  Gov't.Br. 6-32.

In section B.1, we show that the general verdict may have rested on protected speech.  We begin with the government's overbroad reading of the material support statutes, and then closely examine the evidence in which it tries to locate the provision of a "service."  Section B.2 shows how conspiracy law was abused, through inadmissible hearsay and a massive variance, to try to manufacture

3

a link upon which to base the "service" theory.    Section B.3 addresses the government's arguments concerning the legal impossibility of the object crimes under 18 U.S.C. §§ 956 and 2332.

In section C, we address the government's arguments on the other main points of the appeal, including the massive prejudice that infected all of the jury's work.

**B.    Objects Of The "Conspiracy" Included Constitutionally Protected Speech And Legally Impossible Theories Of Criminal Liability.**

**1.    Material Support Through Translation.**

*a.    Statutory Framework*.  The government asserts that the speech evidence is an independently sufficient object to support a conviction for a "service conspiracy," based on illegal "coordination," in the provision of translations. Gov't.Br. 61-77.  It points to Internet activity, and relies heavily on the content of the materials Mehanna translated, evidence of Mehanna's political and religious point of view, and the out-of-court statements of unindicted persons.

Before turning to the evidence, it will help to refocus on what the statute actually bars.   The relevant sections contain no reference to "coordination." Congress made it unlawful to "knowingly *provide*[] material support or resources *to* a foreign terrorist organization."   18 U.S.C. §2339B(a)(1) (emphasis added). "Service" is a kind of "material support or resource[]," 18 U.S.C. §2339A(b)(1);

4

18 U.S.C. §2339B(g)(4) (adopting definition for purposes of §2339B),[2] but a service is not unlawful unless it is "provide[d] … to" the FTO, 18 U.S.C. §2339B(a)(1). The phrase, "provide [a service] to" may not be "construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States." 18 U.S.C. §2339B(i). Last, Congress included a special carve-out for "religious materials," provision of which is lawful. 18 U.S.C. §2339A(b)(1).

Within these statutory limitations, "service" was further illuminated in *Holder v. Humanitarian Law Project,* 130 S.Ct. 2705 (2010) ("*HLP*"). Service, the Court noted, was "'the performance of work commanded or paid for by another: a servant's duty: attendance on a superior'"; or "'an act done for the benefit or at the command of another.'" *Id.* at 2721 (quoting Webster's Third New International Dictionary 2075 (1993)). A "benefit" cannot be casual or incidental. "[W]e in no way suggest that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech *benefits* foreign terrorist organizations." *HLP*, 130 S. Ct. at 2730 (emphasis added). *HLP*'s "coordination" standard protects independent advocacy, *id.* at 2721-22, and an independent advocate seeks to benefit the object of his advocacy,

---

[2] The government concedes that the only "material support" it alleges as to the speech evidence is "service." Gov't.Br. 67, n.31 (discussion of "personnel" and "expert advice and assistance" is "irrelevant").

and may succeed in doing so. "Coordinated" is a gloss for the *conduct* at issue in *HLP*, which was in-depth, face-to-face training of an FTO by the plaintiff. *Id*. at 2720-22. Training would constitute providing a service if conducted in that sort of "coordinated" manner, *id*. at 2715, as opposed to the instruction that might be accomplished by independent publication of a book. *Id*. The government offered no proof that Mehanna had the direct, interactive relationship with an FTO that was present in *HLP*.[3] Thus the question presented here is, outside of that direct, interactive context, what sort of *writing* constitutes provision of a service within the statute's cautionary rubrics?

The answer is straightforward. *Writing* might be a service like any other— but only if the defendant "provides [a writing] to a foreign terrorist organization," as §2339B(a)(1) requires, or "provides [a writing] … knowing and intending that [the writing is] to be used in preparation for, or in carrying out" an object crime, as §2339A(a) requires. A writing is a service provided to an FTO only in two situations: first, where the writer writes as "'commanded or paid for by another,'" or in performing "'a servant's duty: attendance on a superior.'" *HLP*, 130 S.Ct. at

---

[3] *HLP* did not decide "exactly how much direction or coordination is necessary for an activity to constitute a 'service.'" 130 S.Ct. at 2710. The NGOs in *HLP* proposed advocacy before the United Nations and Congress, publishing pro-FTO writings, advocating for political prisoners, and "teaching" of negotiation techniques through published writings. The Court declined to find those activities unlawful on a pre-enforcement challenge. *Id*. at 2722.

2721 (quoting Webster's Third New International Dictionary 2075), and second, where the writer provides a material benefit to the FTO through direct interaction so substantial as to afford the parties the opportunity directly to teach and learn from each other—which the Court labeled unlawful "coordination." *Id.* at 2721-22.[4]

Such "coordination" cannot be extended to the speaker's hope that his speech will be welcome. A builder might hope that Osama bin Laden would move in and benefit from his house; were Congress to brand such activity as "service," no Constitutional problem would arise, for there is no Constitutional amendment for home-building. There is one for speech. If one makes a speech, even knowing that its philosophy will be congenial to an FTO, one is engaging in protected activity. *See, e.g., Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969) (First Amendment protects advocating violence or unlawful activity "except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action"). It follows that where the "service" is writing political speech outside the command structure, the task must involve the high degree of direct interaction involved in *HLP,* or it will be protected by the special

---

[4] Mehanna does not contend, as the government's straw-man argument would have it, that contact must be in person to meet the standard. *See* Gov't.Br. 72-73. Electronic contact might be sufficiently direct and purposeful in another case. The record did not show it here.

carve-out in §2339B(i) and by the First Amendment itself. *HLP* shows that speech content is immaterial to the crime, for the content there was concededly benign. It must be the speaker's actual relationship with the FTO, and not his message, nor his expectation that his message will be welcome, that serves as the basis for liability. The government dwelt below, and does here, on the *content* of Mehanna's writing, which is not relevant to show guilt, but is relevant to provide a defense. Because Mehanna's writing was obviously political and religious, and the government did not prove the necessary command structure or direct interaction, it must be protected.

   b. *The "Conspiracy" Evidence.* The government's core challenge was to show a sufficient relationship between al Qa'ida and Mehanna with respect to Mehanna's translation activities. This would not be easy, given its threshold concession that Mehanna "was not instructed by al-Qaeda to engage in [translation] activities." App.1382. In part to try to establish a link, and in part to distract the jury from its absence, the government belatedly added 37 foreign "co-conspirators" by March 17, 2011 letter. Its brief passes quickly over the putative "linkage" evidence in this material. Gov't.Br 21, 24-25, 68. Closer inspection is warranted.

   The government's lead "fact" concerns Younis Tsouli, added as an unindicted U.K. "co-conspirator" in the March letter. Gov't.Br. 21 (citing to

App.0705[5]).   More than a year and a half after Mehanna's return from Yemen, Tsouli sent an instant message ("IM") to Waseem Mughal, stating, "AQ IN IRAQ ASKED ME TO CONTACT TP AND ASK YOU GUYS TO WORK ON TRANSLATING THURWAT AL SANAAM their official online ebook." App.0705.   This was an out-of-court statement, offered to prove the truth of the matter asserted: *i.e.,* that al Qa'ida in Iraq did indeed "ask[] [Tsouli] to contact [Tibyan Publications] and ask" someone to translate the ebook.   Absent an exception to the hearsay rule, it should have been excluded.   The court admitted the statement under Federal Rule of Evidence 801(d)(2)(E), but that was error, for there was no independent evidence of the necessary conspiracy in the first place: *i.e.,* that Mehanna and *Tsouli* were members of a conspiracy to provide translations to al Qa'ida.   *Tsouli sent his IM to Mughal, not Mehanna.*   App.0705.   It was not sent via Tibyan.   *See id.*   There was no evidence that anyone forwarded the IM itself, or its content to Mehanna, nor that Mehanna responded to it, nor that anyone ever translated *Thurwaat al Sanaam*, nor that Tsouli and Mehanna ever met, communicated, or jointly engaged in any plan, nor that Mehanna translated anything else under the request, direction or control of Tsouli.

In another instant message cited by the government, Gov't.Br. 68—this one sent via Tibyan to Mehanna on October 10, 2005—Aboo Mahmoud Al

---

[5] *See* Dkt.395, 66:2-22, 115:16-24, and App.1532.

9

Muraabit wrote, "the ikhwaan from the cloud people are asking us if we can translate this msg from the al doctor regarding curryland." App.0765. The message is again offered for its truth (that al Qa'ida really is requesting the translation at issue), and so it should have been excluded, unless the government offered admissible evidence that Mehanna and Muraabit were members of a criminal conspiracy to provide material support or resources to al Qa'ida. And while Mehanna certainly associated—electronically—with Muraabit, no *extrinsic* evidence showed that the two conspired to provide translations, or anything else, *to al Qa'ida*.[6] There was no evidence that Mehanna ever replied to Muraabit's email, nor that he translated the "msg" at issue. To the contrary, the government's evidence shows that Mehanna never opened Muraabit's related file—later, he did not know what it was:

| Muraabit:[7] | …was wondering/u got any ideas/for an intro to the msg to the curry people |
| Mehanna: | what do u mean |
| Muraabit: | an intro |
| Mehanna: | isn't it a document? |
| Muraabit: | no its a video by the dr |
| Mehanna: | oh |

App.0961.[8]

---

[6] *See infra* at 18-20 (discussing government's "expert" testimony).

[7] Muraabit appears on this, and other chats, as Abu Mu'ndhir. Others similarly employed alternate online names. *See* Gov't.Br. Addendum ("Chart of Identities").

10

There is some confusion in the government's brief about a video entitled, *Wa Yakoon*. Gov't.Br. 22, 24. More than two years after Mehanna's return from Yemen, in an email chat, Muraabit asked Mehanna to edit a translation of the transcript of a video entitled *Wa Yakoon*. App.0956. Mehanna did not agree to do so in the chat, *id.*, and the government offered no evidence that he ever agreed to do so. Mehanna never edited, translated, or disseminated such a video or transcript. Nor was there any evidence that al Qa'ida requested the translation or the editing.

And for its centerpiece—that Mehanna was part of al Qa'ida's "media wing"—the government relies on this single snatch from a February 2, 2006 IM:

> Muraabit:    in the [IM] threads/one guy said … we are aqs in raafidayn [two flowing rivers]/media wing/hehe."

App.0923. [9] The statement was hearsay twice removed—Muraabit's hearsay statement as to what an anonymous "guy" said on the Internet—and a *joke* at that ("hehe"). It is hard to imagine clearer evidence than Mehanna's response that he was *not* in any "media" or other wing of al Qa'ida:

> Mehanna:    man, I don't think/we deserve that title
> Muraabit:    Yeah.
> Mehenna:    maybe/ if we are lucky/we get to clean their toilets.

---

[8] There was no evidence that Mehanna ever participated in any translation of such a video.

[9] Review of the entire exhibit shows the irony of the remark.

11

Muraabit:     lol.

App.0923-0924.[10]  The most the government's hearsay offerings suggested was that al Qa'ida's media wing was some group of people so distant from Mehanna and his Internet friends that the idea of media collaboration struck them as "laugh out loud" funny.

It was not simply that the government relied on text-messaged "hehes" and "lols" from an absent declarant about what "one guy said" on the Internet, and not merely that the government failed to show, through admissible extrinsic evidence, that al Qa'ida directed *Tibyan's* translations.  There was no evidence that Tibyan directed *Mehanna*.  The government cites a series of exhibits as evidence that Mehanna received "translation assignments" through Muraabit and Ehsanul Sadequee.  Gov't.Br. 24 n.15.  This evidence actually shows that Mehanna consistently and independently translated what *Mehanna* wanted to translate:

- Exs.248&249: In April 2005, Mehanna sent Sadequee his translation of *Such are the Messengers Tested and the Outcome Will Be In Their Favor*, and accompanying images.  There was no evidence that any one requested this translation or material.  As far as the record shows, Mehanna chose to translate and disseminate the material.  App.0413, 0440

- Ex.252: In June 2005, Mehanna sent Sadequee a document, *Tahweed of Action*, that he had obtained elsewhere.  There was no evidence that Mehanna

---

[10] *See* Dkt.390, 59:9-60:9, 79:15-80:19.

> translated this document, nor that he did anything with it at any one's request. App.0442
>
> - Ex.255: In April 2005, Mehanna sent Sadequee his translation of *The Importance of the Word*. There was no evidence that anyone requested this translation. App.0477
>
> - Three chat transcripts between Mehanna and Muraabit contain either passing references to potential projects or no supporting information at all. App.0931, 0952, 0956. There is no evidence that any of these projects was ever translated, nor requested by al Qa'ida.

The only translation Mehanna ever did at another's request was his partial translation of *The Ruling Regarding Killing Oneself to Protect Information*. App.0453. Sadequee told Mehanna that *Tibyan* (not al Qa'ida) wanted to translate items, and asked Mehanna if he would be willing to translate books. App.0715. And once again, he translated a portion, which includes discussion of ancient religious texts. *See* App.0453, 745-1746.

Even if accepted, the government's hearsay evidence tended to show, first, that Tibyan could not be equated to al Qa'ida, and second, that Mehanna was *not* directed or controlled. On the first point, if Tsouli's IM is taken as true, then al Qa'ida found it necessary to communicate a request to Tsouli, in order to reach Tibyan, and to request help, rather than directing subordinates to carry out tasks. That means that Tibyan was not itself the mouthpiece of al Qa'ida, and a request to Mehanna was not the direction or control of an FTO merely because it came via

13

the website.  As the government's witness said, "[m]ost of the materials that they [Tibyan] were translating were coming from one or two websites that were *like the clearinghouses for all sorts of literature* either coming directly from people who were affiliated with al Qa'ida *or idealogs [] who supported the ideology of al Qa'ida*."  App.1574 (emphasis added).

Second, the evidence showed the opposite of direction or control: Mehanna did not translate or edit per Tsouli's IM to another, nor Muraabit's email to him. He independently translated what *he* wanted to translate.  Centrally, this was *39 Ways*.  No one requested, controlled, or directed this translation; the work was selected by Mehanna precisely as a kind of personal manifesto.  *See* App.1685 (government witness's agreeing that *39 Ways* "was a book designed to show Muslims who were not going to go fight on a battlefield how, nonetheless, they could fulfill their obligations as a Muslim."); App.1462 (*39 Ways* is rooted in the Qur'an).  Translating it was the archetype of personal political and religious expression.

*39 Ways*, App.0244, was a document greatly mischaracterized by the government at trial and in its brief.  *39 Ways* is "religious rhetoric" that incorporates verses and other authorities regarding Islamic jurisprudence accepted

14

by many mainstream Muslims.  App.1837, 1838.[11]   It contains "at least 40 verses of the Qur'an" and "42 Hadiths of the prophet," religious texts that "any reasonably literate Muslim would have come across in his or her religious education."  App.1837; *see also* Brief of Amici Curiae Scholars, Publishers, and Translators in the Fields of Islam and the Middle East in Support of Defendant-Appellant and Reversal ("Scholars' Brief") at 19-20 (noting that the popular website www.onislam.net/english often debates precisely the questions discussed in *39 Ways*). The government concludes that it "equates" jihad with terrorism, but context shows exactly the opposite, as the Scholars' Amicus Brief lays out in some detail.  Scholars' Brief at 18-23.

The record showed the same utter absence of direction, control, or direct interaction as to the second pillar of the government's case, Mehanna's translation of the *Umar Hadid* video. The government suggests the video was not publicly available in October 2005, when Mehanna obtained a copy.  Gov't.Br. 69, n.34; App.0717.  But there was no proof of its source, and the issue was academic.  No one asked Mehanna to translate it; he did so on his own initiative four months later,

---

[11] Although he never did so, Mehanna *could* have provided *39 Ways* directly to an FTO, because "religious materials" by definition are not "material support or resources." 18 U.S.C. §2339A(b)(1). The government has not seriously contested Mehanna's argument, Opening Br. 13-15, 41, that *39 Ways* is protected religious material under the statute.

when it was widely available.[12]  There was no evidence that al Qa'ida approved of the translation, nor even that al Qa'ida was ever aware that the translation existed.

The *absence* of government evidence is itself powerful evidence—of Mehanna's independence.  Mehanna worked in the Sudbury bedroom of his parents' home.  He had no way, other than electronic, to receive direction or control from abroad, nor to provide writings to an FTO.  The government had comprehensive knowledge of his electronic communications: years of Mehanna's IM, and computer records, App.1447, 1448, 1452 (describing August 2006 and October 2009 computer searches).  As this appeal has shown, it is quick to point to every scrap of electronic chitter-chatter it can find in that vast record.  *See, e.g.,* App.1043, 1099, 1106, 1177, 1184, 1222.  It offered the jury more than a thousand exhibits, and not one showed a contact between the young man in the bedroom and a foreign terrorist organization.[13]

---

[12] The independent speaker sometimes has later regrets, as Mehanna did for his work on this video.  He later calling his translation work a "wasted . . . week of my life," App.0485, and regretted its appeal to those who were insufficiently pious. *See infra* at 27 n.22.

[13] The government claims that an Egyptian perfume seller whom Mehanna met in Yemen "had an Al-Qa'ida connection."  Gov't.Br. 47-48.  The evidence demonstrated none.  Pippin testified that the perfume seller was affiliated with Jama'at al-Islamiyah, "an Egyptian group in the '70s and '80s." App.1599.  When led by the government, he agreed that Jama'at al-Islamiyah "*kind of* combined with al Qa'ida…after al Qa'ida came into being."  *Id.* (emphasis added).  There was no evidence whether the perfume seller affiliated with this "kind of" combination decades later.  Expert testimony showed that the group did not combine with al

16

The point of the government's belated identification of 37 "co-conspirators" was to try to go around this hole in the evidence: to induce the jury to convict Mehanna for his deeply unpopular views, and for associating with persons whom, through hearsay, it would argue supported al Qa'ida. Its articulations are artful: "Mehanna was pleased to contribute to [al Qa'ida]'s propaganda effort." Gov't.Br. 25. The same would be said for any independent advocate. Again: "Around the same time that At-Tibyan began translating Al-Qa'ida's propaganda at Al-Qai'da's behest, Mehanna became influential at At-Tibyan," Gov't.Br. 22. In other words, says the government, he is guilty by association.

### 2.     Abuse of the Law of Conspiracy.

    *a.    Abuse of the Co-Conspirator Exception.* Before turning to special rules applicable to conspiracy cases involving political speech, review shows that the government's approach to forging the necessary link violated basic rules of conspiracy law. The Court may begin, at a granular level, with the co-conspirator exception to the hearsay rule; it was through this exception that the government sought to use the 37 belated "co-conspirators" to establish the necessary link between Mehanna's translation activities and al Qa'ida.

---

Qa'ida at all, Dkt.417, 79:22-24, and to the contrary signed a peace treaty with the Egyptian government that "continue[s] to the present." Dkt.417, 79:22-80:1. Pippen met a teacher at a Yemini school in 1998. Evidently the perfume seller was a relative. App.1568, 1584.

Before out-of-court statements may be introduced for truth through this exception, there must be a conspiracy in the first place. If the proof of conspiracy is the co-conspirator's out-of-court statement itself, the prosecution becomes circular and unreliable. At common law, juries were charged that they must find the existence of the conspiracy by *independent* evidence. *United States v. Petrozziello*, 548 F.2d 20, 22 (1st Cir. 1977).[14] When rules amendments shifted that responsibility to trial judges, this Court made clear the need for findings, derived from evidence independent of co-conspirator statements, showing that a conspiracy existed. *Id.* at 22-24. The government must introduce "*extrinsic proof* of the declarant's involvement in the conspiracy." *United States v. Sepulveda,* 15 F.3d 1161, 1182 (1st Cir. 1993) (emphasis added).

The extrinsic proof was absent. There was no *admissible* extrinsic evidence of a conspiracy including Tsouli and Mehanna, or Mughal and Mehanna to provide translations to al Qa'ida. The government's only offer of "extrinsic evidence" was the testimony of Evan Kohlmann.[15] But the question whether A entered into an

---

[14] *Petrozziello's* facts illustrate the sort of extrinsic facts the Court had in mind. The conspirators, charged with conspiracy to distribute heroin, had traveled together by car to the scene. The defendant watched as the co-conspirator left to complete the transaction, tried to escape as soon as agents approached, and had heroin on his person when arrested. *Id.* at 23-24.

[15] The defense vigorously objected to all aspects of Kohlmann's testimony. App.0130, 0131.

agreement with B with an unlawful purpose is not the kind of "scientific" or "technical" question suitable for an expert opinion under Federal Rule of Evidence 702. "Testimony that particular persons were members of the conspiracy [is] not an appropriate subject for expert testimony." *United States v. Casas*, 356 F.3d 104, 120 (1st Cir. 2004) (holding inadmissible a government agent's testimony, offered without direct personal knowledge, as to the role of certain individuals in a drug-related conspiracy). Testimony of this kind has been condemned by this Circuit. *United States v. Flores-de-Jesús*, 569 F.3d 8, 26-27 (1st Cir. 2009) (holding improper testimony gathered by expert witness as to defendants' roles in the alleged conspiracy). Admission of Kohlmann's testimony to establish membership in a conspiracy was a plainly erroneous evidentiary ruling. *Casas*, 356 F.3d at 113.[16]

Stripped of its "expert" filigree, Kohlmann's "linkage" testimony was simply a recitation of out-of-court statements made by third parties—the very thing held insufficient by *Sepulvada*. Kohlmann testified that:

- al Qa'ida contacted Tibyan for translation help, App.1786;

---

[16] In *Casas*, this Court vacated a conspiracy conviction because an expert was permitted to opine that the defendant was a conspirator. Although three other witnesses gave at least some corroborative evidence, "[w]e cannot say that it is highly probable that the jury would have convicted Cunningham in the absence of [Agent] Stoothoff's improper testimony." 356 F.3d at 124.

19

- App.0705 showed Younis Tsouli's being "contacted by the media wing in al Qa'ida in Iraq, who . . . asked him to forward on a request to Tibyan Publications, who he was also working with," App.1786;

- "al Qa'ida's representatives were actually posting messages hailing his work online, were posting messages saying, Thank you so much for all your contributions. We really appreciate it." *Id.*

This testimony was the lynch-pin of the "coordination" theory. The government was permitted to leverage Kohlmann not as an expert describing the way al Qa'ida operates online, but rather as a fact witness to try to establish who conspired with whom. The government offered no other extrinsic evidence to establish a conspiracy between Mehanna and any person to provide any service to al Qa'ida.

   *b. The Variance Problem.* The problem was not merely evidentiary. Even where the government's evidence is admissible, *United States v. Dellosantos*, 649 F.3d 109 (1st Cir. 2011), teaches that the government must prove a discrete conspiracy and establish that the defendant and the speaker were part of it. The prosecution cannot jumble together multiple conspiracies into a single conspiracy—even closely-related conspiracies involving many of the same people—and convict the defendant based on "'mere association with other conspirators or mere presence at the scene of the conspiratorial deeds.'" *Id.* at 115 (quoting *United States v. Zafiro*, 945 F.2d 881, 888 (7th Cir. 1991)); *Kotteakos v.*

20

*United States*, 328 U.S. 750, 772 (1946) ("Guilt with us remains individual and personal. . . . It is not a matter of mass application.").[17]  Otherwise, the danger of spillover is too great: that the defendant will be convicted not for his participation in a criminal conspiracy, but for his protected associations with others who may have done so.  *United States v. Drougas*, 748 F.2d 8, 18 (1st Cir. 1984) ("the court must take care that evidence against one [alleged co-conspirator] is not misinterpreted by the jury and used as the basis for convicting another [alleged co-conspirator] not connected to that evidence"); *United States v. Flaherty*, 668 F.2d 566, 582 (1st Cir. 1981) ("If the Government proves more conspiracies than the one charged in the indictment, a defendant involved in one conspiracy may not be convicted on the basis of evidence that relates only to a separate conspiracy.").

Spillover happened here.  The government introduced evidence of discrete conspiracies in which Mehanna did not participate (involving Pakistan and Abusamra's trip to Iraq). Opening Br. 31-32.  It put in evidence about potential domestic terrorist attacks, none of which was alleged or charged in the indictment, and omits from its brief the fact that government witnesses either said Mehanna did

---

[17] Through the large conspiracy charge, "the prosecution secures several familiar advantages … [including] much more potent use of the co-conspirator exception to the hearsay rule."  *United States. v. Jones*, 674 F.3d 88, 91 and n.1 (1st Cir. 2012); *United States v. García–Torres*, 280 F.3d 1, 6 (1st Cir. 2002) (reversing conspiracy conviction); *United States v. Franco-Santiago*, 681 F.3d 1, 9-12 (2012) (reversing  conviction under the Hobbs Act for being a member of an ongoing conspiracy to commit a series of robberies, where defendant participated in one robbery).

21

not speak in favor of it, or that he actively opposed it. Opening Br. 31. The government suggests that Mehanna conspired to join Maldonado in fighting in Somalia, Gov't.Br. 26-27, when Maldonado testified that Mehanna actively dissuaded him from going to fight in Somalia, and indicated no inclination of his own to do so. App.1640. What really happened below is that the jury was permitted to convict Mehanna for his associations with persons who engaged in or discussed activity that he disagreed with.

The government went far beyond these discrete conspiracies, however, when the trial court permitted it to bring in the rogue's gallery of 37 unindicted co-conspirators. This exceeded permissible discretion for two reasons. As already shown, the "steno pool" idea was the government's only way to try to establish the necessary link between Mehanna and al Qa'ida, is nowhere in the indictment, and was based on hearsay. And second, the huge volume of alleged co-conspirators were brought in not to establish any link at all, but simply to sour the jury on Mehanna by placing before it the rants of jihadis with whom Mehanna never communicated. The prejudicial consequences of permitting that variance are discussed below at 35-39.

The prejudice was enormous and obvious, and the subject of lengthy motions and arguments. This appeal does not ask the Court to second-guess an "on-the-spot judgment," *see Freeman v. Package Mach. Co.,* 865 F.2d 1331, 1340

(1st Cir. 1988), or "battlefield determination," *see United States v. Shinderman,* 515 F.3d 5, 17 (1st Cir. 2008), made at half past two on a given day of trial. *United States v. Bunchan (I)*, 580 F.3d 66, 71 (1st Cir. 2009). Here the issue of the variance was so large, so regularly raised and challenged, and represented such a discrete bulk of witnesses and evidence that the trial court had ample time to consider it, and the appellate record does afford the Court a clear "coign of vantage,' *Shinderman,* 515 F.3d at 17, from which it is clear that a significant error was made.

                   *c.*    *Conspiracy Law in the First Amendment context.* The conspiracy-law problems outlined above became acute at trial because the alleged object of the charged conspiracy was not narcotics sales or robbery, but political and religious speech. Thus the use of out-of-court statements to try to prove the conspiracy itself did not simply violate *Dellosantos* and *Petrozziello*, it worked precisely the "metasta[sis]" this Court warned against in *United States v. Spock*, 416 F.2d 165, 173 (1st Cir. 1969). The government's theory amounted to one of Mehanna's "presence at the scene of the conspiratorial deeds," *i.e.,* the Tibyan website, *Dellosantos*, 649 F.3d at 115, and his "mere association with other conspirators," *i.e.*, others who communicated via the website, *id.*, or as shown above, others who advocated activities that he disagreed with. This theory violated his right to associate, which the First Amendment has always protected. *HLP,* 130

23

S.Ct. at 2730 ("the statute does not penalize mere association with a foreign terrorist organization"); *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 908-09 (1982).

The Scholars' Brief shows how untenable the guilt-by-association theory was in this Internet-age case. Mehanna viewed, posted, and commented on a website along with many others. Many of them argued with each other, and some who were active on the site claimed to be in contact with al Qa'ida. Mehanna was ultimately kicked off the site. App.1590. In 2010, while the government was indicting Mehanna in this courthouse for translating a video and a religious work, across the river Harvard University Press was publishing "Al Qaeda in its Own Words." Scholar's Brief at 8. It was not just Harvard. *Amici* identified twenty-one examples of scholarly works containing translations of the writings of various national enemies and/or al Qa'ida leaders, including the publication of a "technical, crime-facilitating training manual" (no such document appears in the trial record of this case); a Princeton University compendium of translations from the Blind Sheikh, Osama bin Laden, and others; and the 2007 *Al Qaeda Reader*. *Id*. at 6-9.

This sort of material Mehanna viewed, translated, and disseminated is available to anyone with an Internet connection. The Scholars' Brief identified six websites that regularly post such translations, among them www.memri.org,

sponsored by a §501(c)(3) charitable organization, and www.ctc.usma.edu, *hosted by the United States Military Academy. Id.* at 9-11.

With study of these materials widespread, prosecutors try to distinguish between translators based on point of view. For example, the government asserts repeatedly that Mehanna sought to "recruit" others. Gov't.Br. 19-20. The question was—recruit to *what?* Every advocate seeks to recruit others to his point of view, and Mehanna was undoubtedly an evangelist. He was animated by a particular sense of religious obligation to *da'wah*, that is, the "issuance of a summons" to understand Islam through a dialectical process—as one witness explained, the "process of inviting others to Islam and teaching Muslims how to be better Muslims." App.1836. He sought "to build a wall of honor for Islam" by "show[ing] examples of how Islam is superior to kufr [disbelief]." App.1081. There was no evidence that he was recruiting personnel for al Qa'ida, as the statute requires. Indeed, the government has abandoned any theory that his translation activities were a conspiracy to provide "personnel" within the statute. Gov't.Br 67 n.31.

The government dwells on excerpts about "brainwashing," Gov't.Br. 19-20, but the full text makes clear that the word is tongue-in-cheek, and Mehanna's goal was to proselytize for Islam, not al Qa'ida. For example, in one exhibit, a friend asks, "so how is the dawah up there/any public movements?" App.1125.

25

Mehanna notes that it is not going well ("there a total of like 3/bros up here"), and the friends says, "if you have 3 hardcore bros/ then ur set." *Id.* Mehanna asks, "set to do what … specifically?" The friend replies, "a weekly dawah table/call people to tawheed[18]/EZ/table/books/posters/3 bros/for 2 hrs." App.1126.

Mehanna was *indeed* a recruiter, but he was recruiting for God—or at any rate, his view of God. He "h[e]ld halaqahs" [study circles] with local youth, studying the Qur'an, fundamentals of Islam, and "a short biography of one of the *Salaf*." App.1201.[19] He "h[e]ld talks here and there about the basics of Islam, to which the MSA invites non-Muslim students and faculty to come and listen," *id.*, and was "a regular khatib [person who delivers sermon] at the local universities and mosques." *Id.* He invited a friend to come to "the Da'wah Center" because "I'm going over the sciences of the Qur'an[.]" App.1110. When Abubakr asked if "it is unwise to give a khutbah [sermon] on al-wala wal bara," Mehanna replied, "No…of course not…in fact, it is a propriety to do so…be smart in what you say but, say the truth." [20] App.1079. He discussed religious texts, App.1078,

---

[18] "Tawheed" is the Islamic doctrine of monotheism.

[19] Exhibit 778A goes on at great length about the course of study for the halaqah study circles, and speaks of opportunities to "combat some misguidance that is prevalent here." App.1201.

[20] The government tries to build its criminal conspiracy out of religious debate, and the mundane. It argues that "Mehanna [r]adicalize[d]," Gov't.Br. 7, citing Mehanna's discussion about a hadith. App.1130. It argues that Mehanna's observance of *wala wa'l-bara*, which it translates as "loyalty and enmity" is

App.1129, and religious obligations with friends, App.1158, 0745, 1227, and he translated religious works. App.0453, 0718, 0728, 0766, 0768, 1353.

Mehanna said that he hoped his translation of *39 Ways* "makes an impact," App.0963. So does any translator.[21] He lamented that his work on the *Umar Hadid* project was a "wasted [] week of [his] life" because viewers sought entertainment ("Coming Soon!/ Just Released!"); rather than enlightenment, and were therefore "bedroom mujahidin." App.0500.[22] One can differ with the

---

evidence that his "'creed'… required enmity towards 'non-believers.'" Gov't.Br. 8. "*Wala wa'l bara*" is a religious doctrine, rooted in the Qur'an, *see, e.g., Q.* 3:28, 3:118, 60:1, concerning the extent to which a Muslim should associate with other Muslims and disassociate with non-Muslims. The government finds dark significance in Ex. 597, which, it says, recommends terrorism. Gov't.Br. 8 n.3, App.1035. The exhibit is an IM between Mehanna and Abousamra. Abousamra spoke of the negative consequences of renouncing his citizenship, including not being able to see his child. Mehanna replied, "u might be sent on a khidmah." App.1040. In Arabic, "khidmah" means "duty," not terrorism. *See, id.*

[21] A translator brings a work to those who could not access it before: an exercise that, by definition, seeks an impact. William Tyndale, who translated the Bible from Latin into English, also hoped for an impact—and reportedly said to a "learned man," "the boy that driveth the plough, shall know more of the scripture than thou dost!" DAVID DANIEL, WILLIAM TYNDALE, A BIOGRAPHY 79 (1994).

[22] The "bedroom mujahidin" comment appears during a *five-hour* chat session between Mehanna and his fiancée. App.0485-0502. They discuss a car accident, Mehanna's pharmacy rotations, whether he will earn enough to support the couple, the virtues of mothers, corruption in Saudi Arabia, and their hope to live in a Muslim country. They speak about sin and forgiveness. Mehanna begins to describe how video culture is inconsistent with the duty to "go for dawah." (not "go for jihad.") With evident sarcasm, he then contrasts "bedroom mujahidin," *i.e.,* those who prefer videos to Islamic virtues, such as fasting and prayer (App.0500), with those who seek self-improvement and closeness to God. *Id.* Mehanna says, "I used to be in that mindset" (*i.e.,* excitement over the combat

27

propositions of Mehanna's faith; a religious scholar might debate whether his approach is true to Islam. What is clear from the record is that his "recruiting" was to a religious point of view, not for finding personnel for, or providing service to an FTO.

In short, the government based the bulk of its case in a high-profile criminal prosecution entirely on a point of view. Its presentation was calculated to inflame a jury.[23] In light of this problem in the proof, the government's glancing treatment of *Brandenburg* is remarkable. Gov't.Br. 65 n.29. There is not one First Amendment for citizens charged under the material support statutes and another for the rest of us. The same Constitutional amendment applies equally to all governmental action and all criminal statutes. *Brandenburg*'s imminence standard remains the law. 395 U.S. at 447-48.[24] The government's argument is that

---

scenes in videos), [but] after doing *Umar Hadid/* I realized that I'd just wasted a week of my life," explaining, "if someone is going to *go for dawah* b/c of a nashid [song], or a video/then they can always come back [*i.e.*, from da'wah] b/c of something as easy as a nashid or a video/u have to go out of submission to Allah/Allahu A'lam/I just feel, as u said/ppl take watching these vids as ibadah/so, they're basically bedroom mujahidin." App.0499-0500 (emphasis added).

[23] First Amendment cases generally arise where the speech disturbs the general view. That speech can be revolting, as say, the reptilian speech of the Westboro "Baptists" denouncing a fallen veteran at his own funeral, *see Snyder v. Phelps*, 131 S.Ct. 1207 (2011), and the loathsome depictions of crushed animals in *United States v. Stevens*, 130 S.Ct. 1577 (2010).

[24] *HLP* did not overrule or undermine *Brandenburg sub silentio*; the imminence standard simply was not at issue. *See* 130 S.Ct. at 2733 (Breyer, J., dissenting) ("No one contends that the plaintiffs' [teaching and political advocacy]

28

Mehanna hoped his translations would inspire others to fight U.S. soldiers. Even if, *arguendo*, his speech had demonstrated that aspiration, *Brandenburg* would squarely protect it, because no one suggests that Mehanna's speech reached *Brandenburg*'s imminence threshold. *See* Opening Br. 37-40, 46.

The government's real message at trial, and the drumbeat of its brief, is the content of Mehanna's message. Because the message of the speech translated was hypothetically welcome to the FTO (in fact, there is no evidence the FTO was ever aware of it), the government argued to the jury that it was material support of the FTO. App.1954. But this argument cannot withstand any sort of First Amendment scrutiny. *HLP* expressly protects independent advocacy, 130 S.Ct. at 2722, and the advocate's speech is always a "benefit" to the subject of its advocacy, in that sense. Whether he is dependent or independent, the advocate, by definition, intends that his speech will promote the subject for which he advocates. The government never showed that Mehanna's speech was more than that.

---

speech to these organizations can be prohibited as incitement under *Brandenburg*."). Courts continue to cite and apply *Brandenburg*. *See, e.g., Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653, 2670 (2011) ("Absent circumstances far from those presented here, the fear that speech might persuade provides no lawful basis for quieting it.") (citing *Brandenburg*); *United States v. El-Mezain*, 664 F.3d 467, 536-37 (5th Cir. 2011); *United States v. Bagdasarian*, 652 F.3d 1113, 1115 n.9 (9th Cir. 2011) ("urging others to commit violent acts 'at some indefinite future time' does not satisfy the imminence requirement for incitement under the First Amendment").

A/75511824.1

### 3.    The Government's Legally Impossible Theories of Material Support

a.    *Section 956*.  Legal impossibility in one of the potential objects to support a general conspiracy verdict is also grounds for reversal.  *United States v. Boots*, 80 F.3d 580, 589 (1st Cir. 1996), *overruled on other grounds*; *Pasquantino v. United States*, 544 U.S. 349, 354-55 (2005).[25]    Addressing the §956 impossibility argument, the government sidesteps the text of §2339A, and the impossibility it creates for the use, *in this case*, of §956 as an object crime.  To make out a conspiracy case under §2339A, as charged in Counts II and III, the government had to prove that Mehanna conspired with another ("2339A Conspiracy") to furnish "material support or resources," knowing or intending that they would be used in the commission of an object crime.  "Material support or resources" do not include moral support or conversation.  It must be the object of

---

[25] In *Boots,* the government brought mail and wire fraud charges.  One of its conspiracy theories was that cross-border smugglers were fraudulently depriving Canada of tax revenue.  80 F.3d at 585.  This Court determined that that theory, even if true, was outside the statute itself.  *Id.* at 586.  Although two other theories properly stated an illegal purpose, and the jury convicted for the relevant underlying crimes, the Court could not assume that the conspiracy conviction was not based on legal impossibility.  *Id.* at 589.  Relying on *Yates,* this Court reversed and remanded.  *Id.*

The Supreme Court later held in *Pasquantino* that this species of mail fraud *is* covered by the statute, 544 U.S. at 354-55, but the proposition that a reviewing court must reverse a conspiracy conviction on a general verdict, where one of the possible objects was legally impossible, remains the law.  *See United States v. Bailey*, 405 F.3d 102, 109-10 (1st Cir. 2005).

A/75511824.1

the 2339A Conspiracy that these "material support or resources" be provided to a third party. The heading of §2339A ("Providing material support *to terrorists*") (emphasis added) and language of the of the statute (using the verb, "provide") make this clear. And it must be contemplated that the material support and resources provided are "to be used" in carrying out the object crime. 18 U.S.C. §2339A(a).

Section 2339A identifies many object crimes, and few of them require a further conspiracy. The problem is that the object crime here requires a domestic conspiracy. For §956 to furnish the object crime, the conspirators in the 2339A Conspiracy must agree to furnish material support or resources to another, knowing and intending that those specific resources will be used by that third party in a *domestic* conspiracy ("956 Conspiracy ").

Such a thing might occur in other cases, but was legally impossible under the theory of the indictment and at trial, because the government contended that the 2339A Conspiracy's purpose was to furnish "material support or resources"—in the form of as "personnel"—*to terrorists they allegedly hoped to find in Yemen.* App.1928 ("This trip was an attempt to provide support to foreign terrorists by providing themselves as personnel to fight American forces in Iraq."); App.1954 ("There should be no doubt as to what the truth is about why the defendant went there…That's provision—or attempt to provide material support to terrorists.")

31

In this Court the government pivots, contending that "Mehanna conspired to provide support *to Abousamra and Abuzahra*, who conspired in the United States…" Gov't.Br. 50 (emphasis added). This was not its theory at trial: Counts II and III charge that Mehanna and Abousamra conspired under §2339A, and Count IV makes clear that this is the same conspiracy that supports the direct charge under §956. The government did not point to "material support or resources," as defined by statute, that Mehanna provided (or conspired to provide in the 2339A Conspiracy) to Abousamra and Abuzahra, knowing and intending that Abousamra and Abuzahra would use those resources in the 956 Conspiracy. The government offered no proof that Mehanna furnished money, or weapons, or personnel to the other two conspirators to enable their further domestic conspiracy.

*United States v. Hassoun*, 476 F.3d 1181 (11th Cir. 2007), and *United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011), are the only authorities the government cites for its reading. *Hassoun* deals with the pleading stage, and whether the government could conceivably make out either charge under the different facts of that case. *Jayyousi* reviewed the verdict in the same case. The court did not address the impossibility problem (whether because it was not raised, or because the facts may have shown material support provided to others, who then conspired in the United States to use that support abroad, is unclear from the opinion). The court considered and rejected the argument that §956 requires a

showing that defendants personally committed violent acts, 657 F.3d at 1105, but it does not appear that the defense raised, or that the court considered, the requirement in the §956 object crime that there be proof of a domestic conspiracy that is at least contemplated to make use of the material support. The decision provides no analysis of how the §956 requirement of a domestic conspiracy was met.

        *b.*     *Section 2332*. The government contends that the §2332(d) "certification requirement applies only to a 'prosecution for any offense described in this section,' *i.e.*, a prosecution under Section 2332 itself." Gov't.Br. 52. Section 2332(d)'s plain text belies that premise.[26] Even if that premise is granted, however, the §2332 predicate offense must at least be *certifiable* in order to support a conviction under §2339A.

---

[26] As the government implicitly concedes, "described in this section" is not synonymous with "under this section." Gov't.Br. 52. Counts II and III, although brought *under* Section 2339A, were predicated on an offense *described* in Section 2332. *See* Second Superseding Indictment, App.0011, 0019; Gov't.Br. 49 ("the evidence proved that Mehanna violated Section 2332(b)"). On its face, the certification requirement applied to Counts II and III. The cases cited by the government, concerning prosecutions brought under Section 2332 but not 2339A, did not address this issue and do not counsel otherwise. *See United States v. Siddiqui*, 699 F.3d 690, 696 (2d Cir. 2012); *United States v. Yousef*, 327 F.3d 56, 83-85 (2d Cir. 2003).

A/75511824.1

But the prosecution never offered evidence that there was a certifiable crime. The evidence in the case showed a "feckless" trip that fell apart at inception.[27] There was no violence to any American in view, other than the most speculative and removed view, a proposition illustrated by what actually happened, which is that Mehanna, meeting with no resistance at all, came home of his own accord. Absent a certifiable offense, there could be no unlawful conspiracy. Absent either a certification or evidence of the crime's being certifiable, conviction was a legal impossibility, and the jury's general verdict must be reversed as to Counts II and III.[28]

_____

[27] In this "conspiracy" by a young Mehanna, hiding from parents, flying off to Abu Dhabi, and then flying home again, there was always the whiff of the grand "conspiracy" hatched by Tom Sawyer's Gang, which ended at supper time, when the boys went home. *See* MARK TWAIN, THE ADVENTURES OF HUCKLEBERRY FINN (1885) 8-15. Abuzahra received his email; Little Tommy Barnes, "cried and said he wanted to go home to his ma, and didn't want to be a robber no more," *compare id.* at 11 *with* App.1717. The enterprise was so feckless, as the trial judge put it, App.1973, that for years the government did not arrest Mehanna. The record cannot support a presumption, even if a presumption were legally permissible, that the crime was "certifiable."

[28] The government argues that the verdicts on Count VII (finding false Mehanna's statement that he went to Yemen to investigate schools) and Count IV (establishing that Mehanna participated in a domestic conspiracy to kill abroad), proves the jury must have found sufficient facts to ground conspiracy convictions on the Yemen conduct alone. Gov't.Br. 36. The Count VII finding is sufficient only to prove that Mehanna did not investigate schools, not what he did intend to do. Like the Count IV verdict, it was the product of all of the conspiracy and trial errors discussed elsewhere in the brief. Where a conspiracy was tried in such a way that the jury may have relied on constitutionally protected conduct, the Court will not affirm based on speculation that other indicators show an unprotected

**C.     Other Problems at Trial Warrant Reversal**

**1.     Inflammatory Material So Prejudiced the Trial that the Convictions on All Counts Must Be Reversed**

The trial of this case reprised *United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008), and the government's efforts to distinguish the case are puzzling.  The government says that the trial judge in *Al Moayad* failed to balance probative value against prejudice.  That is incorrect: "[T]he record reflects that the district court did consider the balance between [Black's testimony's] probative value and probable prejudicial effect before allowing Black to take the stand.  However, we must conclude that, given the highly charged and emotional nature of the testimony and its minimal evidentiary value, the court's decision was arbitrary." *Id*. at 161.  The government notes that *Al-Moayad* involved the irrelevant introduction of bin Laden into the proceedings.  Gov't.Br. 85.  So did the prosecution below.  In *Al-Moayad*, the government's "presentation of images of Bin Laden and Al-Zawahiri, was highly inflammatory and irrelevant." *Id.*  So too below.  As in *Al-Moayad*, defendant offered to stipulate to his understanding of the FTO's tactics, which "significantly diminished" any probative value of the testimony.  545 F.3d at 160.  This was not a case about an interstate prostitution ring where the jury heard a few minutes of testimony about a pimp's assault of a prostitute, see *United States v.*

---

route to the verdict.  *Boots*, 8 F.3d at 589 (striking conspiracy conviction even where convictions for potential object crimes were sustained).

*Tavares*, 705 F.3d 4, 16 (1st Cir. 2013), or even saw the equivalent of "nightly news dispatches from Baghdad,'" *see United States v. Abu-Jihaad*, 630 F.3d 102, 133 (2d Cir. 2010). This was a case of "extraordinarily compelling circumstances." *Tavares*, 705 F.3d at 16.

Rule 403 requires a weighing of each pan in the balance: probative value and danger of unfair prejudice. The government dwells on the first pan, relying on cases where the evidence had significant probative value. *United States v. Hammoud*, 381 F.3d 316, 341-42 (4th Cir. 2004), upheld the introduction of violent Hizballah videos because, although the tapes provided some evidence of motive, critically, the defendant's knowledge of Hizballah's unlawful activities was in dispute, and defendant contended that he sympathized only with Hizballah's humanitarian goals. In *United States v. El-Mezain*, 664 F.3d 467, 511 (5th Cir. 2011), evidence was offered to "rebut the defendants' denial that they supported Hamas" and "demonstrate[] the defendants' knowledge of Hamas and support for it." *United States v. Mubayyid*, 658 F.3d 35, 56 (1st Cir. 2011) involved a dispute about the purpose of an organization; evidence of the defendant's beliefs were material to that understanding. And of course, instructional materials showing how to carry out a crime and a video depicting a similar crime had "significant probative value" in *linking* the defendants to a crime with the thumbprint of the instruction. *United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998).

This case was dramatically different. There was no operation instructed in a video, nor contention that the defendant did not understand al Qa'ida's nature.[29] At trial, Mehanna's counsel offered that he could "virtually stipulate to the defendant's state of mind." App.1646. The evidence here shed no direct light on the purpose of the Yemen visit, nor on whether there was logistical control. In the main, the speech occurred after Mehanna had voluntarily removed himself from Yemen. It was offered only to show Mehanna's sympathies—which the government described as "the key issue in the case." Gov't.Br. 77-78. No amount of evidence of intent could make it more or less likely that that logistical evidence existed.

The government largely ignores the other pan. But it weighed heavily. The prejudice was massive. The *State of the Ummah* video features bin Laden speeches. App.0786, 0787. There was extensive evidence about this video, including App.0557, 0988-0990, 1105, 1666-1667, 1727, 1792-1793. Yet Agent Khoury admitted that Mehanna did not edit, translate or sub-title it; he simply watched and discussed it. App.1516. There was no suggestion that al Qa'ida sent it to him, or that he communicated with al Qa'ida about it. *Id.* The jury saw an Al Jazeera interview with bin Laden, which Mehanna had obtained from public

---

[29] Also distinguishable is *United States v. Abu-Jihaad*, 630 F.3d 102, 133 (2d Cir. 2010), where the defendant "concede[d] the relevancy of [website] materials to an understanding of Azzam's operations and to his own *mens rea*."

sources and had at home, a video of bin Laden eulogizing Zarqawi, which was on Mehanna's computer in 2006, and images from the cover of a book entitled *Messages to the World – The Statements of Osama bin Laden*, which Mehanna described reading in the Harvard Coop.  App.0199, 0332, 1084, 1194.

The jury saw a translation of a portion of a Zawahiri writing entitled, *Loyalty and Enmity, An Inherited Doctrine in a Lost Reality*, which Mehanna possessed. App.0241. There was no evidence he worked on it, or obtained it from an unlawful source.  The same was true of video excerpts showing a speech by Zawahiri, which were on Mehanna's computer in 2006.  App.0330, 0331. The jury saw photos of deceased Zarqawi, videos containing eulogies for Zarqawi, and a video containing a speech by Zarqawi.  App.0311, 0312, 0313, 0365, 0369.  None of this material established any link between Mehanna's activities and al Qa'ida.  Two FBI agents discussed a translation of the *Wa Yakoon* video, which contained quotations from Zarqawi relating to killing U.S. soldiers.  App.0310, 1204, 1517.  There is no evidence that Mehanna edited *Wa Yakoon*, translated it, [30] disseminated a translation, or received it from an FTO.  Yet another video, *Juthath*, was introduced, App.0325, 0326, and yet another FBI agent testified, this time explaining how the video shows remains of U.S. soldiers while Zarqawi gives a speech discussing, among other activities, the death of American businessman

---

[30] The translation used British usage and spelling.  App.1816.

Nick Berg, whom Zarqawi had beheaded. App.1695-1696. There was no evidence that Mehanna edited, produced, or translated the video. The parade continued throughout weeks of trial. None of this evidence was even remotely relevant to anything but Mehanna's political and religious point of view. This, like *Al-Moayad* before it, was that rare case where the trial judge's balancing of slim or no probative value against the danger of massive prejudice was an abuse of his discretion, warranting reversal.

### 2.     The Court's "Coordination" Instructions Were Erroneous.

The government's argument about the sufficiency of the jury instructions turns, in part, on the parties' differing positions as to the standard required for provision of a "service" under the material support statutes. Gov't.Br. 72. The government's reading is incorrect, *see supra* at 4-8, and the court's jury instructions legally erroneous. If, *arguendo,* there was enough to go to a jury on "coordination," the trial court's failure to define "coordination" amounted to a green light that the jury find coordination in shared point of view and in website activity. Opening Br. 50-51. The government's argument that the jury needed no guidance on how to understand and apply the "coordination" concept, Gov't.Br. 74, ignores *HLP*'s acknowledgement that "coordination" left open "difficult questions" of "degree" that the Court declined to resolve on a pre-enforcement challenge—and that would need to be resolved in a case like this. 130 S.Ct. at

39

2722.   The government makes no cogent argument why, absent a correct instruction as to the logistical requirements for coordination, its direction that the jury not consider the First Amendment was not prejudicial.  Gov't.Br. 75.  That instruction was particularly harmful in light of the volume of prejudicial evidence from the unindicted co-conspirators that was admitted, as discussed above.

### 3.   The Court Erred In Excluding Mehanna's Expert Rebuttal Witnesses.

The government argues the exclusion of the Stephen Durlauf and Brian Williams testimony was within the trial court's discretion, and harmless.  Gov't.Br. 91.  Each expert was called specifically to rebut testimony by Evan Kohlmann regarding the importance of videos to al Qa'ida's recruiting efforts.  App.1776, 1780.  We have shown above how critical a witness Kohlmann was; Durlauf and Williams would have testified that his testimony lacked proper basis and was presented as anecdotal observation and opinion, not on the basis of scientific or verifiable analysis.  App.1822, 1845.  The government points out that Kohlmann's testimony was not based on "strict 'experimental science' standards,"  Gov't.Br. 88-89, but that was the point Mehanna was entitled to call witnesses to make, particularly when the government relied entirely on Kohlmann to try to show extrinsic evidence of the conspiracy.   Given Kohlmann's significance, it was deeply prejudicial to prevent Mehanna from offering the jury evidence from experts who deal in hard fact and scientific methods for judging causality.  *Ruiz-*

40

*Troche v. Pepsi Cola of Puerto Rico Bottling*, 161 F.3d 77, 85 (1st Cir. 1985) ("[A]n expert's scientific testimony . . . should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.") (*citing Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993)).

Exclusion of testimony causes harm where it "results in actual prejudice because it had a substantial and injurious effect or influence in determining the jury's verdict." *United States. v. Shay*, 57 F.3d 126, 134 (1st Cir. 1995) (finding that restriction on the ability of the defense to challenge key government evidence was grounds for remand). The exclusion of Mehanna's expert witnesses had such an effect here. The government spent many hours buttressing its case through extensive discussion of the translation, content, and purported recruitment and propaganda impact of dozens of videos—many of which he simply viewed. App.1781, 1846; Exs.26, 27, 28A, 28B, 29A, 29B, 30, 31A, 31B, 31C, 31D, 32, 33A, 33B, 33C, 34, 35, 36, 37, 38A, 38B, 38C, 38D, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51A, 51B, 51C, 51D, 52A, 52B, 52C, 54, 55A, 55B, 56A, 56B, 56C, 57, 58, 59A, 60A, 60B, 61, 374, 376, 377, 449, 450, 1241A, 1241B. Kohlmann used his testimony to support these arguments by describing the importance of these videos. App.1781-1782. To deny the defense a full rebuttal

41

when the government witness relies on his anecdotal observations and opinions—now dubbed "comparative analysis social science," Gov't.Br. 90—to characterize the nature, use, and effectiveness of speech was an abuse of discretion.

### 4.    The *Brady* Ruling.

As Mehanna has not been granted access to any of the relevant under-seal submissions, he cannot effectively reply to the government's blanket assertions, except to note what the government does not assert that the evidence in question did not show that Mehanna declined an overture to criminal activity.   The government simply makes an opaque and blanket statement concerning the trial court's discretion.  Gov't.Br. 86-87.  Mehanna relies on the grounds set out in his Opening Br. 61-63.

### 5.    The Government Could Not Prove Materiality as to Count VI.

Below, Mehanna argued that a statement the recipient knows to be false, and actively solicits knowing it to be so, "has no natural tendency to influence, [and is not] capable of influencing" a government function, as required by *United States v. Sebbagala*, 256 F.3d 59, 65 (1st Cir. 2001).  Opening Br. 63-68.  The government argues that this position is foreclosed, Gov't.Br. 92, but relies on cases holding that the government *need not prove* its detrimental reliance on a false statement.  Such cases are different from cases where the government, through its own evidence, proves that it did not detrimentally rely on a false statement that it reached out to

procure.  The government offers no controlling authority where (a) the defendant, rather than seeking a benefit from a government agency, is instead sought out by federal investigators; (b) the government's proof shows that the government knows and believes the defendant's statement is false at the time it is made; and (c) the government seeks to benefit from the statement because of its utility in seeking leverage regarding other potential charges.

The government cites *United States v. Edgar*, 82 F.3d 499, 510 (1st Cir. 1996) (finding a natural tendency to influence where the defendant made false statements on worker's compensation forms that were nonetheless submitted too late to influence government action), but that case once again involved a defendant who sought out a government benefit through falsehood.  It did not involve statements the government knew to be false.  As in *Sebbagala*, the defendant in *Edgar* submitted to a government agency information that no one else had.  Here, the government approached the defendant hoping his answer would conflict with what it already knew; Mehanna's statements could not have influenced the FBI investigation of Maldonado in these circumstances.

The Supreme Court left open this defense in *Brogan v. United States*, 522 U.S. 398, 402 (1998), noting that it may be possible to argue "that a disbelieved falsehood does not pervert an investigation."  The Court noted that it would be strange to pin the materiality of a false statement on the credulousness of the

43

federal investigator. *Id*. But there is no question of credulousness investigators here, just as there is no question that the only influence Mehanna's statement could have had was to arm them with leverage. The FBI knew the truth the moment it approached Mehanna, and his statements raised no questions about that truth in their investigation.

### 6. In the Alternative, Mehanna is Entitled to Resentencing.

That Judge O'Toole departed downward, based on §3553A factors, is an insufficient answer. On review here, neither party can effectively challenge the exercise of discretion in departing downward, although the government tries to. Gov't.Br. 98-101. It remains the case that there was legal error in departing from the wrong baseline. *See* Opening Br. 70.

The government argues that the 2006 FBI interview was part of an ongoing conspiracy, relying on *United States v. Cruzado-Laureano*, 404 F.3d 470 (1st Cir. 2005). *Cruzado-Laureano* involved *witness tampering* by the defendant (a politician), after learning of an FBI investigation of political corruption crimes. *Id.* at 479. The witnesses were the victims of the original crimes and *the defendant approached them on his own initiative*. *Id.* at 476-79. This was obviously part of the same criminal enterprise. By contrast, Mehanna initiated nothing. The government approached him, and he responded to its questions. Speaking to the FBI can hardly have been part of the same criminal conspiracy that, the

44

government alleges, began in 2001. Other cases in which this Court has applied the "one book rule" show the kind of continuing scheme that was not present here, or special circumstances. *See United States v. Innamorati*, 996 F.2d 456, 489 (1st Cir. 1993) (offenses relating to single continuing drug distribution conspiracy spanning effective date of guidelines); *DeCato v. United States*, 51 Fed.Appx. 888, 890-91 (1st Cir. 2002) (plea agreement stipulates to later version of guidelines).

## CONCLUSION

Appellant requests the relief set out in his Opening Brief.

Respectfully submitted,


*/s/ Sabin Willett*
Sabin Willett, No. 18725
Susan Baker Manning, No. 1152545
Julie Silva Palmer, No. 1140407
**BINGHAM McCUTCHEN LLP**
One Federal Street
Boston, Massachusetts 02110-1726
617.951.8000

J. W. Carney, Jr., No. 40016
**CARNEY & BASSIL**
20 Park Plaza, Suite 1405
Boston, MA 02116
617.338.5566

A/75511824.1

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## <u>REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) and this Court's order of April 23, 2013, because this brief contains

11,091 words, excluding the parts of the brief exempted by Fed. R. App.

32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

version 2010 in 14 point Times New Roman.

*/s/ Sabin Willett*
Sabin Willett

Dated: May 3, 2013

<u>**CERTIFICATE OF SERVICE**</u>

I, Sabin Willett, certify that on May 3, 2013, the document(s) filed through the ECF system will be sent electronically to the below registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Mr. Tarek Mehanna
Registration number: 05315-748
CMU
FCI TERRE HAUTE
Federal correctional facility
P.O. BOX 33
Terry Haute, IN  47808

Dina Chaitowitz, Esq.
Chief of Appeals - Criminal
United States Attorney's Office
     for the Dist. of Massachusetts
John J. Moakley Federal Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02110

Liza Collery, Esq.
Jeffrey D. Groharing
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Aloke Chakravarty, Esq.
United States Attorney's Office
     for the Dist. of Massachusetts
John J. Moakley Federal Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02110

/s/ *Sabin Willett*
Sabin Willett, Esq.
Bingham McCutchen LLP
One Federal Street
Boston, Massachusetts  02110-1726
Telephone:  617-951-8000

47