UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 12-1461

_____

**Tarek Mehanna,**

Defendant-Appellant,

v.

**United States of America,**

Appellee.

_____

**ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

_____

**BRIEF OF DEFENDANT-APPELLANT
TAREK MEHANNA**

Sabin Willett, No. 18725
Susan Baker Manning, No. 1152545
Julie Silva Palmer, No. 1140407
**BINGHAM McCUTCHEN LLP**
One Federal Street
Boston, Massachusetts  02110-1726
617.951.8000

J. W. Carney, Jr., No. 40016
**CARNEY & BASSIL**
20 Park Plaza, Suite 1405
Boston, MA 02116
617.338.5566

# **TABLE OF CONTENTS**

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD..........................xi

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ................................................................1

STATEMENT OF THE CASE............................................................3

STATEMENT OF FACTS ................................................................7

SUMMARY OF ARGUMENT ..........................................................19

ARGUMENT ..............................................................................21

I.    STANDARD OF REVIEW ....................................................21

II.   THE MERITS ....................................................................22

     A.    The Government's Non-Speech Theories Cannot Support the
        Convictions Under Counts I-IV. ..........................................22

        1.    Controlling Conspiracy Decisions Were Ignored....................23
        2.    The Statutory Insufficiency of the Evidence. ..........................26
        3.    The Conspiracy Evidence. ....................................................29
        4.    The Government Did Not Prove "Attempt." ..........................34

     B.    Mehanna's Speech Was Not, and Constitutionally Cannot Be
        Material Support (Counts I-III). ..........................................36

        1.    Mehanna's First Amendment Rights. ....................................36
        2.    The Trial Court Misapplied the Core Concept of
            "Coordination."..................................................................41
        3.    The Court's Instructions on "Coordination" Were
            Insufficient and Erroneous....................................................48
        4.    The Court's Direction to Ignore the First Amendment
            Warrants Reversal. ..............................................................52

     C.    Multiple Errors at Trial Separately Warrant Reversal. ....................54

        1.    Inflammatory But Protected Speech Evidence So
            Prejudiced the Trial that the Convictions on All Counts
            Must Be Reversed. ..............................................................54
        2.    The Court Erred In Excluding Mehanna's Expert
            Rebuttal Witnesses..............................................................60

i

3. Appellant was Unfairly Prejudiced By the Court's *Brady* Ruling. ........................................................................62

D. The Government Could Not Prove Materiality as to Count VI. ........64

E. Prejudice and the Spill-over of Evidence Requires Reversal and Remand of All Counts. ........................................................................69

F. In the Alternative, Mehanna Is Entitled to Resentencing. .................71

III. CONCLUSION ............................................................................72

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Al Bahlul v. United States,*
    D.C. Cir. No. 11-1324.................................................................40

*Almendarez-Torres v. United States,*
    523 U.S. 224 (1998)................................................................26

*Ashcroft v. American Civil Liberties Union,*
    535 U.S. 564 (2002)................................................................37

*Ashcroft v. Free Speech Coal.,*
    535 U.S. 234 (2002)................................................................40

*Bachellar v. Maryland,*
    397 U.S. 564 (1970)................................................................69

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
    457 U.S. 853 (1982)................................................................40

*Bond v. Floyd,*
    385 U.S. 116 (1966)................................................................37

*Brady v. Maryland,*
    373 U.S. 83 (1963).............................................................passim

*Brandenburg v. Ohio,*
    395 U.S. 444 (1969)...........................................................passim

*Brogan v. United States,*
    522 U.S. 398 (1998)................................................................66

*Chambers v. Mississippi*
    410 U.S. 284 (1973)........................................................4, 21, 70

*Daubert v. Merrell Dow Pharmaceuticals,*
    509 U.S. 579 (1993)............................................................61, 62

*Dennis v. United States,*
    341 U.S. 494 (1951)................................................................38

iii

*Eisenstadt v. Baird,*
    405 U.S. 438 (1972)..................................................................46

*Elrod v. Burns,*
    427 U.S. 347 (1976)..................................................................37

*Hamling v. United States,*
    418 U.S. 87 (1974)....................................................................54

*Healy v. James,*
    408 U.S. 169 (1972)..................................................................47

*Hess v. Indiana,*
    414 U.S. 105 (1973)..................................................................38

*Hill v. Colorado,*
    530 U.S. 703 (2000)..................................................................46

*Holder v. Humanitarian Law Project,*
    130 S. Ct. 2705 (2010).......................................................passim

*In re Terrorist Bombings of U.S. Embassies in East Africa,*
    552 F.3d 93 (2d Cir. 2008) .....................................................28

*Lee v. Weisman,*
    505 U.S. 577 (1992)..................................................................46

*Meyer v. Nebraska,*
    262 U.S. 390 (1923)..................................................................40

*Miller v. Florida,*
    482 U.S. 423 (1987)..................................................................71

*NAACP v. Claiborne Hardware Co.,*
    458 U.S. 886 (1982)..................................................................22

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964)..................................................................37

*Noto v. United States,*
    367 U.S. 290 (1961)..................................................................38

*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling*,
   161 F.3d 77 (1st Cir. 1998) ................................................................. 62

*Sanchez-Lopez v. Fuentes-Pujols*,
   375 F.3d 121 (1st Cir. 2004) ................................................... 48, 49, 54

*Snyder v. Phelps*,
   131 S. Ct. 1207 (2011) ............................................................ 21, 36, 37

*Stanley v. Georgia*,
   394 U.S. 557 (1969) ............................................................................. 57

*Strickler v. Greene*,
   527 U.S. 263 (1999) ....................................................................... 63, 64

*Stromberg v. State of Cal.*,
   283 U.S. 359 (1931) ............................................................................. 69

*Texas v. Johnson*,
   491 U.S. 397 (1989) ....................................................................... 37, 53

*Thomas v. Review Bd. of Indiana Employment Sec. Div.*,
   450 U.S. 707 (1981) ............................................................................. 16

*United States v. Abu-Jihaad*,
   600 F. Supp. 2d 362 (D. Conn. 2009) ................................................. 44

*United States v. Al-Moayad*,
   545 F.3d 139 (2d Cir. 2008) ........................................................... 58, 59

*United States v. Bailey*,
   123 F.3d 1381 (11th Cir. 1997) .......................................................... 72

*United States v. Bedore*,
   455 F.2d 1109 (9th Cir. 1972) ............................................................ 67

*United States v. Bertoli*,
   40 F.3d 1384 (3d Cir. 1994) ............................................................... 72

*United States v. Boots*,
   80 F.3d 580 (1st Cir. 1996) .......................................................... 29, 36

v

*United States v. Chevoor*,
    526 F.2d 178 (1st Cir. 1975)..............................................................66

*United States v. Cruz-Arroyo*,
    461 F.3d 69 (1st Cir. 2006)...............................................................33

*United States v. Cruzado-Laureano*,
    404 F.3d 470 (1st Cir. 2005).............................................................72

*United States v. Davey*,
    155 F. Supp. 175 (S.D.N.Y. 1957) ...................................................68

*United States v. Dellinger*,
    472 F.2d 340 (7th Cir. 1972) ............................................................24

*United States v. Dellosantos*,
    649 F.3d 109 (1st Cir. 2011)......................................................passim

*United States v. Desena*,
    260 F.3d 150 (2d Cir. 2001) .............................................................34

*United States v. Doyon*,
    194 F.3d 207 (1st Cir. 1999)......................................................34, 35

*United States v. Ehrlichman*,
    379 F. Supp. 291 (D.D.C. 1974)......................................................67

*United States v. El-Mezain*,
    664 F.3d 467 (5th Cir. 2011) ............................................................54

*United States v. Goergen*,
    683 F.3d 1 (1st Cir. 2012).................................................................72

*United States v. Johnson*,
    952 F.2d 565 (1st Cir. 1992).............................................................27

*United States v. LiCausi*,
    167 F.3d 36 (1st Cir. 1999)...............................................................33

*United States v. Lindh*,
    212 F. Supp. 2d 541 (E.D.Va. 2002) ...............................................44

*United States v. Martinez-Medina*,
   279 F.3d 105 (1st Cir. 2002)...............................................................33

*United States v. Montour*,
   944 F.2d 1019 (2d Cir. 1991) ..............................................................24

*United States v. Moore*,
   612 F.3d 698 (D.C. Cir. 2010)..............................................................65

*United States v. Moss*,
   138 F.3d 742 (8th Cir. 1998) ...............................................................34

*United States v. Naiman*,
   211 F.3d 40 (2d Cir. 2000) ..................................................................70

*United States v. Ortland*,
   109 F.3d 539 (9th Cir. 1997) ...............................................................72

*United States v. Paulino*,
   445 F.3d 211 (2d Cir. 2006) ................................................................58

*United States v. Pomales-Lebron*,
   513 F.3d 262 (1st Cir. 2008).........................................................32, 33

*United States v. Prigmore*,
   243 F.3d 1 (1st Cir. 2001)............................................................49, 54

*United States v. Rodriguez*,
   630 F.3d 39 (1st Cir. 2010)..................................................................71

*United States v. Rooney*,
   37 F.3d 847 (2d Cir. 1994) ..................................................................69

*United States v. Royer*,
   549 F.3d 886 (2d Cir. 2008) ................................................................59

*United States v. Rule Indus., Inc.*,
   878 F.2d 535 (1st Cir. 1989)................................................................52

*United States v. Sattar*,
   272 F. Supp. 2d 348 (S.D.N.Y. 2003) ..................................................47

*United States v. Sebaggala*,
      256 F.3d 59 (1st Cir. 2001)....................................................................66, 67, 69

*United States v. Shay*,
      57 F.3d 126 (1st Cir. 1995)..........................................................................62

*United States v. Spock*,
      416 F.2d 165 (1st Cir. 1969).....................................................................passim

*United States v. Stevens*,
      130 S. Ct. 1577 (2010)..................................................................................37

*United States v. Ventura-Melendez*,
      275 F.3d 9 (1st Cir. 2001)..............................................................................34

*United States v. Vivit*,
      214 F.3d 908 (7th Cir. 2000) .........................................................................72

*United States v. Wright*,
      665 F.3d 560 (3d Cir. 2012) ..........................................................................70

*Virginia v. Black*,
      538 U.S. 343 (2003)......................................................................................53

*Yates v. United States*,
      354 U.S. 298 (1957)................................................................................29, 36

## FEDERAL STATUTES

18 U.S.C.
      § 371..........................................................................................................5
      § 956....................................................................................................passim
      § 1001..................................................................................................passim
      § 2251........................................................................................................72
      § 2332............................................................................................23, 27, 28
      § 2339A.................................................................................................passim
      § 2339B.................................................................................................passim
      § 3231..........................................................................................................1
      § 3742..........................................................................................................1

28 U.S.C. § 1291 ...............................................................................................1

**U.S. CONSTITUTION**

Art. I, § 9, cl. 3 ..................................................................................71

**RULES**

Fed. R. Crim. P. 32...........................................................................53

Fed. R. Evid.
  104(e) .............................................................................................62
  403....................................................................................................58
  801............................................................................................20, 33

L.R. 34.0...............................................................................................xi

**U.S. SENTENCING GUIDELINES MANUALS**
  § 1B1.11(b)(3) (Nov. 2011)..........................................................72
  § 2A1.5 (Nov. 2003) ......................................................................71
  § 3B1.3 ............................................................................................47

**OTHER AUTHORITIES**

ALFRED, LORD TENNYSON, ULYSSES.......................................................55

Anita Shapira, *Land and Power: The Zionist Resort to Force 1881-1948*
  (1992) .............................................................................................16

Brief for Respondents, *Holder v. Humanitarian Law Project*, 130 S.Ct. 2705
  (2010) (Nos. 08-1498, 09-89) 2009 WL 4951303.............................45

Encyclopedia of Religion (Lindsay Jones ed., 2d ed. 2005) ...................14

"Ex-Cop Here Quizzed on Klan Murder Plot," CHICAGO TRIBUNE
  (Dec. 27, 1968) ............................................................................38

GEOFFREY STONE, PERILOUS TIMES (2004)............................................23

H.R REP. NO. 783 (1986) ......................................................................28

Oxford English Dictionary (2d ed. 1989) ............................................14

Rob Nordland, *Al Qaeda Taking Deadly New Role in Syria's Conflict*, N.Y. Times, July 24, 2012, *available at* http://www.nytimes.com/2012/07/25/world/middleeast/al-qaeda-insinuating-its-way-into-syrias-conflict.html?ref=rodnordland&_r=0 .............. 40

Steven R. Morrison, *When Is Lying Illegal? When Should It Be? A Critical Analysis of the Federal False Statements Act*, 43 J. MARSHALL L. REV. 111 (2009) ........................................................................................... 66

The Compact Oxford English Dictionary (2d ed. 2004) ........................................ 42

The New Oxford American Dictionary (2001) ........................................................ 46

Thomas Aquinas, *The Summa Theologica of St. Thomas Aguinas* (Dominican Provinc trans., Christian Classics 1981) ........................................ 16

Walt Whitman, LEAVES OF GRASS ........................................................................ 55

## <u>REASONS WHY ORAL ARGUMENT SHOULD BE HEARD</u>

Pursuant to L.R. 34.0, Defendant-Appellant Tarek Mehanna requests oral argument.  In light of the importance of the Constitutional issues in the case, the complex weave of the government's liability theories, and the massive record, oral argument will assist the Court's review.

## JURISDICTIONAL STATEMENT

This is an appeal from a judgment of the United States District Court for the District of Massachusetts (O'Toole, J.), entered April 13, 2012. Add.1. The district court had jurisdiction under 18 U.S.C. §3231. Defendant-Appellant Tarek Mehanna was sentenced on April 12, 2012, and noticed this appeal the next day. Dkt.433. This Court has jurisdiction under 28 U.S.C. §1291 and 18 U.S.C. §3742.

## STATEMENT OF ISSUES

A.    Whether the government proved specific intent to engage in a criminal conspiracy or attempt under 18 U.S.C. §§2339A, 2339B and 956, in connection with Mehanna's seven-day excursion to Yemen and voluntary return to the United States, when the evidence was insufficient to prove a predicate crime, and the government submerged the relevant dispute in evidence of separate alleged conspiracies, protected speech showing Mehanna's political and religious views, hearsay speech from numerous unindicted third persons, and speech from infamous national enemies with whom Mehanna had no contact of any kind. (Counts I-IV)

B.    Whether an American citizen who was neither directed nor controlled by, nor interacted, with al Qa'ida, and who received no compensation from it, contradicted certain of its views, and furnished to it no money, weapons, or other materiel, was properly convicted of conspiring to provide and providing or

1

attempting to provide material support under 18 U.S.C. §§2339A and 2339B, on the basis of translations and other political and religious speech. (Counts I-III)

C.      Whether the verdicts must be reversed on all counts when a jury was directed to disregard the First Amendment, given no instruction on the meaning of "coordination," forbidden to hear key defense rebuttal experts, and buried in inflammatory, prejudicial, and irrelevant evidence, including unpopular speech, violent videos, scores of images of 9/11 and Osama bin Laden, and the hearsay speech of unindicted "co-conspirators" unmentioned in the indictment. (Counts I-VII)

D.      Whether a false statement conviction under 18 U.S.C. §1001 may be imposed on the basis of unsworn statements actively solicited by the government that it knew to be false when solicited. (Count VI)

E.      Whether the unfair prejudice in this case was so extreme as to require, under the "spillover" doctrine and the Fifth Amendment, *vacatur* and remand of all counts as to which the Court does not direct acquittal. (Counts I-VII)

F.      Whether the trial judge erred in sentencing by departing from the wrong base sentencing range, in violation of the *Ex Post Facto* clause.

## <u>STATEMENT OF THE CASE</u>

Beneath a massive prosecution lay a modest dispute.  In 2004, Mehanna went to Yemen, where he engaged in no terrorist activities and encountered no foreign terrorist organization ("FTO").  Then he went home again.  The government claimed he had criminal aspirations, while the defense argued that the trip was not criminal at all, noting Mehanna's fidelity to a rule of faith barring his entry into anti-American hostilities.  Mehanna opted instead for home and pharmacy school, while another man apparently launched a separate journey to Jordan and Iraq.

Could the government prove the excursion was part of a criminal conspiracy?  A few days would have sufficed to try the question.  But for more than a month, evidence about the Yemen trip was submerged in a vague theory of a decade-long speech "conspiracy," and the relevant logistical evidence overwhelmed by a tidal wave of political and religious speech that was constitutionally protected, irrelevant, or both.  This included Mehanna's translations and political speech, the speech of acquaintances, and the inflammatory speech of "unindicted coconspirators" whom Mehanna never met, spoke to, or had even indirect contact with.  The jury watched disturbing video clips having nothing to do with Yemen.  Osama bin Laden, who, so far as the evidence showed, never heard of Mehanna, led a parade of infamous national

3

enemies across the monitors in the jury box.  A government witness speculated that Mehanna's independent speech would recruit young men for al Qa'ida; when the defense called experts to rebut, the court barred their testimony.  And as it wound up a prosecution that had nothing to do with 9/11, the government seared the jury's consciousness with image upon image of towers in flame.

Almost all of the government's evidence was irrelevant to the purposes of the Yemen trip.  All was offered to savage Mehanna himself, and ensure that, notwithstanding the First Amendment, his unpopular thoughts and expressions would win a conviction that the facts could not.  This prosecution swamped the oldest proposition of our criminal jurisprudence: that every defendant is entitled to a fair trial.  *Chambers v. Mississippi*, 410 U.S. 284, 194 (1973).

*Procedural History.*  In November 2008, Mehanna was arrested and charged with making a false statement to a federal officer.  He was released into the community on bail the following month.  A year later, after declining to act as an informant, he was charged with terrorism-related offenses.  The 2010 Second Superseding Indictment charged Mehanna with conspiracy to provide material support to al Qa'ida in violation of 18 U.S.C. §2339B (Count I); conspiracy and provision and attempted provision of material support to terrorists (Counts II and III), both in violation of 18 U.S.C. §2339A; conspiracy to kill in a foreign country in violation of 18 U.S.C. §956 (Count IV); conspiracy to make false statements to

4

federal officers under 18 U.S.C. §371 (Count V); and the making of false statements to federal officers, in violation of 18 U.S.C. §1001(a)(2) (Counts VI, VII). App.0001.

Mehanna sought and was denied a bill of particulars. App.0045; 0077. Before trial, the government asserted two theories as to the terrorism-related counts: that Mehanna and the alleged co-conspirators (1) "conspired and attempted to provide themselves and each other as personnel in the form of personally participating in terrorist training and combat;" and (2) "conspired and attempted to provide ... services, expert advice and assistance, training, and personnel in the form of their online activities of translating, editing and distributing certain pro-jihadi materials for terrorists and Al Qa'ida." Dkt.200, 5-6. Mehanna moved to dismiss so much of Counts I-III as rested on protected speech, App.0083; Dkt.225, and to dismiss the charges under Counts I-III as unconstitutionally vague. App.0115, Dkt.222. The court denied the motions, App.1401, 23:13-19; App.1862-1863, 3:20-4:4, and also denied Mehanna's motion to dismiss Counts VI and VII. App.0085; App.1403, 29:24-30:6.

Trial commenced in October 2011. During 35 court days, hundreds of exhibits of Mehanna's speech were introduced, *see, e.g.*, Exs.495-737 (App.0922-1193), as was the speech of dozens of "unindicted co-conspirators," with many of whom Mehanna never had any contact. *See, e.g.*, App.0199, 0332, 1194, 0217,

0330, 0331, 0325; 3/17/11 Letter (identifying 37 "unindicted co-conspirators"). The jury watched 33 disquieting video clips because Mehanna might have watched them, and the trial court admitted at least two dozen images of al Qa'ida leaders and twenty-nine images of the World Trade Towers on 9/11 because the images were on Mehanna's computer. *See, e.g.,* App.1479, 64:20-21; App.0243, 0344, 0353, 0354-0356, 0358-0362, 0364, 0377, 0379, 0381, 0382-0409. Defense objections to inflammatory, irrelevant, and hearsay evidence were largely denied, as were several mistrial motions. App.0119, 0135; App.1507, 48:22-62:15; App.1644, 84:12-86:7; App.1645, 92:16-94:7; App.1694, 51:6-15; App.1759, 102:4-105:5; App.1765, 16:19-17:6; App.1905-1915, 46:2-56:1. The trial court allowed a government expert to testify that Mehanna's speech would recruit for al Qa'ida, but barred rebuttal testimony. App.1822-1823, 20:6-24:22.

Mehanna moved for acquittal upon the conclusion of the government's case, App.0132, and at the close of evidence. App.0189. He requested a special verdict form to show whether the jury had based verdicts on speech protected by the First Amendment, App.0181; Dkt.378, and moved to exclude hearsay speech of persons not shown to be co-conspirators, App.0135. These motions were denied. App.1821, 15:14-18; App.1863-1868, 4:5-9:11; App.1905-1915, 46:2-56:1; App.0192. On December 20, 2011, the jury returned guilty verdicts on all counts. App.0192.

## <u>STATEMENT OF FACTS</u>

*Tarek Mehanna*.  "Terrorist" is a resonant word; the trial showed how poorly that resonance fits Mehanna.  He engaged often in speech, never in terrorism, and never spoke at the direction of, nor under the control of anyone but himself. "The defendant," the government conceded, "was not instructed by al-Qaeda to engage in all these activities."  App.1383, 39:5-6.

Mehanna's point of view defies shorthand labels.  He embraced beliefs shared by many Americans—for example, that it was wrong to invade Iraq, App.1971, 53:14-54:20, or to attack civilians.  App.0745, 0759.  He also showed a taste for violent films that would find little sympathy outside America's video-game subculture, App.1087, and praised persons most Americans loathe, including Osama bin Laden, App.1078.

For all that, Mehanna's speech included views abhorrent to al Qa'ida: for example, that Islam forbids the killing of civilians, App.0745, 0759, and gives al Qa'ida no right to excommunicate and kill "apostates."  App.1840-1841, 89:7-92:6; App.1841, 93:16-95:15; App.1310.  He contradicted the reported head of al Qa'ida in Yemen Anwar al-Awlaki, App.1825-1827, 60:22-68:11; App.1232, 1243-1244, disputed teachings that contracts with the West were voidable, App.1527, 71:10-77:13; App.1227-1228, and denied al Qa'ida's view that any non-Muslim might be killed if found in Muslim lands.  App.1463, 15:13-16:24;

7

App.0738.   His independence culminated in expulsion from the British Jihadi website, at-Tibyan, *for expressing democratic ideas*.   App.1590, 124:17-125:13. The vast record of speech showed a thinker and speaker directed and controlled not by an FTO, but by a personal conception of religious faith and an idiosyncratic point of view.

Central to Mehanna's independence was his view that the Islamic tenet of *aman,* a covenant to obey the law within a country that permits practice of the faith, App.1829, 131:4-22; App.1680-1681, 115:10-117:18, forbade him from engaging in hostilities against Americans, *see* App.1839, 66:12-68:6; App.0745. This too conflicts with al Qa'ida's view.   App.1829, 133:13-134:25; App.1839, 68:20-69:15 (repudiation of 1998 bin Laden fatwa).

An American citizen, Mehanna lived in Sudbury, attended Lincoln-Sudbury Regional High School, and matriculated at Massachusetts College of Pharmacy, where his father is a professor.  App.1447, 15:17-16:1; App.0481; App.1607, 21:4-16.  He was a senior in high school when curiosity about his faith began to deepen. App.1744-1745, 27:10-30:23.   He became a student, and then a scholar of Islam, studying the Qu'ran, the Hadiths, and religious disputation about them.  App.1745, 30:21-31:4; App. 1745-1746, 32:3-34:23.

*The Yemen Trip.*  Devotees of the King James Bible find no country where its diction is still heard in common speech; for lovers of the Qu'ran, there is

8

Yemen. *See* App.1595-1596, 55:5-61:12. Cadences of Yemeni Arabic come closer to the poetry of the holy book than Arabic spoken elsewhere, App.1832, 74:8-16, and Islamic schools in Yemen are renowned. *Id*. at 75:9-24.

Late in 2003, Ahmad Abousamra[1] traveled alone to California, seeking information about Yemen from Jason Pippin, who had studied there. App.1567-1568, 33:24-34:6. Abousamra's intent, Pippin testified, was "very vague." App.1585, 104:7-11. With a gift of $5,000, he tried to persuade Pippin to accompany him to Yemen. App.1593, 48:9-13. Pippin was not persuaded. App.1585, 102:16-19. "[I]t wasn't entirely clear what his exact plans were in terms of who he was going with or dates and things like that." *Id.* at 104:7-11. Pippin testified that Abousamra said only that he hoped to make a plan with Boston-area associates: "there were people that [Abousamra] *wanted to go—*who he wanted to have accompany him," App.1593, 50:11-14 (emphasis added), but Abousamra said "*they're not in a position to go and train and to fight*." *Id*. at 50:15-17. Pippin knew no fighters in Yemen.

Abousamra returned to Boston. Later, Abousamra, Kareem Abuzahra and Mehanna agreed to go to Yemen. App.1709, 14:14-16. There was evidence that Abousamra wanted to find a way to Iraq, but Abuzahra did not "remember anything specific that [Mehanna] said." App.1708, 11:7-10. Abuzahra bought

---

[1] At trial, Abousamra was an indicted but absent co-conspirator.

return tickets for himself and Mehanna, to be used "[i]f things didn't work out." App.1713, 29:3-6, 30:4-6; App.1748, 108:1-10.  None of the three knew of a training camp or formed any specific action plan.  As Abuzahra admitted, the only contact information was the "scribbled" name from Pippin, "torn off from a piece of paper.  Ahmad [Abousamra] had it the whole time.  I never had it."  App.1713, 29:5-19.

On February 1, 2004, the three flew from Boston to Abu Dhabi.  App.1214. That no common plan existed was proved instantly; receiving an email from home, Abuzahra immediately dropped out and returned to the United States.  App.1717, 44:14-46:18.  That terminated any conspiracy of which he ever was a part: after return, he actively distanced himself from Mehanna and Abousamra, App.1720-1721, 57:9-61:1, even blocking Mehanna from his messenger list.  App.1721, 62:6-7.  Over objection, he was permitted to testify to statements made by Abousamra months later, after Abousamra's return, and long after the conclusion of any conspiracy.  App.1721-1723, 62:8-71:21.

Abousamra and Mehanna traveled together from Abu Dhabi to Yemen. App.1214.   Seven days later, they returned to Abu Dhabi, where the joint enterprise ended.  *Id*.  From there they went in *opposite* directions.  Abousamra (apparently) left on a new and solitary journey to Jordan and later, Iraq.  App.1552, 45:7-46:9; App.1723, 69:20-70:9.  There was no evidence that Mehanna funded,

10

encouraged or supported that trip logistically, or in any way "furnished" Abousamra as personnel. When Abousamra launched his separate expedition, Mehanna was perfectly able to join him. He opted instead for home. App.1214.

In Yemen, the scholar in Mehanna had discovered a religious school, App.1552, 45:3-7, while the American suburbanite came face to face with grinding poverty. App.1119-1120; *see* App.1595, 54:1-8 (Pippin describes mud huts in Yemen). Mehanna would later tell a friend that he nevertheless hoped one day to "live with people and live around a scholar or the student of a scholar." App.1501, 150:17-151:18. He wanted to stay on the path of seeking "ilm," (knowledge), for the rest of his life. App.1502, 153:7-17; App.1075.

The government contested this account. Its witnesses, heavily-coached and vulnerable to prosecution, said Mehanna sought a training camp. App.1550, 37:14-39:15; App.1565, 136:4-13 (Hassan Masood, subject to deportation); App.1620, 131:7-25 (Daniel Maldonado, imprisoned and subject to transfer beyond reach of visits from children); App.1707, 5:19-24 (Abuzahra, immunized and facing prosecution). None identified a mature plan that would accomplish violence. The key witness, Abuzahra, testified under an immunity deal in which he avoided serious personal jeopardy. App.0904. He had previously lied to the FBI, App.1753-1754, 55:9-60:21, practiced lying to friends, App.1751, 46:14-16,

11

and rehearsed his testimony five or ten times for an average of four hours per rehearsal.  App.1755, 70:5-14.

*Translation Activities.*  In 2005, Mehanna began to translate.  He purchased books on Islam, App.1689, 19:13-17, and gave religious talks at a local mosque.  App.1685, 137:1-11.  Unraveling his faith, he engaged any audience—friends, local Muslims, his on-line community—in conversation about religion.  *Id.*; App.1560, 90:25-91:12; App.1598, 66:2-18.  During this period, Mehanna accessed the Tibyan website.  *See, e.g.,* App.0706-0714, 0738-0758, 1218.  Over objection, a government witness claimed that "coordination" existed between Tibyan and al Qa'ida, App.1789, 47:1-21, but the government offered no evidence that Tibyan was itself maintained, funded, directed, or controlled by al Qa'ida.  On Tibyan's public web forums, posters argued about religious interpretation.  *See, e.g.*, App.0706, 0738-0758.  One indirect request that someone translate a text, allegedly emanating from al Qa'ida,[2] was made *to the website*, App.0765; App.1540, 22:12-25; App.1786-1787, 34:6-36:2, but there was no evidence that Mehanna responded, and he never translated the requested text.  App.1532, 73:2-74:13.  On another occasion, two men conversed on the site about translating al Qa'ida propaganda, but there was no evidence that Mehanna responded to the

---

[2] The suggestion that the request was made *at all* was hearsay.  The government managed to get it before the jury by expanding the "conspiracy" to include a "co-conspirator" unmentioned in the indictment.  *See infra* at 30-31.

speakers, or even knew of their conversation.  App.0705; App.1540, 20:3-22:11; App.1786, 32:11-19. Most significantly, Mehanna was expelled from Tibyan for his dissent from hardline views.  App.1590, 124:17-125:13.

*The Speech Evidence.*  The speech evidence fell into four categories.  First was speech that, in the government's view, *itself* constituted material support, not because it was provided to an FTO, as the statute requires, but because of its content: one translation of a religious text,[3] and one subtitling of a video ("*Ipso Facto Speech*").  The second category was the bulk of Mehanna's instant messages ("IMs") and web posts, relevant to nothing except his political point of view ("*Political Speech*").  This category comprised hundreds of exhibits and consumed weeks of trial.  Admitted over objection, it showed advocacy of some, and *against* other unpopular views of unpopular groups.  The third category was the hearsay speech and images of *others*—including infamous enemies who, so far as the evidence showed, never communicated with Mehanna or knew of his existence ("*Third-party Speech*"). The droplet in this wave of speech was the fourth category—speech bearing (ambiguously at that) on why Mehanna went to Yemen ("*Logistical Speech*").

  i.    *Ipso Facto Speech.*  The centerpiece of the government's case was Mehanna's translation of *39 Ways to Serve and Participate in Jihad*, *see, e.g.*,

---

[3] *See infra* at 41-42.

App.0718, 0728, 0766, 0768, a work that never advocates for terrorism, but rather identifies a core thesis of Mehanna's personal view—that there are alternative paths, many of which involve no fighting, by which to satisfy the religious duty of Jihad.[4]  App.1685, 138:20-139:18.[5]  In 2005, Mehanna posted his translation. App.1855, 87:10-16.

*39 Ways* is "religious rhetoric," App.1838, 57:1-2, that "speaks at a high level of generality and abstraction."  App.1844, 137:25-138:7.  As a government witness conceded, the tract is rooted in the Qu'ran.  App.1462, 111:6-9.  Years after *39 Ways* was published, App.1789, 45:16-17, Mehanna's translation allowed an English speaker to read the Prophet's words, App.1461, 99:17-23, and quotations from the Hadiths.  *Id.* at 98:18-99:10.  "[L]ong on abstract rhetoric and very short on concrete facts," App.1838, 56:16-19, the book explains that a Muslim should learn to swim and ride horses (Way 27), App.1843, 132:10-12; App.0283, should learn first aid (Way 28) to support the troops, App.1843, 132:20-24; App.0284, and should abandon luxury (Way 37), App.0290, because "living a

---

[4] "Jihad" is a religious duty inculcated by the Qu'ran and Islamic tradition. *See* 8 Oxford English Dictionary 238 (2d ed. 1989). It can denote a range of meaning, from "the struggle against one's evil inclinations or efforts toward the moral uplift of society," 7 Encyclopedia of Religion 4917 (Lindsay Jones ed., 2d ed. 2005), to armed conflict.

[5] Daniel Spaulding agreed that *39 Ways* "was a book designed to show Muslims who were not going to go fight on a battlefield how, nonetheless, they could fulfill their obligations as a Muslim."  App.1685, 139:2-5.

simple life is an important value in Orthodox Islam." App.1843, 133:7-12. The book never mentions al Qa'ida, App.1815, 96:5-7, and is not a military training manual. App.1855, 86:17-87:25. *39 Ways* is "a generic work that describes the virtue of Jihad and the virtue that one can obtain by participating in different things that are nonlethal [*sic*]." App.1837, 55:16-18. The battlefield referenced in the book is a "generic battlefield somewhere" that "affirms the generic virtue of fighting in a Jihad.... It doesn't tell you anything about anywhere. So it's not concrete. It's simply generic." App.1837-1838, 55:21-56:3. Way 19 calls for prayers for soldiers, App.1843, 134:20-23; App.0273, such as are heard in Trinity Church on Easter. Book of Common Prayer 823 (1979). Way 35 directs the faithful to proselytize. App.1844, 136:9-19; App.0288. So too does Matthew's Gospel. *Matt*. 28:19.

In late 2005, Mehanna provided English subtitles for an Arabic-language video entitled *Ghazwah Omar Hadeed* (*The Expedition of Shaykh Umar Hadid*). App.0685. *The Expedition* depicted persons preparing to fight U.S. troops in Fallujah. The original version of the video was publicly available prior to Mehanna's translation. App.1787, 37:8-38:8; App.0717.

   *ii.    Political Speech.* Hundreds of Mehanna's IMs, emails, and website postings were introduced. This material shows a youth working out strong and unpopular views—some subtle, some crude—while on a search for religious

15

understanding through study. He debated points as arcane as how the devout should position the body for sleep, App.1838, 58:23-25, and as timely as the law of war. App.1242 (deception and theft are contrary to Islam); App.1227 (one must honor agreements even with adversaries); App.1353 (whether one should defer to the mujahideen).[6] He considered the volume for recitation of prayers, App.1838, 58:25-59:1, and explored religious teaching on the virtues of fasting, App.1225, and obligations filial, App.1218, and charitable. App.1836, 42:21-43:2. He preached sermons locally, App.1685, 137:1-11, calling on young men to study rather than fight. App.0759. The material is not exclusively religious—Mehanna appears as neither saint nor ascetic, and his chitter-chatter has its share of gossip, juvenilia, and adolescent braggadocio. *See, e.g.,* App.1043, 1224. He expressed views no less crudely than do Americans who post on anti-Muslim Internet sites. Over objection, App.1760, 106:7-107:12, the court even admitted juvenile efforts at poetry, including Mehanna's poem, *Make Death What You Seek*, App.0769, as well as jejune efforts that one can only classify as doggerel. App.0702, 0703.

---

[6] The problem of armed conflict is debated in many religious faiths. *See, e.g.,* Thomas Aquinas, *The Summa Theologica of St. Thomas Aquinas* Part II-II q. 64 (Dominican Provinc trans., Christian Classics 1981); Anita Shapira*, Land and Power: The Zionist Resort to Force 1881-1948* (1992) (discussing religious underpinning of Maccabean revolt against foreign ruler); *Josh.* 10:40-42, 11:15-23 (extoling genocide); *Matt.* 5:38-39 (Jesus preaching nonviolence). At all events, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of Indiana Employment Sec. Div.,* 450 U.S. 707, 714 (1981).

16

iii.    *Third-party Speech*.  The trial court admitted the speech and images of others, merely because it appeared on Mehanna's computer or because he saw or forwarded it.  This included at least 33 numbing video clips, App.1479, 64:20-21; App.1482, 76:9-77:9, 78:8-79:7;  App.1483, 80:5-21, 82:18-19;  App.1483-1484 83:22-84:1;  App.1484, 84:19-85:1, 85:14-21;  App.1487, 99:1-3;  App.1489, 104:23-105:6;  App.1512, 81:12-82:2;  App.1513, 91:3-5;  App.1514, 101:13-15; App.1515, 103:23-104:2, 104:7-12;  App.1540, 23:1-5;  App.1644, 84:2-7; App.1645, 88:5-7;  App.1646, 94:11-13;  App.1695, 73:16-74:17;  App.1764, 126:24-127:2, and many images of national enemies,  App.0243, 0344, 0354-0356, 0358-0362, 0364, 0377, 0379, 0381 (fourteen of bin Laden), and App.0357, 0363, 0365-0370, 0372, 0377 (ten of Abu Musab al-Zarqawi).  To complete a case that had no relationship to 9/11, the government showed the jury twenty-eight images of the World Trade Center in flames.  App.0382-0409.[7]

iv.    *Logistical Speech.*  What little "speech" evidence was admitted regarding the purposes of traveling to Yemen consisted mainly of IMs and chats from Mehanna to others after the fact.  One government witness, Ali Aboubakr, admitted that Mehanna spoke with enthusiasm about schools in Yemen. App.1486, 94:13-95:3;  App.1501, 150:17-151:8;  App.1047, 1068.    Mehanna

---

[7]  The latter were not images that Mehanna had downloaded, but "thumbnails," *i.e.*, electronic footprints left on any computer whose user had looked at Internet news concerning 9/11.  *See* App.1849, 15:1-16:3.

17

emailed a photograph not of a camp, but a library.  App.0503-0505 ("Notice the simple and humble environment…. May Allah make knowledge beloved to us, and make easy for us the path to attaining and acting by it.").  Spaulding, a government witness, admitted that Mehanna never said he supported al Qa'ida, or that he or his friends should join it, or advance its cause.  App.1685-1686, 140:22-141:5.  He did not know of any instance in which Mehanna was directed by, in contact with, or coordinating with al Qa'ida.  App.1686, 142:6-16.  The objective evidence was inconsistent with an intent to kill, then or later.  Mehanna declined to go to Iraq with Abousamra, App.1749, 13:16-25, and later declined Maldonado's entreaties to join him in Somalia.  App.1499, 144:13-145:4.

*Refusal to Cooperate, Arrest, and Charge.*  The FBI began investigating Mehanna no later than 2006, searching his hard-drive that August.  App.1447, 14:3-9, 15:9-19; App.1448, 21:20-22.  Aware in 2006 of what it would later call "[crimes] amongst the most serious in our system of justice," App.1961, 14:4-5, the government left Mehanna at large.  It did not arrest him until November 10, 2008, when he went to the airport to depart for Saudi Arabia and a job in clinical pharmacy.  App.1453, 21:25-22:19; App.1363-1372.  Even in 2008, the government deployed no terrorism indictment, or other accusation likely to limit his freedom.  Mehanna was charged only with making false statements to the FBI, Dkt.22, and thereafter permitted to teach seventh graders.  Dkt.61, 26:14-27:16.

18

The charges that speech—or anything else—amounted to terrorism, material support, or terrorist conspiracy came only a year later, after Mehanna declined to become a cooperating witness. Dkt.38.

The initial failure to charge speaks loudly, for the government never knowingly ignores public safety. Only Mehanna's refusal to serve as an informant brought on its heavy artillery. Mehanna was a provocative speaker, not a criminal: chat room-savvy, a voluble source, a possible gateway to others. The government thought him significant enough to arrest only when he was about to leave; it thought him significant enough to prosecute for terrorism only after he refused to cooperate. He was sentenced to seventeen and one half years in prison, App.1976, 74:2-10, after the government asked for twenty-five. Dkt.430, 13. Maldonado, the cooperating witness who actually engaged in combat in Somalia, will serve ten years. App.0906. Abuzahra, the cooperating witness who actually supported acts of domestic terrorism, was not charged at all. App.0904.

## SUMMARY OF ARGUMENT

A core problem below was the trial court's profound misapplication of conspiracy law and rules in speech cases. Contrary to *United States v. Spock*, 416 F.2d 165 (1st Cir. 1969), and *United States v. Dellosantos*, 649 F.3d 109 (1st Cir. 2011), the court permitted the government to expand the theory of criminal agreement from a Yemen trip in which Mehanna participated, to distinct

enterprises in which he did not, and irrelevant discussions that were not conspiracies at all. It admitted a massive amount of inadmissible, and in some cases wildly prejudicial evidence, including protected speech and hearsay that did not meet the requirements of the co-conspirator exception under Fed. R. Evid. 801(d)(2)(E). The court made related errors in the management of the trial. These problems require reversal of all counts, including in particular Counts II (conspiracy under §2339A), III (attempt under §2339A), and IV (violation of §956), and to the extent that it rests on Yemen, Count I (conspiracy under §2339B). (22-35)

A separate and crucial problem arose from the theory that Mehanna's speech *itself* constituted provision of material support. The government argued that Mehanna had provided and conspired to provide material support to al Qa'ida through pure speech: his translation of a religious book and a video, and his uploading the translations to the Internet. The government conceded that Mehanna did not translate at al Qa'ida's direction, App.1954, 145:6-14, and offered no evidence that he did so at its request, nor that Mehanna ever met or communicated with anyone from al Qa'ida about undertaking this work. And it offered no evidence that Mehanna "provided" any translation "to" al Qa'ida, as sections 2339A and 2339B require. Absent proof of direct provision to or interaction with al Qa'ida, this is the very "independent advocacy" that *Holder v. Humanitarian*

*Law Project,* 130 S. Ct. 2705, 2733 (2010) ("*HLP*") held protected from prosecution under the material support statutes. *See also Brandenburg v. Ohio*, 395 U.S. 444 (1969). Each of Counts I-III must be reversed on this independent ground. (35-53)

Errors at trial, including the admission of deeply prejudicial, nonprobative speech, the exclusion of expert testimony, and rejection of a challenge under *Brady v. Maryland*, 373 U.S. 83 (1963), warrant reversal of all counts. (54-63)

The trial court permitted the jury to find materiality in statements the government knew to be false when made and had procured simply for leverage in attempting to force cooperation, warranting reversal of Count VI. (63-68)

Under *Chambers* and related doctrines, the prejudice was so deep that reversal of all counts is warranted. (68-70)

In the alternative, use of the 2011, rather than 2003 guidelines for the base offense was error requiring resentencing. (70-71)

<div align="center">

**ARGUMENT**

</div>

**I.    STANDARD OF REVIEW**

Prosecutions based on speech expressing a political point of view are subject to the highest threshold of review. An appellate court must independently review the whole record, *Snyder v. Phelps*, 131 S. Ct. 1207, 1216 (2011), ensuring that no

<div align="center">21</div>

aspect of the verdicts trenches on First Amendment rights. *Spock*, 416 F.2d at 172-73.

The conspiracy convictions present special problems, for the Constitution protects Mehanna's right to associate with groups with unlawful objectives. *HLP*, 130 S. Ct. at 2733; *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908-09 (1982). Because the government may use conspiracy prosecutions to interfere with this right, this circuit employs *strictissimi juris* review. *Spock,* 416 F.2d at 172-73. "When the alleged agreement is both bifarious and political within the shadow of the First Amendment," a court must find "an individual's specific intent to adhere to the illegal *portions*" of the agreement. *Id.* at 173 (emphasis added).

## II.    THE MERITS

Because of the confusing way the case was put to the jury, it is impossible to analyze the record count by count. Appellant begins with two pervasive themes of the trial: (a) that Mehanna's 2004 Yemen trip showed a criminal conspiracy supporting Counts I-IV; and (b) that his protected speech supported the convictions under Counts I-III.

### A.    The Government's Non-Speech Theories Cannot Support the Convictions Under Counts I-IV.

The Yemen case was so thin that the government wrapped it in distinct conspiracies, real or imagined, inflamed the jury with repeated references to 9/11, Osama bin Laden, and the like, and presented the whole as a package. Mehanna

22

objected, *see, e.g.,* App.1464, 4:20-5:19; App.1503-1504, 4:12-8:1; App.1421, 9:12-11:13, but the government was permitted to proceed.   App.1464, 5:21; App.1504, 9:13-18; App.1425, 28:1-14.

Count I (18 U.S.C. §2339B) required proof that Mehanna conspired to provide material support and resources to al Qa'ida.  App.0001-0002.  There was no evidence of an al Qa'ida presence in Yemen in February, 2004, App.1831, 70:1-23, nor of an al-Qa'ida link to Mehanna's Yemen plans.   The essence of the "Yemen case" rested on Counts II-IV.

Count II (18 U.S.C. §2339A) required proof that Mehanna (a) conspired (b) to provide "material support or resources," (3) knowing and intending that the support was to be used by others in preparation for and in carrying out violations of either 18 U.S.C. §§956 or 2332.   App.0011.   Count III also rested on §2339A, charging actual or attempted provision or concealment, as opposed to conspiracy. App.0019.  Count IV charged that Mehanna conspired while in the United States to commit acts "that would constitute the offense of murder" in violation of 18 U.S.C. §956(a)(1).  App.0020.

## 1.    Controlling Conspiracy Decisions Were Ignored.

Conspiracy is a handy tool for the prosecutor.  *See, e.g.,* GEOFFREY STONE, PERILOUS TIMES 481 (2004) ("[T]he crime of conspiracy has routinely been used by prosecutors to 'get' union organizers, political dissenters, radicals, and other

'dangerous' individuals who could not otherwise be convicted of an offense.").
*Dellosantos* held that involvement in a related but distinct conspiracy did not suffice to prove the defendant's specific intent to join the conspiracy charged. 649 F.3d at 121-24. Its rule takes on increased importance in speech cases, as exemplified in *Spock*, this Court's Vietnam-era reversal (in part) of convictions for conspiracy to aid and abet violation of the Military Selective Service Act. In *Spock,* the Court held that where the government charges a single conspiracy involving protected First Amendment activity, criminal intent must be judged *strictissimi juris*, *i.e.,* with proof of specific intent to engage in the unlawful aspects of the conspiracy, lest "one in sympathy with the legitimate aims of [] an organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share." *Spock*, 416 F.2d at 172-73 (quoting *Noto v. United States*, 367 U.S. 290, 299-300 (1961)); *see also United States v. Montour*, 944 F.2d 1019, 1024 (2d Cir. 1991); *United States v. Dellinger*, 472 F.2d 340, 392 (7th Cir. 1972).

Some conspirators in *Spock* published a written "Call" to resist the Vietnam war, and some had arranged a surrender of draft cards at the Arlington Street Church. Spock signed the Call and issued "vigorous criticism of the government's program ... [whose] natural consequences might be to interfere with it, or even to

24

lead to unlawful action." 416 F.2d at 170. Yet he was entitled to acquittal as a matter of law, because the government had not proved specific intent to engage in the crime (abetting non-possession of a draft card), *id.* at 178 n.30, as opposed to association with a "movement" containing lawful and unlawful elements:

> Spock's actions lacked the clear character necessary to imply specific intent under the First Amendment standard. *He was not at the Arlington Street Church meeting*; in fact he knew nothing of it until afterwards. … *He contributed nothing, even by his presence, to the turning in of cards*. [Other statements did not] extend at all beyond the general anti-war, anti-draft remarks he had made before. His attendance is as consistent with a desire to repeat this speech as it is to aid a violation of the act.

*Id.* at 179 (emphases added).

Ferber helped collect draft cards. He was entitled to acquittal for a different reason: the conspiracy charge was overbroad. "[T]he evidence did not warrant a finding that through other statements or conduct he joined the larger conspiracy for which the other defendants were prosecuted.… *It may be that Ferber engaged in a smaller conspiracy. This does not mean that he should be convicted for the larger one*." *Id*. (emphasis added).

*Spock* teaches that where protected speech is involved it is "improper" to rest conspiracy convictions on "numerous statements of third parties alleged to be co-conspirators." *Id.* at 173. Thus Mehanna's intent "is not [to be] ascertained by reference to the conduct or statements of another even though he has knowledge thereof." *Id*. And where conviction is obtained on an overbroad conspiracy

25

theory, reversal is necessary even where a narrower conspiracy theory might have been pursued.

This case presents both the variance problem at issue in *Dellosantos*—that the "conspiracy" tried differed from what the Grand Jury indicted on—and the *Spock* problem—that the government's "conspiracy" theory rested on a range of protected First Amendment activity.

### 2.    The Statutory Insufficiency of the Evidence.

Counts II and III presented a threshold statutory problem.  The government contended that Mehanna conspired to provide himself and Abousamra as personnel to terrorists in Yemen, there to be trained for attacks in Iraq.  To make out the crime under section 2339A, the personnel Mehanna allegedly conspired to provide had to be intended for use by recipients[8] "in preparation for, or in carrying out" a specified crime.  18 U.S.C. §2339A.

*i. Section 956.*  The first specified was 18 U.S.C. §956, *itself* a conspiracy crime, which requires that a person conspire "*within* the jurisdiction of the United States."  *Id*. §956(a)(1) (emphasis added).  The problem was legal impossibility. Putative recipients of the "personnel" could not "use" that support, as section

_____

[8] Section 2339A requires provision *to someone other than the defendant.* The heading ("§2339A. Providing material support to terrorists"), and the natural reading of "[w]hoever *provides* material support or resources ... knowing or intending that *they are to be used* ..." is that support is provided to another, who uses it to commit the predicate crime.  *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (headings may inform construction).

26

2339A contemplates, to commit a predicate crime requiring conspiracy *within* the United States, because by definition, those recipients were contemplated to be abroad.

As charged here, section 956 also requires that the domestic conspiracy agree to a foreign "act that would constitute the offense of murder" 18 U.S.C. §956(a)(1); *see United States v. Johnson*, 952 F.2d 565 (1st Cir. 1992) (domestic conspiracy to furnish materiel for attack on British air base in Northern Ireland sufficient). While the government need not identify a specific victim, the statute requires more than the vaguely aspirational "piece of paper with a name scribbled on it" of someone who might know someone who might help make a plan. App.1713, 29:9-19. The government's theory—that Mehanna hoped to find contacts who might point out where training would be found—does not amount to conspiracy to commit an "act that would constitute the offense of murder."[9]

*ii.        Section 2332.* Section 2332 was also unavailable as a predicate. It requires proof that conspirators agree to an attempt or a conspiracy—in each case occurring *outside* the United States—"to kill[] a national of the United States." The articulation, "*a* national" again requires more than vague inclinations. There had to be a contemplated conspiracy or attempt occurring *outside the United States*

---

[9] Nothing in the speech evidence could possibly have sufficed as evidence of a plan to "murder" or "kill," as the predicate offenses required. *See infra* at 36-41.

to make use of Mehanna's or Abousamra's person to kill some national of the United States. *In re Terrorist Bombings of U.S. Embassies in East Africa,* 552 F.3d 93 (2d Cir. 2008) (offense made out by evidence of actual extraterritorial plot to bomb U.S. embassies and kill U.S. nationals in Nairobi and Dar-es-Salaam). The evidence showed no contemplated foreign conspiracy with any concrete object in view; at trial there was no evidence of foreign conspirators, and the only evidence of any *foreign* agreement was the objective evidence that the group disbanded: one immediately, and the second, Mehanna, a week later, before any actual plan to kill could be formed abroad.

Prosecution under section 2332 also requires a certification that the offense in view was "intended to coerce, intimidate, or retaliate against a government or a civilian population." 18 U.S.C. §2332(d). Congress intended to omit less serious foreign crimes from the statute's reach. H.R REP. No. 783 at 87-88 (1986) (statute not intended to reach barroom brawls). No certification is in the record, which eliminates section 2332(d) as an available predicate, and even if, for *conspiracy* under 2339A, the certification requirement was excused, the predicate crime would at least have to be *certifiable.* A "feckless" visit to Yemen, App.1973, 62:5-11 (observations of the court), could not suffice.

Because the jury was permitted to rest conviction on *either* section, *see* App.1921, 11:24-12:9; App.1923, 20:6-9; App.1925, 30:15-17, a determination

28

that one was legally impossible would require reversal.  *Yates v. United States*, 354 U.S. 298, 312 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978) (verdict for conspiracy to engage in multiple predicate crimes reversed where "the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected"); *United States v. Boots*, 80 F.3d 580, 589 (1st Cir. 1996) *overruled on other grounds by Pasquantino v. United States*, 544 U.S. 349 (2005).

### 3.    The Conspiracy Evidence.

*Yemen*.  The Court should begin with the frailty of the "Yemen case." Mehanna agreed to go abroad in late 2003, and abandoned Abousamra on or about February 11, 2004.  App.1605, 115:9-22; App.1214.  His intent in Yemen was vigorously contested.  The jury had to reject a substantial case that Mehanna, immersed in Islamic scholarship, was searching for a madrassa.  *See, e.g.*, App.1555, 59:9-22; App.1560, 91:9-12; App.1685, 137:6-11; App.0681.  Masood thought Mehanna "more moderate" than Abousamra, App.1560, 90:8-24, and could not recall him expressing his reasons for going to Yemen.  App.1562, 104:9-15. Abousamra himself said that Mehanna was "not in a position to go and train and to fight."  App.1593, 50:11-17.  No trainer or camp was visited.

Mehanna believed in *aman*, and urged that it was unlawful to kill non-Muslims randomly in Muslim lands. App.1681, 116:14-19; App.1690, 38:6-21;

App.1757, 88:1-8; App.1829, 134:18-25; App.0738-0745, 0759. He returned home and completed his pharmacy degree.  By late 2006, when encouraged by Maldonado to join him in fighting in Somalia, Mehanna demurred.  App.0653.  He was interested in being "somewhere where I can pray five times a day in a mosque" and in "marriage and stuff."  App.0655-0656.

The government's theory rested mainly on the practiced liar Abuzahra, who himself abandoned any conspiracy immediately, and testified with the threat of prosecution hanging over him at trial.  "If you did not believe that it was in your best interest to tell the truth to the FBI," he was asked, "you would lie, right?"  App.1754, 59:18-20.  "Yes," he replied.  *Id.* at 59:21.

*Separate Conspiracy Theories*.  With evidence so thin, the government pivoted to variances.  The indictment named no co-conspirator in the United Kingdom, yet the court admitted statements, otherwise hearsay, of Daour, Mughal, Tsouli, and Qureshi to try to make out the only connection to al Qa'ida in the case.  Given arguments to the jury that Mehanna acted at the behest of al Qa'ida's "media wing" and conspired with bin Laden, App.1439, 48:17-49:19; App.1934, 65:11-24, it was highly prejudicial to omit this fulcrum of the government's case from the indictment, an omission compounded by belated production of a massive volume of electronic evidence regarding U.K. matters (much of it in Arabic) three weeks before the trial date.  App.1414, 17:17-19:19.  Nine months after the grand

jury issued its Second Superseding Indictment, the government also named—by *letter*—a rogue's gallery of national enemies, including bin Laden, Zarqawi, and others, as further "unindicted coconspirators," *see* 3/17/11 Letter, evidently for the purpose of making their statements admissible. *See, e.g.,* App.0799, 0241, 0311-0313, 0324, 0325, 0326, 0329, 0330, 0331, 0332, 0704, 0786, 0787, 1194.

A second, alarming category of evidence—amounting in effect to a variance—concerned discussion of domestic attacks, including a mall shooting and an assault on a military base (evidently ideas of Abousamra's and/or Abuzahra's). *See, e.g.,* App.1704-1706, 138:16-148:15 (Abuzahra testifies that he asked Maldonado "if he could get us guns;" later, "we just kind of dropped it"). No such activity was charged against Mehanna or even mentioned in the indictment. Masood could not "remember any comment by Tarek agreeing with that." App.1561, 94:10-12; Spaulding said Mehanna thought it was foolish, App.1680, 112:9-10, would violate *aman,* App.1681, 119:12-14, and that Spaulding should not be involved.[10] The subject had nothing to do with Yemen or Mehanna, but its prejudice was obvious.

There was more. The jury heard hours of testimony about Abousamra and Masood's efforts, two years *before* the Yemen trip, to travel to Pakistan to obtain

---

[10] Mehanna helped convince Spaulding that such activity would be un-Islamic. App.1681, 118:19-119:8.

training to fight in Afghanistan.  App.1546-1547, 20:6-27:1.  Mehanna was not involved; the evidence related at most to a separate "conspiracy" he never joined. Abousamra's out-of-court statements were admitted, in violation of rules 402 and 802.

The jury also heard about discussions between Mehanna, Maldonado, and Omar Hamammi in August 2006, more than two years *after* the Yemen excursion. App.1630, 28:3-30:16.  This had nothing to do with Yemen.  Mehanna was "preoccupied with obtaining classical books on the lives of Islamic scholars," Maldonado said.  App.1639, 32:22-33:9. Mehanna disagreed with Maldonado's plan to go to Somalia, and discouraged him from pursuing it.  App.1639-1640*, 33:9-34:17.  There was no criminal agreement, and this evidence too should have been excluded.

This conflation of conspiracies was inappropriate under *Dellosantos*, and in a material support prosecution the variances were highly prejudicial.  *United States v. Pomales-Lebron*, 513 F.3d 262, 269 (1st Cir. 2008) (adequate indictment should "(1) [set forth] the nucleus of operative facts giving rise to the charges against the appellant; (2) list[] some overt acts referable to the charged conspiracy; and (3) describe[] the nature of the alleged agreement between the alleged co-conspirators") (internal quotations omitted).  They did not provide Mehanna with sufficient detail to prepare a defense, avoid unfair surprise at trial, and plead

double jeopardy. *United States v. Pomales-Lebron*, 513 F.3d 262, 269 (1st Cir. 2008); *United States v. Cruz-Arroyo*, 461 F.3d 69, 77 (1st Cir. 2006). Mehanna sought relief in vain. App.0139-0140; App.1911-1914, 52:16-55:17.

Even the testimony *about* Yemen exceeded the bounds of Fed.R.Evid. 801(d)(2)(E). Abuzahra departed the enterprise before reaching Yemen, App.1717, 44:14-46:18, and thereafter distanced himself from Mehanna and Abousamra. App.1720-1721, 57:9-61:1. Rule 801(d)(2)(E) should have excluded any out-of-court statements made by Abuzahra after return from Yemen, *see, e.g.*, App.1551, 43:6-16, for they were not "during and in furtherance of" a conspiracy. *United States v. LiCausi*, 167 F.3d 36, 50 (1st Cir. 1999) (statements made after returning from out-of-state crime spree not in furtherance of conspiracy).

The court also should have excluded almost every statement attributed to Abousamra. His discussions with Pippin occurred *before* any criminal agreement with Mehanna, *supra* at 9, and thus were not made "during" a conspiracy with Mehanna, as required by Rule 801(d)(2)(E). Abuzahra, Masood, and Pippin testified to statements made by Abousamra after his return in 2004. *See, e.g.*, App.1723, 69:7-71:21. This was long *after* the close of any conspiracy involving Mehanna, and once again outside the scope of Rule 801(d)(2)(E). App.1722-1723, 64:5-69:4. *Licausi*, 167 F.3d at 50; *United States v. Martinez-Medina*, 279 F.3d 105, 117 (1st Cir. 2002) ("idle conversations" not within Rule 801(d)(2)(E));

33

*United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001) (same); *United States v. Moss*, 138 F.3d 742, 744 (8th Cir. 1998).  Admission of the conspiracy evidence, taken as a whole, violated Mehanna's rights under the Sixth Amendment to the Constitution.  *United States v. Ventura-Melendez*, 275 F.3d 9, 15 (1st Cir. 2001).

### 4.     The Government Did Not Prove "Attempt."

The proof was also legally insufficient to show *attempt* as to Count III, which requires a substantial step in furtherance "strongly corroborative of the actor's criminal purpose."  *United States v. Doyon*, 194 F.3d 207, 211 (1st Cir. 1999) (quoting MODEL PENAL CODE § 5.01 (1985)) ("close question" whether defendant's payment of drug debt was substantial step toward possession of drugs). "One can imagine some debate," this Court noted, "as to whether a trip from New York to San Francisco—certainly substantial in time and expense—could properly be regarded as attempted bank robbery if there were no other plans or preparation beyond a general (albeit clearly expressed) desire to rob an undesignated San Francisco bank by undetermined means at some unspecified point in the future." *Doyon*, 194 F.3d at 212 n.5.  Here one must posit a San Francisco without banks, for there was no evidence of the existence of a training camp to which Mehanna could have provided support in Yemen in February, 2004, App.1831, 70:1-6; App.1834, 105:24-106:9, and he went there with nothing but one scribbled scholar's name.  Even if the name were a "substantial step" toward training, it was

not a substantial step toward *murder,* which each of the predicate crimes required. A range of possibility separates goat-herding[11] from an actual criminal plan to kill, including mere curiosity and other gradations. "Too ready classification of an otherwise lawful act as a substantial step may capture someone who might well have thought better, and abandoned the effort, before the attempt flowered into the substantive crime." *Doyon*, 194 F.3d at 212. Even under the government's theory, Mehanna thought better: his return flight home was "complete and voluntary renunciation" of any plan posited by the government.

Count IV charged direct violation of 18 U.S.C. §956 in connection with Yemen: *i.e.*, that Mehanna conspired in the United States to commit an act abroad that would constitute the offense of murder. App.0020. The statutory analysis is different than for Count II—because no "material support" is involved, the government did not need to make the legally impossible showing that personnel were to be provided abroad for use by the recipient in a domestic conspiracy. But this conviction must also be reversed for all of the other reasons discussed above. *See supra* at 22-33.

For the reasons discussed, it was error to deny and overrule Mehanna's motions to dismiss and his objections to submitting Count I-IV to the jury.

---

[11] Mehanna later said, "I didn't go there to graze goats." App.0866.

**B.  Mehanna's Speech Was Not, and Constitutionally Cannot Be Material Support (Counts I-III).**

The government rested Counts I-III, in part, on the notion that Mehanna's speech furnished material support, including in particular his translations of *39 Ways* and *The Expedition*.  The theory cannot be reconciled with the First Amendment.  The trial court erred when it denied Mehanna's motions to dismiss the speech components from these counts, and his related request for acquittal. App.0083, 0132; App.1401, 23:13-19; App.1862-1863, 3:19-4:4; App.1868, 9:10-11.

Because the jury may have based its Count I-III verdicts on speech protected by the First Amendment—and this Court cannot know the basis of the general verdicts given the trial court's refusal of a special verdict form, App.1904, 45:23-25; App.1957, 169:18-23; App.0192—the Count I-III verdicts must at minimum be vacated.  *Yates*, 354 U.S. at 312 (reversal where "the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected"); *Boots*, 80 F.3d at 589.

**1.  Mehanna's First Amendment Rights.**

The First Amendment permitted Mehanna to "say anything [he] wish[ed] on any topic." *HLP,* 130 S. Ct. at 2722-23.  Citizens may sympathize with a terrorist organization, *id.* at 2723, or ghoulishly "thank God for dead soldiers" near a fallen Iraq veteran's interment, *Snyder*, 131 S. Ct. at 1217-19.  "[G]overnment has no

36

power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (internal quotation marks omitted). However caustic or offensive, *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), however reptilian the speech may be, *Snyder*, 131 S. Ct. at 1616-17, Congress may not punish it for expressing a point of view. *United States v. Stevens*, 130 S. Ct. 1577 (2010) (statute criminalizing fetishistic "crush videos" depicting animal torture facially unconstitutional). Politics, war, and religion lie at the core of this protection. *Texas v. Johnson*, 491 U.S. 397, 411 (1989); *Elrod v. Burns*, 427 U.S. 347, 356 (1976) ("[P]olitical belief and association constitute the core of those activities protected by the First Amendment.").

The First Amendment also permits Americans who hold politically unpopular views to associate with others who hold similar views. They may associate with, and even be *members* of FTOs, *HLP*, 130 S. Ct. at 2730; *Claiborne Hardware*, 458 U.S. at 908-09, as Mehanna never was.

Speech cannot be punished merely because it is sympathetic to unlawful acts, *Bond v. Floyd*, 385 U.S. 116, 133-34 (1966) (sympathy for criminal draft evasion), even where the acts are those of the enemy in wartime, *Snyder*, 131 S. Ct. at 1216-17. And speech cannot be criminalized merely because its object is

37

persuasion, for the object of *all* advocacy is persuasion, and independent advocacy is protected.  *HLP*, 130 S. Ct. at 2722-23.

*Brandenburg* draws the constitutional line between advocacy speech that Congress may and may not punish.  Even speech encouraging crimes is immune, unless "[it] is directed to inciting or producing *imminent* lawless action and *is likely* to incite or produce such action."  395 U.S. at 447 (emphases added).  The Ohio of 1964 had seen domestic terrorism[12]; when Klansmen gathered to call for the murder of blacks and Jews and for overthrowing the government, *id.* at 445-46, the call was frightening.  Yet even that group's repulsive speech, delivered in a combustible time, could not support a prosecution.  395 U.S. at 447-49.  To invoke "imminent" lawless action, the speaker must address individuals, whom he intends to incite to specific criminal acts, and who are imminently likely to carry them out without delay.  *Hess v. Indiana*, 414 U.S. 105, 108-09 (1973).

*Brandenburg*'s imminence requirements are a buffer around unpopular thought.  "Throughout our decisions there has recurred a distinction between the statement of an idea which may prompt its hearers to take unlawful action, and advocacy that such action be taken.'" *Dennis v. United States*, 341 U.S. 494, 545 (1951) (Frankfurter, J., concurring), *cited in Noto v. United States*, 367 U.S. 290,

---

[12] While *Brandenburg* was pending, Ohio police disrupted a plot to assassinate justices of the Supreme Court.  "Ex-Cop Here Quizzed on Klan Murder Plot," CHICAGO TRIBUNE (Dec. 27, 1968) at 7.

297 (1961).  Criminalizing translation as a form of incitement invades that buffer.

It also asks courts to condition criminal liability on the translator's point of view.

This was powerfully illustrated at trial, where the jury met an American who

immersed himself in the cant of al Qa'ida, used a computer to visit and mine Jihadi

websites, disseminated translations of videos and propaganda, interacted with al

Qa'ida members, and frequently spoke out publicly about his views.  His name was

Evan Kohlmann, and he was the government's star witness.  He provided al Qa'ida

videos and documents, including statements by bin Laden and Zawahiri, to an

organization that published them on its website.  App.1812, 81:20-82:9; App.1813-

1814, 85:4-89:24.  He frequents websites and online forums the government

regards as dangerous and procures the documents, videos, and messages posted

there.  App.1782, 16:1-17:16; App.1784, 26:3-20.  Like Mehanna, he traveled to

the Middle East; *unlike* him, Kohlmann "coordinated" with terrorists—meeting

face to face with and interviewing "individuals who have either been convicted or

have acknowledged their involvement in international terrorist activities,"

App.1769, 100:1-4; App.1770, 106:9-107:3.  Kohlmann was the government's

champion, but his conduct was distinguishable from Mehanna's mainly by his

political views.

　　　　Kohlmann's role showed the incoherence of the government's position.  It is

"perfect" for news agencies to broadcast "an excerpt of two to three minutes" of a

video, App.1782, 18:7-9, but criminal for Mehanna to subtitle the whole thing. Thoroughness thus becomes crime, even though translation is core First Amendment activity. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (transferring ideas is protected); *Meyer v. Nebraska*, 262 U.S. 390, 403 (1923) (upholding the teaching of modern foreign languages).[13] The government argued that Mehanna's dissemination of speech might inspire illegal conduct, but so might the tirade in *Brandenburg,* or the "Call" in *Spock.* "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coal.,* 535 U.S. 234, 253 (2002) (virtual child pornography protected despite risk of encouraging child abuse).

The proposition that translations *actually* inspire is hardly self-evident. They do not inspire Kohlmann, except to testify, and he offered no scientific or quantitative analysis that they inspired anyone else to criminal acts. In a recent government prosecution, actual third parties were *put off* by a propaganda video. Brief of Petitioner at 51, *Al Bahlul v. United States,* No. 11-1324, (D.C. Cir. Mar.

---

[13] Assessing events in Syria, *The New York Times* recently provided an Internet link and partial translation for an al Qa'ida video. *See* Rob Nordland, *Al Qaeda Taking Deadly New Role in Syria's Conflict*, N.Y. Times, July 24, 2012, *available at* http://www.nytimes.com/2012/07/25/world/middleeast/al-qaeda-insinuating-its-way-into-syrias-conflict.html?ref=rodnordland&_r=0. Under the government's theory, that might have been criminal.

9, 2012), Dkt.1362978.   With no evidence of any recruit provided through Mehanna's translation and publication, the theory of recruitment by translation left the jury to the speculations of the government's house witness.[14]

### 2. The Trial Court Misapplied the Core Concept of "Coordination."

The government conceded that Mehanna "was not instructed" by al Qa'ida. App.1383, 39:5-6.   Mehanna provided no money, material, or personnel.   He neither translated nor disseminated anything at al Qa'ida's direction, nor was compensated or controlled by it, nor communicated with it.   *See supra* at 12. Mehanna's translation of *39 Ways* was separately protected by section 2339A(b)(1) (excluding "religious materials" from the definition of "material support or resources").   *See supra* at 13-15.

The government also rested on the Political and Third-party speech discussed above, but there was no showing that any of this speech was translated, disseminated or expressed at the direction or control of al Qa'ida, nor that any of it was intended and likely to inspire imminent lawlessness.   As to Mehanna's website visits, even password-protected sites are electronic public squares: one speaks,

---

[14] Kohlmann does handsomely rooting out defendants for the government. App.1808, 50:19-52:5 (Kohlmann testified for the government in 20 criminal cases, never for a defendant); App.1806-1807, 44:17-45:11 (from 2006-11, Kohlmann earned approximately 40% of his income working with federal prosecutors, the FBI and U.S. military, and foreign governments); App.1806, 41:21-42:5 ($389,000 in consulting fees from foreign governments in 2006-10); *id.* at 43:5-12 (contract with NBC to provide "terrorism expertise").

while others applaud, criticize or denounce.  If visiting websites constituted material support, Kohlmann's whole career would be criminal.

Thus the prosecution of Mehanna's translations and disseminations pivoted to "coordination," which the government framed, with the court's permission, as a sort of "conscious parallelism" in content.  Mehanna was prosecuted for his message, even though the message was his own, and resulted, ironically, in both criminal prosecution and expulsion from Tibyan.  App.1590, 124:17-125:13.

*Coordination*.  The word, "coordination," never appears in section 2339A or the relevant provisions of 2339B.  Although it avoided defining the term, the *HLP* Court used "coordination" to describe the special kind of "service" at issue there: direct, face-to-face teaching, training or advising. "The statute makes clear that 'personnel' does not cover *independent* advocacy," the Court explained. "'[S]ervice' similarly refers to concerted activity, not independent advocacy." *Id.* at 2721-22; *see also* The Compact Oxford English Dictionary (2d ed. 2004) (defining "concerted" as "[a]rranged by mutual agreement; agreed upon, pre-arranged; planned, contrived; done in concert").  Coordination described not the *content* of the speech, but the *relationship* of the speaker and the FTO.  What

42

mattered was that the expert training and advising (concededly benign) was made directly to, and by engaging directly with the FTO.  *Id*. at 2722-28.[15]

From this coinage, the trial court reminted a radical notion: that "coordination" might be found not in the speaker's relationship, *but the speech itself*.  Because his objective was to support al-Qa'ida, the government argued in closing, he was coordinating with al-Qa'ida.  App.1954, 145:5-14.  That flatly contradicted Mehanna's First Amendment rights.  *HLP*, 130 S.Ct. at 2721-22; *Brandenburg*, 395 U.S. at 447-49.  The trial court refused to correct this misapprehension, *see infra* at 48-52; when the jury retired, it had effectively been instructed that moral support was material support.

What the statute actually says is that *provision*, not "coordination" of "material support or resources" is a crime.  *See* 18 U.S.C. §2339A.  "Material support or resources" are mainly concrete items like property, currency, safe houses, weapons, false documents, and communications equipment.  *Id*.

---

[15] The Supreme Court did not decide "exactly how much direction or coordination is necessary for an activity to constitute a 'service.'" 130 S. Ct. at 2710.  Whether advocacy "on behalf of the rights of the Kurdish people and the PKK" before the United Nations and Congress, publishing writings "supportive of the PKK and the cause of Kurdish liberation," or "advocat[ing] for the freedom of political prisoners in Turkey" could—even in theory—run afoul of §2339B "must await a concrete fact situation." *Id*. at 2722 (declining to decide these issues on a pre-enforcement challenge) (internal quotations omitted). The Court did not impose liability on the "teaching" of negotiation techniques through a published book or op-ed, *id*. at 1720-21, which standing alone would not show a relationship between speaker and FTO, even if the speech was intended to benefit the FTO.

§2339A(b)(i).   Where *speech* is alleged to provide or constitute "personnel," "service," or "expert advice," the statute must not be construed "to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States." *Id.* §2339B(i).

*Personnel.* To show provision of "personnel," whether as translator or recruit, the government had to prove that Mehanna provided (or attempted or conspired to provide) "1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization." 18 U.S.C. §2339B(h).   "Personnel" means "employees or employee-like operatives who serve the designated group and work at its command." *United States v. Lindh*, 212 F. Supp. 2d 541, 572 (E.D.Va. 2002); *United States v. Abu-Jihaad*, 600 F. Supp. 2d 362, 400 (D. Conn. 2009), *aff'd*, 630 F.2d 102 (2d Cir. 2010) (provision of classified military information to Jihadi website does not, without more, constitute provision of *personnel* under §2339B).   "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." 18 U.S.C. §2339B(h).

Thus speech proves a "personnel" case only where the crime is based on the speaker's function. The speaker is like a recruiting sergeant. What he says is not material—what matters is that an FTO instructs him to say it, and he complies.

*Service*. The government argued that the same speech amounted to a "service" to al Qa'ida, in that it tended to recruit personnel to al Qa'ida's mission. This contradicted its position in *HLP* that "a defendant must *direct his aid to* a foreign terrorist organization." Brief for Respondents at 13, *HLP*, 130 S.Ct. 2705 (2010) (Nos. 08-1498, 09-89) 2009 WL 4951303 at *13 (emphasis added). "[P]olitical advocacy on behalf of" an FTO and "writ[ing] and distribut[ing] publications supportive of" an FTO, the government recognized, *"would not be criminal"* if conducted independently. *Id.* at 37-38 (emphasis added). The government conceded that the preposition, "to," is a "function word to indicate movement … toward … a place, person, or thing that is reached," and thus that because the statute only prohibits imparting a specific skill "*to* a foreign terrorist organization," 18 U.S.C. 2339B(a)(1) (emphasis added), it "excludes all advocacy or expression that occurs independently of such an organization." *Id.* at 22 (quoting *Webster's Third New International Dictionary* 2041 (1993)) (emphasis added). An individual who wants his speech to support an FTO's objective has not, without more, met this test.

Unless the same functional approach applies—the government must demonstrate that the speaker was directed or controlled, or interacted directly—its prosecution is simply for advocacy speech. "Advocacy" is "public support for or recommendation of a particular cause or policy." New Oxford American Dict. 24 (2001). The use of active speech to persuade, inspire or encourage persons to specific ends cannot be enough for liability, for even an independent advocate intentionally advances the goals of the person for whom he speaks. *HLP*, 130 S Ct. at 2730 ("[T]he statute does not penalize mere association with a foreign terrorist organization ... [or] being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group.") (internal quotation omitted). *Hill v. Colorado*, 530 U.S. 703, 716 (2000) (First Amendment protects "right to attempt to persuade others to change their views"). "[T]he very object of some of our most important speech is to persuade...." *Lee v. Weisman*, 505 U.S. 577, 591 (1992); *see Eisenstadt v. Baird*, 405 U.S. 438, 459 (1972).

*Expert Advice and Assistance.* The government tried to make out a third term in the definition: "expert advice and assistance" as a translator of Arabic to English. Rudimentary knowledge of a language spoken by hundreds of millions of people is not "expertise." *See HLP*, 130 S. Ct. at 2724 ("plaintiffs' speech is not barred if it imparts only general or unspecialized knowledge"). Arabic and English are "general and unspecialized": each language is familiar to hundreds of millions

46

of uneducated persons. A first-generation American, Mehanna never took an Arabic course, and his Arabic was only conversational.  App.1842, 37:18-39:15; App.1960, 10:11-20 (special skills adjustment not available, and noting Mehanna learned Arabic at home where it was "frequently spoken"); *see also* U.S. SENTENCING GUIDELINES MANUAL §3B1.3 Application Note 4 (Nov. 2011).  In sum, the trial court's equation of "coordination" with conscious parallelism cannot be reconciled either with the statute or *HLP*.

The equation also violated Mehanna's First Amendment rights.  In *Brandenburg*, the speaker knew the Ku Klux Klan's agenda to be criminal and intended to advance it.  395 U.S. at 447-49.  "[T]he critical line for First Amendment purposes must be drawn between advocacy, which is entitled to full protection, and action, which is not."  *Healy v. James*, 408 U.S. 169, 192 (1972). Nothing in *The Expedition*, *39 Ways*, the videos, or the IM chatter was both intended and likely—as *Brandenburg* requires—to cause a listener imminently to join an FTO under section 2339B, or commit a predicate crime under section 2339A.

The court's construction was also unconstitutional for vagueness.  *United States v. Sattar*, 272 F. Supp. 2d 348, 356-61 (S.D.N.Y. 2003), held that the statutory terms, "communications equipment" and "personnel" did not provide fair notice that counsel to the so-called Blind Sheikh would provide "material support"

47

by communicating the client's messages. "A criminal statute implicating First Amendment rights must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Id*. at 357 (internal quotation omitted). A person of ordinary intelligence could not determine from the material support statute that political speech and translation sympathetic to some, but not all goals of an FTO was criminal.

In short, the government needed, but failed, to prove that when Mehanna spoke, he was so far directed or controlled by al Qa'ida as to be functionally within its command structure, or that he interacted directly with the kind of face-to-face advisory meetings at issue in *HLP*. It was error to deny the motion to dismiss Counts I-III as they relate to speech.

### 3.    The Court's Instructions on "Coordination" Were Insufficient and Erroneous.

The court compounded this error with its jury instructions. Where First Amendment concerns are implicated, the risks posed by erroneous jury instructions are profound. *Sanchez-Lopez v. Fuentes-Pujols*, 375 F.3d 121, 133 (1st Cir. 2004) (*vacatur* ordered where failure to give First Amendment instruction might have affected outcome). This Court reviews *de novo* preserved objections to a refusal to instruct. The focus of review is whether instructions "adequately explained the law or whether they tended to confuse or mislead the jury on controlling issues,"

*Sanchez-Lopez*, 375 F.3d at 133 (internal quotation omitted).  It is reversible error to refuse to give an instruction that was "(1) substantively correct; (2) not substantially covered elsewhere in the charge; and (3) concerned a sufficiently important point that the failure to give it seriously impaired the defendant's ability to present his or her defense."  *United States v. Prigmore*, 243 F.3d 1, 17 (1st Cir. 2001).

The government did not contend that Mehanna translated *39 Ways* or *The Expedition* on al Qa'ida's orders, App.1937, 75:13-76:11; App.1954, 144:24-145:20, and there was no evidence of direct interaction of the sort posited in *HLP*. Thus the government could prevail on its theory of speech-as-material support only if the jury found that Mehanna's translations fit within the four corners of the statute—including the "coordination" gloss—that provision of a material *service* may be found in direct interaction between an FTO and the defendant in furtherance of concerted activity.  *See supra* at 45-46.  The court adopted the gloss wholesale, but refused to define "coordination," failing to instruct that it can be found only in the direct relationship between speaker and FTO/terrorist, and not in the content of the speech itself.  It refused Mehanna's proposed instruction 7 that:

> It is not a crime if a person independently does an act that he believes will be supportive of the terrorist group or will advance its goals and objectives.  In other words, *the person must have a direct connection to the group and be working directly with the group for it to be a violation of the statute.*

49

App.0167-0168 (emphasis added); App.1884-1885, 25:21-26:19; App.1957, 169:2-4, 21-23.   It also refused to give Mehanna's proposed instruction 4 that "coordination" requires more than "[m]ere association with terrorists or a terrorist organization."  App.0160-0161; App.1957, 168:24-169:1, 169:21-23.

The court devoted less than two minutes to "coordination" and "independent advocacy":

> Persons who act independently of a foreign terrorist organization to advance its goals or objectives are not considered to be working under the organization's direction or control. A person cannot be convicted under this statute when he's acting entirely independently of a foreign terrorist organization. That is true even if the person is advancing the organization's goals or objectives. Rather, for a person to be guilty under this count, a person must be acting in coordination with or at the direction of a designated foreign terrorist organization, here, as alleged in Count 1, al Qa'ida.

> *You need not worry about the scope or effect of the guarantee of free speech contained in the First Amendment to our Constitution.* According to the Supreme Court, this statute already accommodates that guarantee by punishing only conduct that is done in coordination with or at the direction of a foreign terrorist organization.  Advocacy that is done independently of the terrorist organization and not at its direction or in coordination with it does not violate the statute.

> Put another way, activity that is proven to be the furnishing of material support or resources to a designated foreign terrorist organization under the statute is not activity that is protected by the First Amendment; on the other hand, as I've said, independent advocacy on behalf of the organization, not done at its direction or in coordination with it, is not a violation of the statute.

App.1924, 24:3-25:4 (emphasis added).[16]

This was an empty catechism, circular and confusing.  Whether "activity []
is proven to be the furnishing of material support or resources" was the *question*,
not the predicate—and the instructions did not give the jurors critical guidance on
how to answer it.  The court refused to say that "coordination" refers to a direct,
working relationship between the speaker and the FTO/terrorist analogous to the
direct training and advising found unlawful in *HLP*, 130 S. Ct. at 2729; *see supra*
at 42-44.  It never told the jury that "coordination" was more than one-sided
parallelism of content.  It refused to guide the jury on "coordination" in a way that
avoided serious vagueness and First Amendment problems, and left the jury free to
convict for the content of Mehanna's speech, even where there was no relationship
to any FTO or terrorist.

The *HLP* Court noted that the boundaries of "coordination" are both
problematic and constitutionally-driven.  Because *HLP* was a pre-enforcement
facial challenge, the Court properly declined to answer the "difficult questions of
exactly how much direction or coordination is necessary for an activity" to violate
the statute.  130 S. Ct. at 2722.  These questions of "degree," the Court held, "must

---

[16] The trial court limited its "coordination" instruction to Count I, but said
nothing about Counts II and III.  The failure to instruct *at all* on the "coordination"
requirement in Counts II and III is an independent and reversible error as to those
counts.

await a concrete fact situation." *Id*. (internal quotation omitted).[17]  But the trial court *had* a concrete fact situation, and was obliged to teach the jury how to apply the law to it.  *United States v. Rule Indus., Inc*., 878 F.2d 535, 544 (1st Cir. 1989) ("[T]he object of a charge to a jury is … to try to make jurors who are laymen understand what you are talking about.") (internal quotation omitted).

### 4.  The Court's Direction to Ignore the First Amendment Warrants Reversal.

The trial court was worse than silent: it directed the jurors *not* to consider Mehanna's First Amendment rights.  App.1924, 24:14-25:4.  A jury left in the dark to find a constitutional line was instructed to ignore constitutional light in searching for it.  The admonition kneecapped Mehanna's closing argument—given the same morning as the instructions—that his activities were constitutionally protected.   App.1952, 137:11-23 (asking jury to "accept [Mehanna's] right to independently advocate" his religious and political beliefs).  But it also invited the government to rush in—and rush it did, arguing that translation and distribution of "something that's produced by al Qa'ida" is necessarily translation "for" and distribution "on behalf of" the FTO, constituting "coordination with" al Qa'ida. App.1954, 145:5-14.

---

[17] *See also id.* at 2732-39 (Justice Breyer, dissenting, criticizing "coordination" as, *inter alia*, vague and unworkable).

At the climax of the trial, moral support became material support.  By instructing them to put the First Amendment out of mind, App.1924, 24:14-15, the court told the jury that it was free to convict on the basis of controversial or unpopular opinions.  This contradicted the law.  *HLP*, 130 S.Ct. at 2721-22; *Johnson*, 491 U.S. at 414 ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *see supra* at 36-41.  The instructions helped realize "the possibility that the [government] will prosecute—and potentially convict—somebody engaging only in lawful political speech," which lies "at the core of what the First Amendment is designed to protect."  *Virginia v. Black*, 538 U.S. 343, 365 (2003) (error to instruct jury that cross burning was sufficient evidence from which to infer necessary intent for hate crime conviction).[18]

The court's refusal to define coordination, and its admonition to disregard the First Amendment, sharpened the prejudice of its refusal to instruct that Mehanna's First Amendment rights included the freedoms to hold, and express,

---

[18] In a poignant illustration of the jury's dilemma, a juror came to sentencing and asked to speak on Mehanna's behalf.  She had been unable to sleep after reading about the case, and did not think Mehanna dangerous, nor that he should be further imprisoned.  App.0196; App.1960-1961, 12:17-13:13. Her request to address the trial court was denied.  This too was error.  *See* Fed. R. Crim. P. 32(i)(4)(A)(ii) (defendant's right at sentencing hearing to "present any information" to mitigate the sentence).

unpopular views, to hold and espouse his particular religious convictions, and to sympathize with and associate with known enemies of the nation, as set out in Mehanna's requested instructions 5 and 6.   App.0164-0166; App.1884-1885, 25:21-26:19; App.1957, 169:2-4, 169:21-23.   After a trial that savaged Mehanna for his beliefs and acquaintances, these essential instructions would have "specifically limited the jury's consideration of the defendant's speech to how it pertained to the elements of the offense as alleged in the indictment."  *United States v. El-Mezain*, 664 F.3d 467, 538 (5th Cir. 2011).[19]

The errors in the jury instructions warrant reversal.  *Prigmore,* 243 F.3d at 17; *Sanchez-Lopez*, 375 F.3d at 133; *see Hamling v. United States*, 418 U.S. 87, 108 (1974) (reversal required where proposed jury instructions likely "would have materially affected the deliberations of the jury").

### C.    Multiple Errors at Trial Separately Warrant Reversal.

#### 1.    Inflammatory But Protected Speech Evidence So Prejudiced the Trial that the Convictions on All Counts Must Be Reversed.

Having bloated the record with evidence of, at best, distinct conspiracies and Mehanna's own protected speech, the government sealed matters with the Political

---

[19] *El-Mezain* upheld instructions that directed the jury to examine only speech intended to provide material support as defined by the statute, 664 F.3d at 538, included the text of the First Amendment, and stated that defendant could not be convicted "simply on the basis of his beliefs, [or] his expression of those beliefs."  *Id*. at 536-37.

and Third-party speech—which had nothing to do with the Yemen trip at all. "[Using] its procedural advantages to expand the strict elements of the offense," *Spock*, 416 F.2d at 172, the government inflamed the jury with weeks of this material.

This included not only Mehanna's instant messages and political views, but speech of infamous "unindicted co-conspirators"—including bin Laden, Zawahiri, and Zarqawi—with whom Mehanna never had contact. The government even threw Mehanna's adolescent verse before the jury.[20]

The government introduced fourteen images of bin Laden, App.0243, 0344, 0354-0356, 0358-0362, 0364, 0377, 0379, 0381, ten of Zarqawi, App.0357, 0363, 0365-0370, 0372, 0377, and four of Zawahiri, App.0362, 0376, 0378, 0380, along with dozens of other prejudicial images, Exs.62, 97, 229-235, 334, 336, 363A, 367A-M, 368A, 785-786; App.0333-0352, because Mehanna may have seen them. More than two hundred exhibits—running to hundreds of pages—of IM chatter between Mehanna and associates about his political views (and everything else

---

[20] If it is criminal to extol death in verse, then Homer, Shakespeare, Tennyson, Whitman and the Psalmist might have been prosecuted, too. *See, e.g.,* HOMER, ILIAD XXII 123-25 (tr. S. Lombardo 1997) (Hector musing, "I'll be much better off facing Achilles, either killing him or dying honorably before the city."); *Psalm* 116:15 ("Precious in the sight of the Lord is the death of his saints."); WILLIAM SHAKESPEARE, JULIUS CAESAR act 2, sc. 2; ALFRED, LORD TENNYSON, ULYSSES, ll. 58-61; WALT WHITMAN, LEAVES OF GRASS, *Out of the Cradle Endlessly Rocking*, Book XIX.

under the sun, *except* Yemen) were admitted.  Exs.495-737 (App.0922-1191).  On the twenty-sixth day of trial, the government showed the jury twenty-eight images of the World Trade Center in flames.  App.0382-0410.  None of this was relevant to criminal intent as to Yemen.

The government introduced Osama bin Laden before Halloween and embraced him almost until Christmas, *see* App.1434, 28:1-14 (opening statement); App.1939, 83:2-22 (closing argument).  Al Qa'ida's *State of the Ummah* video (App.0786-0787), which Mehanna took no part in preparing, was shown several times.  App.1512, 81:2-82:2; App.1727, 85:3-17.  The court admitted an Al Jazeera interview with bin Laden, App.0199; App.1449, 28:11-17, a bin Laden eulogy of Zarqawi, App.0332; App.1803, 101:5-19, and the book, *Messages to the World – The Statements of Osama bin Laden*.  App.1194; App.1468, 23:1-20.  A Scotland Yard inspector played a video featuring Zawahiri entitled *Note to Pakistan*, App.0704,  found on the computer of a person who never testified and whose name appears nowhere in the indictment.  App.1540, 23:1-8.  The jury was also shown a portion of Zawahiri's "Loyalty and Enmity, An Inherited Doctrine and a Lost Reality."  App.0241; App.1693, 36:16-37:18.  The jury heard that Zarqawi is featured in graphic videos beheading Western hostages, App.1796-1797, 75:20-76:7, and saw two more Zarqawi videos, entitled *Slaughterer*, on multiple occasions, App.0311, 0312; App.1479, 64:12-21; App.1764, 126:4-127:2.  There

was no evidence that Mehanna ever viewed *any* of these exhibits until long after he returned from Yemen.

Many exhibits also should have been excluded because they were "thumbnail" images.[21]   As defense expert Mark Spencer explained without contradiction, thumbnails have no probative value, because they can be automatically transferred to a person's computer by an Internet web browser without his knowledge or intervention.  App.1849, 15:19-16:3.

In short, the government showed the jury at least thirty-three video clips having nothing to do with why Mehanna went to Yemen, but rich with Jihadi cant and violence, merely because Mehanna had watched or discussed them.  App.1479, 64:20-21;  App.1482,  76:9-77:9,  78:8-79:7;  App.1483,  80:5-21,  82:18-19; App.1483-1484, 83:22-84:1; App.1484, 84:19-85:1, 85:14-21; App.1487, 99:1-3; App.1489,  104:23-105:6;  App.1512,  81:12-82:2;  App.1513,  91:3-5;  App.1514, 101:13-15; App.1515, 103:23-104:2, 104:7-12; App.1540, 23:1-5; App.1644, 84:2-7; App.1645, 88:5-7; App.1646, 94:11-13; App.1695, 73:16-74:17; and App.1764, 126:24-127:2.  In *Stanley v. Georgia*, 394 U.S. 557, 565 (1969), the Supreme Court struck a conviction based on viewing habits, memorably observing that "[i]f the First Amendment means anything, it means that a State has no business telling

---

[21] *See, e.g.*, App.0333-0340, 0347, 0375, 0382-0412.  Ninety-five of the 158 government exhibits of images recovered from Mehanna's computer were thumbnails.  App.1849, 15:6-17.

a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds."

This is where the trial went off the rails. Deeply prejudicial to Mehanna, this evidence was certain to confuse any rational inquiry into whether the government had proved, beyond a reasonable doubt, a criminal enterprise in connection with Yemen. For example, the jury heard explicit testimony concerning a video—which Mehanna did not prepare or translate, but did view in June, 2002, App.1549, 35:1-11, *more than a year before* anyone discussed Yemen —showing the beheading of a *Wall Street Journal* reporter. Evidence so revolting would inflame any jury. The jury saw clips from numerous videos watched long *after* return from Yemen, including, for example, film clips discussed in February, March, and April, 2006. *See, e.g.*, App.1482, 76:9-77:9, 78:8-79:7; App.1483, 80:5-21, 82:18-19; App.1483-1484, 83:22-84:1; App.1484, 84:19-85:1, 85:14-21. None of this material was even remotely relevant, but even if it were technically so, all should have been excluded under Fed. R. Evid. 403. *United States v. Al-Moayad*, 545 F.3d 139, 159-60 (2d Cir. 2008). Its prejudicial impact dwarfed any trivially-probative value concerning Mehanna's intentions on the Yemen trip.

Courts will invoke Rule 403 where prejudicial information "involve[d] conduct more inflammatory than the charged crime[s]." *United States v. Paulino*,

445 F.3d 211, 223 (2d Cir. 2006).   In *Al-Moayad,* the Second Circuit found

*reversible* error where the government, under an unindicted co-conspirator theory,

introduced bin Laden and Zawahiri into a material support case in which there was

no evidence of any link between them and the defendant:

> [T]he government's presentation of images of Bin Laden and Al-
> Zawahiri, was highly inflammatory and irrelevant, and should not
> have been permitted by the district court. The government presented
> no evidence linking Goba to Al-Moayad, and yet his extensive
> testimony was admitted against Al-Moayad as part of the
> government's rebuttal case.

545 F.3d at 163; *see also United States v. Royer*, 549 F.3d 886, 901-03 (2d Cir.

2008) (affirming exclusion as prejudicial of reference to al Qaeda even in a trial

involving defendant allegedly connected to 9/11).   It is as idle in this case as it was

in *Al-Moayad* to suggest that the jury was not unfairly prejudiced, with bin Laden's

brooding image held before it from the first word until the last.

Mehanna's objections were overruled, and his motions for mistrial denied.

Dkt.279; App.1507-1510, 48:22-62:13; App.1644, 84:12-86:7; App.1646, 92:16-

94:7; App.1808, 51:6-15; App.1759, 102:4-105:5; App.1765, 16:19-17:6.   At the

close of evidence, Mehanna again moved to exclude hearsay statements of those

with whom he had never communicated and with whom the government never

established he had conspired.   App.0135.   Having allowed the evidence in without

restriction, the court denied the motion on the inconsistent basis that statements of

bin Laden, Zawahiri and others had been offered as mere evidence of "events."

59

App.1901-1915, 46:2-56:1.[22]   The court ruled that other individuals, such as Mughal, Tsouli, al-Bualy, al-Dour, Rashad, Siddiqui and Hamammi, met the co-conspirator hearsay exception, App.1913-1914, 54:7-55:12, although there was no evidence that those persons participated in the alleged Yemen conspiracy, or in any conspiracy with Mehanna that had a criminal purpose.

### 2.     The Court Erred In Excluding Mehanna's Expert Rebuttal Witnesses.

Having posited that speech itself might provide material support, the trial court excluded expert evidence that Mehanna's speech did not.  The jury heard Kohlmann opine that reviewing a video in English is substantially likely to cause actual recruits to join al Qa'ida.[23]  He offered no empirical basis for this opinion. App.1771, 113:18-115:3 (report based on "comparative analysis form of social science"). The court then excluded Mehanna's rebuttal experts, Drs. Williams and Durlauf, who would have testified that Kohlmann's analysis was unreliable and the material did not serve any recruiting purpose.  App.1822-1823, 21:1-24:22.  The

---

[22] A personal library may contain Adolf Hitler's *Mein Kampf,*  Karl Marx' *Das Kapital,* Christopher Hitchens' *god Is Not Great*, or even E.L. James' *Fifty Shades of Gray* without proving the librarian's specific intent to commit a crime or conform to the text.

[23] Kohlmann said translations are key to al Qa'ida's recruiting efforts, App.1780, 11:13-22; *see also* App.1776, 135:4-10, and  called *39 Ways* an "instructional [guide] for individuals that are self-radicalizing or self-recruiting to follow in order to get an idea of what they can do to help support al Qa'ida's mission."  App.1789, 46:15-20.

court said, "[T]he success results of the videos as recruitment is not an issue.... It's whether any activity by the defendant in particular was pursuant to a conspiracy to provide material support or was an attempt to provide material support even if the attempt, for example, was a failure because no one even watched them." App.1846, 146:2-10. This was circular. Kohlmann was not called as a mind-reader. He was called to persuade the jury that Mehanna's speech accomplished something material.

Mehanna argued that "[Durlauf's] testimony is absolutely critical for the fact-finder to understand not the substance of the conclusions that Mr. Kohlmann is making but the manner in which he made them." App.1822, 21:7-10. The court said the proposed testimony lacked the proper "fit" under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), noting that it would have amounted to scientific evidence relating to "the probability or likelihood that a given person would act—would be a potential terrorist given his actions," App.1822, 23:6-7, while the testimony it was intended to rebut was "not scientific evidence in a strict sense, and ... was based on something other than experimental science." App.1823, 24:11-16. That Kohlmann's testimony was not science was *Mehanna's* point, not the government's. *Daubert* concerns whether a jury may hear an expert at all. It does not suggest that the credibility of his opinion, once heard, may be shielded from challenge. "[A]n expert's scientific testimony … *should be tested by*

61

*the adversary process—competing expert testimony* and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.'" *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling*, 161 F.3d 77, 85 (1st Cir. 1998) (citing *Daubert*, 509 U.S. at 596) (emphasis added). Once Kohlmann was permitted to testify, Mehanna had the right to call experts to challenge his opinions, and the methodology by which they were derived. Having allowed the government to bury the jury in Mehanna's speech, and then call Kohlmann to say it was effective recruitment, *see, e.g.,* App.1780, 11:11-22, the court abused its discretion by excluding a rebuttal. *United States v. Shay*, 57 F.3d 126, 132-34 (1st Cir. 1995) (conviction vacated where erroneous exclusion of expert potentially resulted in actual prejudice); Fed. R. Evid. 104(e) ("right to introduce before the jury evidence that is relevant to the weight and credibility of other evidence").

### 3.    Appellant was Unfairly Prejudiced By the Court's *Brady* Ruling.

Prior to trial, defense counsel received reliable information that Mehanna had refused a law enforcement agency's solicitation (through an undercover agent or cooperating witness) to criminal acts. *See* Declaration of Janice Bassil (Doc. 00116440010) ¶3, pp.9-10. Mehanna moved to compel the production of this potentially exculpatory evidence. App.0107; App.1404, 33:24-34:21; App.1407, 46:2-10. The government represented that it had no information "evidenc[ing] the

defendant's rejection of tasking from Al-Qa'ida."  Dkt.201, 6; App.1407, 39:9-12.[24]

Following the hearing, the trial court met with government counsel *ex parte* to discuss the motion.  Bassil Decl. ¶¶6-12; App.1409, 53:10-13.[25]  Mehanna's motion was subsequently denied.  App.0117.

*Brady v. Maryland,* 373 U.S. at 87, requires that the government disclose evidence favorable to the accused that would tend to negate guilt, mitigate punishment, or undermine the credibility of government witnesses, including evidence known only to police investigators and not to the prosecutor.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  Reversal is warranted where the government withholds such evidence and prejudice ensues.  *Id.*

Evidence of Mehanna's refusal to commit a crime would have reinforced the defense's core proposition, that Mehanna may have sympathized and spoke, but avoided crossing the line to criminal activity.  It would have helped the jury understand, in the face of testimony of government witnesses testifying under immunity grant, that *aman* was a chosen way of life that prohibited Mehanna from participating in criminal acts against Americans, and further impeached the credibility of Abuzahra's testimony that Mehanna was willing to commit such acts.

---

[24]  In a sting operation, the tasking would not have been "from Al-Qa'ida."

[25]  Mehanna understands that a sealed transcript of that *ex parte* hearing has been lodged with this Court.  Bassil Decl. ¶12.

App.1703-1705, 137:1-142:16.    On information and belief (which may be corroborated by the sealed filings available to the Court), such information exists and was withheld from the defense, which is grounds for reversal and remand. *Brady,* 373 U.S. at 86-87; *Strickler*, 527 U.S. at 281-82.

###    D.    The Government Could Not Prove Materiality as to Count VI.

It is unlawful knowingly or willfully to make "any materially false, fictitious, or fraudulent statement or representation" to the U.S. government. 18 U.S.C. §1001(a)(2).    Mehanna was convicted of two counts (VI and VII) of making such statements to the FBI, and a related conspiracy charge (Count V). Because the government's proof was infected with highly inflammatory evidence including protected speech, the convictions on these (and all other) counts should be reversed and remanded.    *See infra* at 69-71.    In addition, the Count VI conviction must be overturned because, as a matter of law, the evidence was insufficient to prove the materiality element.

By late 2006, Mehanna was a person of extreme interest.    The FBI had secretly searched his computer and home.    App.1447, 14:3-9, 15:9-19; App.1448, 21:20-22.    On December 12, it recorded a call between Mehanna and Maldonado. App.0648, 0650.    The next day, it recorded Mehanna saying Maldonado had moved to Somalia.    App.0788.

Three days later, FBI agents came to Mehanna's work place, questioning him informally in the break room in an unrecorded interview.  App.1604, 110:8-20; App.1607, 125:24.  Looking for leverage, they asked questions about Maldonado, whose answers they already knew.  Mehanna said that he had last heard from Maldonado two weeks earlier, and that Maldonado was living in Egypt.  App.1609, 27:6-23.  This gave the FBI the leverage it had come for.  In 2008, it brought false statement charges.  App.1690, 39:10-24. Although aware of the facts on which it would later base terrorism charges, the government did not bring those charges.  With the lesser charge filed, and greater charges hanging, the government might coerce Mehanna to become an informant.

Mehanna moved to dismiss Counts VI and VII on the ground that his answers to the FBI were not material under §1001(a)(2).  App.0085; App.1401-1402, 23:24-27:15.  The court denied the motion.   App.1403, 29:24-30:6.

"[T]he ever-metastasizing §1001," *United States v. Moore*, 612 F.3d 698, 702 (D.C. Cir. 2010) (Kavanaugh, J., concurring), has long concerned the judiciary:

> [Section] 1001 prosecutions can pose a risk of abuse and injustice ... because §1001 applies to virtually any statement an individual makes to virtually any federal government official-even when the individual making the statement is not under oath (unlike in perjury cases) or otherwise aware that criminal punishment can result from a false statement.

*Id.* at 703 (citing Alex Kozinski & Misha Tseytlin, *You're (Probably) a Federal Criminal,* IN THE NAME OF JUSTICE 43, 47 (2009)); *see generally* Steven R. Morrison, *When Is Lying Illegal? When Should It Be? A Critical Analysis of the Federal False Statements Act*, 43 J. MARSHALL L. REV. 111, 119-20 (2009).

The original purpose of the statute was "to protect the Government from the affirmative, aggressive and voluntary actions of persons who take the initiative" and "from being the victim of some positive statement which has the tendency and effect of perverting normal and proper governmental activities and functions." *Brogan v. United States*, 522 U.S. 398, 413 (1998) (internal quotation omitted) (Ginsberg, J., concurring).  The statute's precursor "prohibited false claims against the government and the use of false statements in support of such fraudulent claims."  *United States v. Chevoor*, 526 F.2d 178, 182 (1st Cir. 1975) (*overruled in part by Brogan*, 522 U.S. at 401-06).

Where a defendant by false statement seeks something from the government—a guaranteed loan, immigration status—"[t]he test of materiality is whether the false statement in question had a natural tendency to influence, or was capable of influencing, a governmental function," not "whether the agency actually relied upon it."  *United States v. Sebaggala*, 256 F.3d 59, 65 (1st Cir. 2001) (false statements to customs official about amount of currency carried by one seeking entry).  But where the speaker seeks nothing from the government—where the

government has sought *him* out—a statement known to be false cannot "ha[ve] a natural tendency to influence, or [be] capable of influencing, a governmental function," as required by *Sebaggala*. The taking of such a statement is not investigative; its only real purpose is to give law enforcement leverage.[26] Reading "materiality" to embrace statements the government knows to be false does not protect the government from manipulation. It fashions a tool with which the government becomes the manipulator.

The better-reasoned cases involving informal FBI interviews conclude that materiality is *not* shown where the FBI knows the statement to be false when it is made. "The statute was not intended to embrace oral, unsworn statements, unrelated to any claim of the declarant to a privilege from the United States or to a claim against the United States, given in response to inquiries initiated by a federal agency or department...." *United States v. Bedore*, 455 F.2d 1109, 1111 (9th Cir. 1972) (reversing conviction for giving FBI a false name). In *United States v. Ehrlichman*, 379 F. Supp. 291, 292 (D.D.C. 1974) (reversing conviction), the court said:

> The principal difficulty with invoking §1001 to punish those who lie to the F.B.I. when there is no legal obligation to respond to its inquiry is that the prosecution can thereafter demand sanctions as onerous as

---

[26] Learning of a lesser crime, prosecutors may negotiate cooperation with a defendant, but the statute should not be read to let them *generate* a lesser crime to obtain coercive leverage.

those imposed under the general perjury statute ... without affording
those suspected of criminal conduct with any of the safeguards
normally provided under that statute....  In short, the F.B.I. interview
may occur—as it did here—under extremely informal circumstances
which do not sufficiently alert the person interviewed to the danger
that false statements may lead to a felony conviction.

*See also United States v. Davey*, 155 F. Supp. 175, 178 (S.D.N.Y. 1957) ("I fail to

see that the giving, receiving and recording of [] a false statement [during an FBI

interview] perverts the true function of the Federal Bureau of Investigation").

When the FBI drops by the Walgreens' break room, a defendant may be

lured to falsehood, but the government trades in deception of a subtler kind.  Never

disclosing its pervasive and surreptitious computer copying, photographs, and

wiretaps, it then projects through falsely casual circumstances what the interview is

not: casual and impromptu.  The citizen cannot conceive that speaking to the

fellow by the coffee machine may cost him years in prison.

Because the government's evidence conclusively disproved materiality, this

Court need not depart from its precedents.  It need not reach whether, in

impromptu FBI interviews, the government must always—or even ever—carry a

burden of proof that it was "actually influenced" by a false statement.  It is enough

in this case to hold that where the government's own evidence shows that it was

not in fact influenced (because here it knew the answers to the questions it asked,

and asked them in a staged setting in order to coerce cooperation), then those

answers did not have a natural tendency to influence its investigation within the

meaning of *Sebaggala*.    With the element of materiality was conclusively

disproved, the Court should reverse the Count VI conviction.

### E.    Prejudice and the Spill-over of Evidence Requires Reversal and Remand of All Counts.

Because the jury was permitted to ground its verdicts in protected speech,

and even the request for a special verdict was denied, all convictions must be

reversed.  *Bachellar v. Maryland*, 397 U.S. 564, 571 (1970) (conviction reversed

where record did not show which of multiple bases supported conviction and one

violated First Amendment); *Stromberg v. State of Cal.*, 283 U.S. 359, 369-70

(1931) (same).   In the shadow of hundreds of exhibits constituting *Ipso facto*,

Political, and Third-party speech, this Court cannot conclude that a jury so

profoundly infected by political speech found the requisite criminal intent under

Counts I-IV, and convicted for that, rather than Mehanna's generally-unpopular

political viewpoint or associations.   Absent special verdicts, it is impossible to

know whether the general verdicts were based on an impermissible prosecution

theory.

This is made more urgent by the extreme prejudice of the trial.  "When an

appellate court reverses some but not all counts of a multicount conviction, the

court must determine if prejudicial spillover from evidence introduced in support

of the reversed count requires the remaining convictions to be upset."   *United

States v. Rooney*, 37 F.3d 847, 855 (2d Cir. 1994).  Whether "prejudicial spillover"

occurred depends, in part, on whether "the elimination of the invalid count [would have] significantly changed the strategy of the trial," *United States v. Wright*, 665 F.3d 560, 575 (3d Cir. 2012), and whether "evidence on the vacated counts was inflammatory and tended to incite or arouse the jury to convict the defendant on the remaining counts," *United States v. Naiman*, 211 F.3d 40, 50 (2d Cir. 2000). Elimination of the prejudicial speech below would have focused the case properly on logistical evidence regarding the 2004 Yemen trip and the 2006 FBI interview. More centrally, the content of the speech provoked irresistible emotions. The government's concluding twin-tower images expressed visually what hundreds of exhibits had kindled in the jury for more than a month: flames. With prejudice so extreme, reversal of all counts is warranted.

Mehanna is also entitled to this relief under the Fifth Amendment. A fair trial is the minimum "process" due an American charged with federal crimes. *Chambers*, 410 U.S. at 294 ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."). The variances, conflation of conspiracies, infection of the trial with protected but unpopular speech, abuse of the evidentiary rules concerning conspiracy and prejudicial evidence, exclusion of defense experts, and the sheer volume of emotionally-charged, non-probative materials admitted in this case combined to deprive Mehanna of that process. *Id.* at 294-303 (cumulative effect of

evidentiary rulings can render trial fundamentally unfair and deprive defendant of due process of law).  This was error warranting, at minimum, *vacatur* and remand.

### F.    In the Alternative, Mehanna Is Entitled to Resentencing.

The trial court departed appropriately, but from the wrong sentencing range; *i.e.,* that advised by the 2011 U.S. Sentencing Guidelines Manual, App.1959, 7:3-5; App.1974-1975, 68:22-70:9.  Had it properly constrained Counts II-IV and limited the prosecution's case to whether Mehanna's trip to Yemen was sufficient to prove the charges against him, any offenses based on those counts were complete upon Mehanna's return from Yemen in February 2004, when the base offense level was 28. U.S. SENTENCING GUIDELINES MANUAL §2A1.5 (Nov. 2003), leading to a range of 97-121 months.  *Id*. §5 pt. A.  The 2011 Guidelines imposed a base offense level of 33 for Count II, which led to a range of 168-210 months— and Mehanna's 210-month sentence.  App.1975, 71:25-72:8; App.1976, 73:1-24. Use of the 2011 guidelines violated the *Ex Post Facto* clause.  Art. I, §9, cl. 3; *see United States v. Rodriguez*, 630 F.3d 39, 41 (1st Cir. 2010) ("Judges *still* must start out by calculating the proper Guidelines range—a step so critical that a calculation error will usually require resentencing") (emphasis original).  If application of the guidelines in effect at the date of sentencing would produce a harsher result than the guidelines in effect on the date of the offense, the court must apply the earlier guidelines.  *Id*. at 42; *see also Miller v. Florida*, 482 U.S. 423, 431 (1987).

71

The government should not be able to use the "one book" rule, §1B1.11(b)(3), as was done in *United States v. Goergen*, 683 F.3d 1, 3 (1st Cir. 2012). Because the Yemen excursion was a unique event, and what followed was constitutionally different and singular (protected speech), the offenses spanning the guideline amendment were neither continuing nor similar in nature. *Contrast Goergen*, 683 F.3d at 2-3 (multiple violations of 18 U.S.C. §2251(a) spanning guidelines amendment); *United States v. Cruzado-Laureano*, 404 F.3d 470, 472-79 (1st Cir. 2005) (continuing scheme).

This circuit should join other circuits that have limited the one-book rule to offenses that are either continuing or related in a constitutionally-permissible way. *United States v. Ortland*, 109 F.3d 539, 545-47 (9th Cir. 1997); *United States v. Vivit*, 214 F.3d 908, 917-19 (7th Cir. 2000); *United States v. Bailey*, 123 F.3d 1381, 1404-05 (11th Cir. 1997); *United States v. Bertoli*, 40 F.3d 1384, 1403-04 n.17 (3d Cir. 1994). Because the trial court erred by failing to base its sentence on the 2003 Guidelines, at minimum Mehanna is entitled to resentencing.

## III.   CONCLUSION

The judgment should be reversed and the case remanded with instructions to enter a judgment of acquittal for Appellant on Counts I-IV and VI, and for a retrial of Counts V and VII, or in the alternative all counts should be vacated and remanded to the district court for a new trial.

72

Respectfully submitted,

/s/ *Sabin Willett*

Sabin Willett, No. 18725
Susan Baker Manning, No. 1152545
Julie Silva Palmer, No. 1140407
**BINGHAM McCUTCHEN LLP**
One Federal Street
Boston, Massachusetts  02110-1726
617.951.8000

J. W. Carney, Jr., No. 40016
**CARNEY & BASSIL**
20 Park Plaza, Suite 1405
Boston, MA 02116
617.338.5566

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITATION, TYPEFACE**
**<u>REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>**

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) and this Court's order of November 30, 2012, because this brief

contains 16,665 words, excluding the parts of the brief exempted by Fed. R. App.

P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

version 2010 in 14 point Times New Roman.

/s/ *Sabin Willett*
Sabin Willett

Dated: May 7, 2013

74

## <u>CERTIFICATE OF SERVICE</u>

I, Sabin Willett, certify that on December 17, 2012, the document(s) filed through the ECF system will be sent electronically to the below registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Mr. Tarek Mehanna
Registration number: 05315-748
CMU
FCI  TERRE HAUTE
Federal correctional facility
P.O. BOX 33
TERRE HAUTE, IN  47808

Dina Chaitowitz, Esq.
Chief of Appeals - Criminal
United States Attorney's Office
    for the Dist. of Massachusetts
John J. Moakley Federal Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02110

Liza Collery, Esq.
Jeffrey D. Groharing
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Aloke Chakravarty, Esq.
United States Attorney's Office
    for the Dist. of Massachusetts
John J. Moakley Federal Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02110


/s/ *Sabin Willett*
Sabin Willett, Esq.
Bingham McCutchen LLP
One Federal Street
Boston, Massachusetts  02110-1726
Telephone:  617-951-8000

75

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 12-1461

_____

**Tarek Mehanna,**

Defendant-Appellant,

v.

**United States of America,**

Appellee.

_____

**ADDENDUM**

_____

# TABLE OF CONTENTS TO ADDENDUM

PAGE

Judgment dated April 13, 2012 (Dkt.432) ....................................................... ADD.1

18 U.S.C. § 371 ................................................................................................ ADD.4

18 U.S.C. § 956 ................................................................................................ ADD.5

18 U.S.C. § 1001 .............................................................................................. ADD.7

18 U.S.C. § 2251 .............................................................................................. ADD.9

18 U.S.C. § 2332 .............................................................................................. ADD.12

18 U.S.C. § 2339A ........................................................................................... ADD.14

18 U.S.C. § 2339B ........................................................................................... ADD.16

18 U.S.C. § 3231 .............................................................................................. ADD.22

18 U.S.C. § 3742 .............................................................................................. ADD.23

28 U.S.C. § 1291 .............................................................................................. ADD.28

Fed. R. Crim. P. 32 .......................................................................................... ADD.29

Fed. R. Evid. 104 ............................................................................................. ADD.38

Fed. R. Evid. 401 ............................................................................................. ADD.40

Fed. R. Evid. 402 ............................................................................................. ADD.41

Fed. R. Evid. 403 ............................................................................................. ADD.42

Fed. R. Evid. 801 ............................................................................................. ADD.43

Local Rule 34.0 ................................................................................................ ADD.45

U.S. Sentencing Guidelines Manual, § 1B1.11 (Nov. 2011) .......................... ADD.46

AO 245B(05-MA)     (Rev. 06/05) Judgment in a Criminal Case
                   Sheet 1 - D. Massachusetts - 10/05

# UNITED STATES DISTRICT COURT
## District of Massachusetts

| | |
|---|---|
| UNITED STATES OF AMERICA<br>**V.**<br><br>**TAREK MEHANNA** | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number: **1: 09 CR 10017 - 001 - GAO**<br><br>USM Number: 27152-038<br><br>J.W. CARNEY, ESQUIRE |

Defendant's Attorney

✓ Additional documents attached

☐ Correction of Sentence for Clerical Mistake (Fed. R. Crim. P.36)

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☑ was found guilty on count(s)   1ss-7ss   ( Date of Verdict: 12/20/11)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

Additional Counts - See continuation page ✓

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC Sec. 2339B | Conspiracy to Provide Material Support or Resources to a Designated Foreign Terrorist Group. | 06/17/10 | 1ss |
| 18 USC Sec. 2339A | Conspiracy to Provide Material Support to Terrorists. | 06/17/10 | 2ss |
| 18 USC Sec. 2339A | Providing and Attempting to Provide Material Support to Terrorists. | 02/28/07 | 3ss |
| 18 USC Sec. 956 | Conspiracy to Kill in a Foreign Country | 06/17/10 | 4ss |

The defendant is sentenced as provided in pages 2 through   10   of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

04/12/12

Date of Imposition of Judgment

Signature of Judge

The Honorable George A. O'Toole

Judge, U.S. District Court

Name and Title of Judge

april 13, 2012

Date

AO 245B(05-MA)   (Rev. 06/05) Judgment in a Criminal Case
Sheet 1A - D. Massachusetts - 10/05

DEFENDANT: **TAREK MEHANNA**
CASE NUMBER: **1: 09 CR 10017 - 001 - GAO**

Judgment—Page 2 of 10

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC Sec 371 | Conspiracy | 06/17/10 | 5ss |
| 18 USC Sec. 1001 (a)(2) | Making False Statements | 12/16/06 | 6ss |
| 18 USC Sec. 1001 (a)(2) | Making False Statements | 12/16/06 | 7ss |

ADD.2

AO 245B(05-MA)     (Rev. 06/05) Judgment in a Criminal Case
                   Sheet 2 - D. Massachusetts - 10/05

DEFENDANT:     **TAREK MEHANNA**                                   Judgment — Page ___3___ of ___10___
CASE NUMBER: **1: 09 CR 10017   - 001 - GAO**

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a
total term of:     210      month(s)

210 months on count 4ss, 180 months on each of counts 1ss-3ss, 60 months on each of counts 5ss-7ss. All
terms of imprisonment to be served concurrently.

☐ The court makes the following recommendations to the Bureau of Prisons:

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m.   ☐ p.m.   on _____ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a_____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

ADD.3

**c**

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
   Title 18. Crimes and Criminal Procedure (Refs & Annos)
      Part I. Crimes (Refs & Annos)
      Chapter 19. Conspiracy (Refs & Annos)
        **§ 371. Conspiracy to commit offense or to defraud United States**

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

CREDIT(S)

(June 25, 1948, c. 645, 62 Stat. 701; Sept. 13, 1994, Pub.L. 103-322, Title XXXIII, § 330016(1)(L), 108 Stat. 2147.)

Current through P.L. 112-89 (excluding P.L. 112-74, 112-78, and 112-81) approved 1-3-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Westlaw.

18 U.S.C.A. § 956                                                                                            Page 1

c

**Effective: April 24, 1996**

United States Code Annotated Currentness
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 45. Foreign Relations
        **§ 956. Conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country**

**(a)(1)** Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2).

**(2)** The punishment for an offense under subsection (a)(1) of this section is--

  **(A)** imprisonment for any term of years or for life if the offense is conspiracy to murder or kidnap; and

  **(B)** imprisonment for not more than 35 years if the offense is conspiracy to maim.

**(b)** Whoever, within the jurisdiction of the United States, conspires with one or more persons, regardless of where such other person or persons are located, to damage or destroy specific property situated within a foreign country and belonging to a foreign government or to any political subdivision thereof with which the United States is at peace, or any railroad, canal, bridge, airport, airfield, or other public utility, public conveyance, or public structure, or any religious, educational, or cultural property so situated, shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be imprisoned not more than 25 years.

CREDIT(S)

(June 25, 1948, c. 645, 62 Stat. 744; Sept. 13, 1994, Pub.L. 103-322, Title XXXIII, § 330016(1)(K), 108 Stat. 2147; Apr. 24, 1996, Pub.L. 104-132, Title VII, § 704(a), 110 Stat. 1294.)

Current through P.L. 112-197 approved 11-27-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 U.S.C.A. § 1001                                                                                              Page 1

c

**Effective: July 27, 2006**

United States Code Annotated Currentness
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 47. Fraud and False Statements (Refs & Annos)
        ➡➡ **§ 1001. Statements or entries generally**

**(a)** Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--

  **(1)** falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

  **(2)** makes any materially false, fictitious, or fraudulent statement or representation; or

  **(3)** makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

**(b)** Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.

**(c)** With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to--

  **(1)** administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch; or

  **(2)** any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ADD.7

Case: 12-1461    Document: 00116520099    Page: 97    Date Filed: 03/09/2013    Entry ID: 5698296

CREDIT(S)

(June 25, 1948, c. 645, 62 Stat. 749; Sept. 13, 1994, Pub.L. 103-322, Title XXXIII, § 330016(1)(L), 108 Stat. 2147; Oct. 11, 1996, Pub.L. 104-292, § 2, 110 Stat. 3459; Dec. 17, 2004, Pub.L. 108-458, Title VI, § 6703(a), 118 Stat. 3766; July 27, 2006, Pub.L. 109-248, Title I, § 141(c), 120 Stat. 603.)

Current through P.L. 112-197 approved 11-27-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

►

**Effective: October 13, 2008**

United States Code Annotated Currentness
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    ↳ Part I. Crimes (Refs & Annos)
      ↳ Chapter 110. Sexual Exploitation and Other Abuse of Children (Refs & Annos)
        → → **§ 2251. Sexual exploitation of children**

**(a)** Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

**(b)** Any parent, legal guardian, or person having custody or control of a minor who knowingly permits such minor to engage in, or to assist any other person to engage in, sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct shall be punished as provided under subsection (e) of this section, if such parent, legal guardian, or person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

**(c)(1)** Any person who, in a circumstance described in paragraph (2), employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, any sexually explicit conduct outside of the United States, its territories or possessions, for the purpose of producing any visual depiction of such conduct, shall be punished as provided under subsection (e).

**(2)** The circumstance referred to in paragraph (1) is that--

(A) the person intends such visual depiction to be transported to the United States, its territories or possessions, by any means, including by using any means or facility of interstate or foreign commerce or mail; or

(B) the person transports such visual depiction to the United States, its territories or possessions, by any means, including by using any means or facility of interstate or foreign commerce or mail.

(d)(1) Any person who, in a circumstance described in paragraph (2), knowingly makes, prints, or publishes, or causes to be made, printed, or published, any notice or advertisement seeking or offering--

(A) to receive, exchange, buy, produce, display, distribute, or reproduce, any visual depiction, if the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct; or

(B) participation in any act of sexually explicit conduct by or with any minor for the purpose of producing a visual depiction of such conduct:

shall be punished as provided under subsection (e).

(2) The circumstance referred to in paragraph (1) is that--

(A) such person knows or has reason to know that such notice or advertisement will be transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mailed; or

(B) such notice or advertisement is transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mailed.

(e) Any individual who violates, or attempts or conspires to violate, this section shall be fined under this title and imprisoned not less than 15 years nor more than 30 years, but if such person has one prior conviction under this chapter, section 1591, chapter 71, chapter 109A, or chapter 117, or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any State relating to aggravated sexual abuse, sexual abuse, abusive sexual contact involving a minor or ward, or sex trafficking of children, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, such person shall be fined under this title and imprisoned for not less than 25 years nor more than 50 years, but if such person has 2 or more prior convictions under this chapter, chapter 71, chapter 109A, or chapter 117, or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any State relating to the sexual exploitation of children, such person shall be fined under this title and imprisoned not less than 35 years nor more than life. Any organization that violates, or attempts or conspires to violate, this section shall be fined under this title. Whoever, in the course of an offense under this section, engages in conduct that results in the death of a person, shall be punished by death or imprisoned for not less than 30 years or for life.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 U.S.C.A. § 2251                                                                                                  Page 5

CREDIT(S)

(Added Pub.L. 95-225, § 2(a), Feb. 6, 1978, 92 Stat. 7; amended Pub.L. 98-292, § 3, May 21, 1984, 98 Stat. 204; Pub.L. 99-500, Title I, § 101(b) [Title VII, § 704(a)], Oct. 18, 1986, 100 Stat. 1783-75; Pub.L. 99-591, Title I, § 101(b) [Title VII, § 704(a)] Oct. 30, 1986, 100 Stat. 3341-75; Pub.L. 99-628, §§ 2, 3, Nov. 7, 1986, 100 Stat. 3510; Pub.L. 100-690, Title VII, § 7511(a), Nov. 18, 1988, 102 Stat. 4485; Pub.L. 101-647, Title XXXV, § 3563 , Nov. 29, 1990, 104 Stat. 4928; Pub.L. 103-322, Title VI, § 60011, Title XVI, § 160001(b)(2), (c), (e), Title XXXIII, § 330016(1)(S) to (U), Sept. 13, 1994, 108 Stat. 1973, 2037, 2148; Pub.L. 104-208, Div. A, Title I, § 101(a) [Title I, § 121, subsection 4], Sept. 30, 1996, 110 Stat. 3009-30; Pub.L. 105-314, Title II, § 201, Oct. 30, 1998, 112 Stat. 2977; Pub.L. 108-21, Title I, § 103(a)(1)(A), (b)(1)(A), Title V, §§ 506, 507, Apr. 30, 2003, 117 Stat. 652, 653, 683; Pub.L. 109-248, Title II, § 206(b)(1), July 27, 2006, 120 Stat. 614; Pub.L. 110-358, Title I, § 103(a)(1), (b), Oct. 8, 2008, 122 Stat. 4002, 4003; Pub.L. 110-401, Title III, § 301, Oct. 13, 2008, 122 Stat. 4242.)


Current through P.L. 112-197 approved 11-27-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 U.S.C.A. § 2332                                                                                           Page 1

▶

**Effective: April 24, 1996**

United States Code Annotated Currentness
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 113B. Terrorism (Refs & Annos)
                ➡➡ **§ 2332. Criminal penalties**

**(a) Homicide.**--Whoever kills a national of the United States, while such national is outside the United States, shall--

   **(1)** if the killing is murder (as defined in section 1111(a)), be fined under this title, punished by death or imprisonment for any term of years or for life, or both;

   **(2)** if the killing is a voluntary manslaughter as defined in section 1112(a) of this title, be fined under this title or imprisoned not more than ten years, or both; and

   **(3)** if the killing is an involuntary manslaughter as defined in section 1112(a) of this title, be fined under this title or imprisoned not more than three years, or both.

**(b) Attempt or conspiracy with respect to homicide.**--Whoever outside the United States attempts to kill, or engages in a conspiracy to kill, a national of the United States shall--

   **(1)** in the case of an attempt to commit a killing that is a murder as defined in this chapter, be fined under this title or imprisoned not more than 20 years, or both; and

   **(2)** in the case of a conspiracy by two or more persons to commit a killing that is a murder as defined in section 1111(a) of this title, if one or more of such persons do any overt act to effect the object of the conspiracy, be fined under this title or imprisoned for any term of years or for life, or both so fined and so imprisoned.

**(c) Other conduct.**--Whoever outside the United States engages in physical violence--

   **(1)** with intent to cause serious bodily injury to a national of the United States; or

   **(2)** with the result that serious bodily injury is caused to a national of the United States;

shall be fined under this title or imprisoned not more than ten years, or both.

**(d) Limitation on prosecution.**--No prosecution for any offense described in this section shall be undertaken by the United States except on written certification of the Attorney General or the highest ranking subordinate of the Attorney General with responsibility for criminal prosecutions that, in the judgment of the certifying official, such offense was intended to coerce, intimidate, or retaliate against a government or a civilian population.

CREDIT(S)

(Added Pub.L. 99-399, Title XII, § 1202(a), Aug. 27, 1986, 100 Stat. 896, § 2331; amended Pub.L. 102-572, Title X, § 1003(a)(1), Oct. 29, 1992, 106 Stat. 4521; renumbered § 2332 and amended Pub.L. 102-572, Title X, § 1003(a)(2), Oct. 29, 1992, 106 Stat. 4521; Pub.L. 103-322, Title VI, § 60022, Sept. 13, 1994, 108 Stat. 1980; Pub.L. 104-132, Title VII, § 705(a)(6), Apr. 24, 1996, 110 Stat. 1295.)

Current through P.L. 112-197 approved 11-27-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Westlaw.

►

**Effective: December 22, 2009**

United States Code Annotated Currentness
 Title 18. Crimes and Criminal Procedure (Refs & Annos)
  ☞▣ Part I. Crimes (Refs & Annos)
   ☞▣ Chapter 113B. Terrorism (Refs & Annos)
    ➡➡ **§ 2339A. Providing material support to terrorists**

**(a) Offense.**--Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442 of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123(b) of title 49, or any offense listed in section 2332b(g)(5)(B) (except for sections 2339A and 2339B) or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

**(b) Definitions.**--As used in this section--

**(1)** the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

**(2)** the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

**(3)** the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.

CREDIT(S)

(Added Pub.L. 103-322, Title XII, § 120005(a), Sept. 13, 1994, 108 Stat. 2022; amended Pub.L. 104-132, Title III, § 323, Apr. 24, 1996, 110 Stat. 1255; Pub.L. 104-294, Title VI, §§ 601(b)(2), (s)(2), (3), 604(b)(5), Oct. 11,

1996, 110 Stat. 3498, 3502, 3506; Pub.L. 107-56, Title VIII, §§ 805(a), 810(c), 811(f), Oct. 26, 2001, 115 Stat. 377, 380, 381; Pub.L. 107-197, Title III, § 301(c), June 25, 2002, 116 Stat. 728; Pub.L. 107-273, Div. B, Title IV, § 4002(a)(7), (c)(1), (e)(11), Nov. 2, 2002, 116 Stat. 1807, 1808, 1811; Pub.L. 108-458, Title VI, § 6603(a)(2), (b), Dec. 17, 2004, 118 Stat. 3762; Pub.L. 109-177, Title I, § 110(b)(3)(B), Mar. 9, 2006, 120 Stat. 208; Pub.L. 111-122, § 3(d), Dec. 22, 2009, 123 Stat. 3481.)

Current through P.L. 112-197 approved 11-27-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

18 U.S.C.A. § 2339B                                                                                    Page 1

**Effective: December 1, 2009**

United States Code Annotated Currentness
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 113B. Terrorism (Refs & Annos)
        **§ 2339B. Providing material support or resources to designated foreign terrorist organizations**

**(a) Prohibited activities.--**

**(1) Unlawful conduct.**--Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d) (2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

**(2) Financial institutions.**--Except as authorized by the Secretary, any financial institution that becomes aware that it has possession of, or control over, any funds in which a foreign terrorist organization, or its agent, has an interest, shall--

**(A)** retain possession of, or maintain control over, such funds; and

**(B)** report to the Secretary the existence of such funds in accordance with regulations issued by the Secretary.

**(b) Civil penalty.**--Any financial institution that knowingly fails to comply with subsection (a)(2) shall be subject to a civil penalty in an amount that is the greater of--

**(A)** $50,000 per violation; or

**(B)** twice the amount of which the financial institution was required under subsection (a)(2) to retain possession or control.

**(c) Injunction.**--Whenever it appears to the Secretary or the Attorney General that any person is engaged in, or is about to engage in, any act that constitutes, or would constitute, a violation of this section, the Attorney General may initiate civil action in a district court of the United States to enjoin such violation.

**(d) Extraterritorial jurisdiction.**--

**(1) In general.**--There is jurisdiction over an offense under subsection (a) if--

**(A)** an offender is a national of the United States (as defined in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22))) or an alien lawfully admitted for permanent residence in the United States (as defined in section 101(a)(20) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(20)));

**(B)** an offender is a stateless person whose habitual residence is in the United States;

**(C)** after the conduct required for the offense occurs an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States;

**(D)** the offense occurs in whole or in part within the United States;

**(E)** the offense occurs in or affects interstate or foreign commerce; or

**(F)** an offender aids or abets any person over whom jurisdiction exists under this paragraph in committing an offense under subsection (a) or conspires with any person over whom jurisdiction exists under this paragraph to commit an offense under subsection (a).

**(2) Extraterritorial jurisdiction.**--There is extraterritorial Federal jurisdiction over an offense under this section.

**(e) Investigations.**--

**(1) In general.**--The Attorney General shall conduct any investigation of a possible violation of this section, or of any license, order, or regulation issued pursuant to this section.

**(2) Coordination with the Department of the Treasury.**--The Attorney General shall work in coordination with the Secretary in investigations relating to--

**(A)** the compliance or noncompliance by a financial institution with the requirements of subsection (a)(2); and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(B)** civil penalty proceedings authorized under subsection (b).

**(3) Referral.**--Any evidence of a criminal violation of this section arising in the course of an investigation by the Secretary or any other Federal agency shall be referred immediately to the Attorney General for further investigation. The Attorney General shall timely notify the Secretary of any action taken on referrals from the Secretary, and may refer investigations to the Secretary for remedial licensing or civil penalty action.

**(f) Classified information in civil proceedings brought by the United States.--**

**(1) Discovery of classified information by defendants.--**

**(A) Request by United States.**--In any civil proceeding under this section, upon request made ex parte and in writing by the United States, a court, upon a sufficient showing, may authorize the United States to--

**(i)** redact specified items of classified information from documents to be introduced into evidence or made available to the defendant through discovery under the Federal Rules of Civil Procedure;

**(ii)** substitute a summary of the information for such classified documents; or

**(iii)** substitute a statement admitting relevant facts that the classified information would tend to prove.

**(B) Order granting request.**--If the court enters an order granting a request under this paragraph, the entire text of the documents to which the request relates shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.

**(C) Denial of request.**--If the court enters an order denying a request of the United States under this paragraph, the United States may take an immediate, interlocutory appeal in accordance with paragraph (5). For purposes of such an appeal, the entire text of the documents to which the request relates, together with any transcripts of arguments made ex parte to the court in connection therewith, shall be maintained under seal and delivered to the appellate court.

**(2) Introduction of classified information; precautions by court.--**

**(A) Exhibits.**--To prevent unnecessary or inadvertent disclosure of classified information in a civil proceeding brought by the United States under this section, the United States may petition the court ex parte to admit, in lieu of classified writings, recordings, or photographs, one or more of the following:

**(i)** Copies of items from which classified information has been redacted.

**(ii)** Stipulations admitting relevant facts that specific classified information would tend to prove.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(iii)** A declassified summary of the specific classified information.

**(B) Determination by court.**--The court shall grant a request under this paragraph if the court finds that the redacted item, stipulation, or summary is sufficient to allow the defendant to prepare a defense.

**(3) Taking of trial testimony.--**

**(A) Objection.**--During the examination of a witness in any civil proceeding brought by the United States under this subsection, the United States may object to any question or line of inquiry that may require the witness to disclose classified information not previously found to be admissible.

**(B) Action by court.**--In determining whether a response is admissible, the court shall take precautions to guard against the compromise of any classified information, including--

**(i)** permitting the United States to provide the court, ex parte, with a proffer of the witness's response to the question or line of inquiry; and

**(ii)** requiring the defendant to provide the court with a proffer of the nature of the information that the defendant seeks to elicit.

**(C) Obligation of defendant.**--In any civil proceeding under this section, it shall be the defendant's obligation to establish the relevance and materiality of any classified information sought to be introduced.

**(4) Appeal.**--If the court enters an order denying a request of the United States under this subsection, the United States may take an immediate interlocutory appeal in accordance with paragraph (5).

**(5) Interlocutory appeal.--**

**(A) Subject of appeal.**--An interlocutory appeal by the United States shall lie to a court of appeals from a decision or order of a district court--

**(i)** authorizing the disclosure of classified information;

**(ii)** imposing sanctions for nondisclosure of classified information; or

**(iii)** refusing a protective order sought by the United States to prevent the disclosure of classified information.

**(B) Expedited consideration.--**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(i) In general.**--An appeal taken pursuant to this paragraph, either before or during trial, shall be expedited by the court of appeals.

**(ii) Appeals prior to trial.**--If an appeal is of an order made prior to trial, an appeal shall be taken not later than 14 days after the decision or order appealed from, and the trial shall not commence until the appeal is resolved.

**(iii) Appeals during trial.**--If an appeal is taken during trial, the trial court shall adjourn the trial until the appeal is resolved, and the court of appeals--

**(I)** shall hear argument on such appeal not later than 4 days after the adjournment of the trial, excluding intermediate weekends and holidays;

**(II)** may dispense with written briefs other than the supporting materials previously submitted to the trial court;

**(III)** shall render its decision not later than 4 days after argument on appeal, excluding intermediate weekends and holidays; and

**(IV)** may dispense with the issuance of a written opinion in rendering its decision.

**(C) Effect of ruling.**--An interlocutory appeal and decision shall not affect the right of the defendant, in a subsequent appeal from a final judgment, to claim as error reversal by the trial court on remand of a ruling appealed from during trial.

**(6) Construction.**--Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States to protect against the disclosure of classified information, including the invocation of the military and State secrets privilege.

**(g) Definitions.**--As used in this section--

**(1)** the term "classified information" has the meaning given that term in section 1(a) of the Classified Information Procedures Act (18 U.S.C. App.);

**(2)** the term "financial institution" has the same meaning as in section 5312(a)(2) of title 31, United States Code;

**(3)** the term "funds" includes coin or currency of the United States or any other country, traveler's checks, personal checks, bank checks, money orders, stocks, bonds, debentures, drafts, letters of credit, any other negoti-

able instrument, and any electronic representation of any of the foregoing;

**(4)** the term "material support or resources" has the same meaning given that term in section 2339A (including the definitions of "training" and "expert advice or assistance" in that section);

**(5)** the term "Secretary" means the Secretary of the Treasury; and

**(6)** the term "terrorist organization" means an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act.

**(h) Provision of personnel.**--No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

**(i) Rule of construction.**--Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States.

**(j) Exception.**--No person may be prosecuted under this section in connection with the term "personnel", "training", or "expert advice or assistance" if the provision of that material support or resources to a foreign terrorist organization was approved by the Secretary of State with the concurrence of the Attorney General. The Secretary of State may not approve the provision of any material support that may be used to carry out terrorist activity (as defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act).

CREDIT(S)

(Added Pub.L. 104-132, Title III, § 303(a), Apr. 24, 1996, 110 Stat. 1250; amended Pub.L. 107-56, Title VIII, § 810(d), Oct. 26, 2001, 115 Stat. 380; Pub.L. 108-458, Title VI, § 6603(c) to (f), Dec. 17, 2004, 118 Stat. 3762, 3763; Pub.L. 111-16, § 3(6) to (8), May 7, 2009, 123 Stat. 1608.)

Current through P.L. 112-197 approved 11-27-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 U.S.C.A. § 3231                                                                      Page 1

c

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
   Title 18. Crimes and Criminal Procedure (Refs & Annos)
      Part II. Criminal Procedure
      Chapter 211. Jurisdiction and Venue
         **§ 3231. District courts**

The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof.

CREDIT(S)

(June 25, 1948, c. 645, 62 Stat. 826.)

Current through P.L. 112-197 approved 11-27-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

18 U.S.C.A. § 3742                                                                                          Page 1

⮞

**Effective: April 30, 2003**

United States Code Annotated Currentness
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    ◤▪ Part II. Criminal Procedure
    ◤▪ Chapter 235. Appeal (Refs & Annos)
    ➡➡ **§ 3742. Review of a sentence**

**(a) Appeal by a defendant.**--A defendant may file a notice of appeal in the district court for review of an otherwise final sentence if the sentence--

  **(1)** was imposed in violation of law;

  **(2)** was imposed as a result of an incorrect application of the sentencing guidelines; or

  **(3)** is greater than the sentence specified in the applicable guideline range to the extent that the sentence includes a greater fine or term of imprisonment, probation, or supervised release than the maximum established in the guideline range, or includes a more limiting condition of probation or supervised release under section 3563(b)(6) or (b)(11) than the maximum established in the guideline range; or

  **(4)** was imposed for an offense for which there is no sentencing guideline and is plainly unreasonable.

**(b) Appeal by the Government.**--The Government may file a notice of appeal in the district court for review of an otherwise final sentence if the sentence--

  **(1)** was imposed in violation of law;

  **(2)** was imposed as a result of an incorrect application of the sentencing guidelines;

  **(3)** is less than the sentence specified in the applicable guideline range to the extent that the sentence includes a lesser fine or term of imprisonment, probation, or supervised release than the minimum established in the guideline range, or includes a less limiting condition of probation or supervised release under section 3563(b)(6) or (b)(11) than the minimum established in the guideline range; or

  **(4)** was imposed for an offense for which there is no sentencing guideline and is plainly unreasonable.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ADD.23

The Government may not further prosecute such appeal without the personal approval of the Attorney General, the Solicitor General, or a deputy solicitor general designated by the Solicitor General.

**(c) Plea agreements.**--In the case of a plea agreement that includes a specific sentence under rule 11(e)(1)(C) of the Federal Rules of Criminal Procedure--

   **(1)** a defendant may not file a notice of appeal under paragraph (3) or (4) of subsection (a) unless the sentence imposed is greater than the sentence set forth in such agreement; and

   **(2)** the Government may not file a notice of appeal under paragraph (3) or (4) of subsection (b) unless the sentence imposed is less than the sentence set forth in such agreement.

**(d) Record on review.**--If a notice of appeal is filed in the district court pursuant to subsection (a) or (b), the clerk shall certify to the court of appeals--

   **(1)** that portion of the record in the case that is designated as pertinent by either of the parties;

   **(2)** the presentence report; and

   **(3)** the information submitted during the sentencing proceeding.

**(e) Consideration.**--Upon review of the record, the court of appeals shall determine whether the sentence--

   **(1)** was imposed in violation of law;

   **(2)** was imposed as a result of an incorrect application of the sentencing guidelines;

   **(3)** is outside the applicable guideline range, and

      **(A)** the district court failed to provide the written statement of reasons required by section 3553(c);

      **(B)** the sentence departs from the applicable guideline range based on a factor that--

         **(i)** does not advance the objectives set forth in section 3553(a)(2); or

         **(ii)** is not authorized under section 3553(b); or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(iii)** is not justified by the facts of the case; or

**(C)** the sentence departs to an unreasonable degree from the applicable guidelines range, having regard for the factors to be considered in imposing a sentence, as set forth in section 3553(a) of this title and the reasons for the imposition of the particular sentence, as stated by the district court pursuant to the provisions of section 3553(c); or

**(4)** was imposed for an offense for which there is no applicable sentencing guideline and is plainly unreasonable.

The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and, except with respect to determinations under subsection (3)(A) or (3)(B), shall give due deference to the district court's application of the guidelines to the facts. With respect to determinations under subsection (3)(A) or (3)(B), the court of appeals shall review de novo the district court's application of the guidelines to the facts.

**(f) Decision and disposition.**--If the court of appeals determines that--

**(1)** the sentence was imposed in violation of law or imposed as a result of an incorrect application of the sentencing guidelines, the court shall remand the case for further sentencing proceedings with such instructions as the court considers appropriate;

**(2)** the sentence is outside the applicable guideline range and the district court failed to provide the required statement of reasons in the order of judgment and commitment, or the departure is based on an impermissible factor, or is to an unreasonable degree, or the sentence was imposed for an offense for which there is no applicable sentencing guideline and is plainly unreasonable, it shall state specific reasons for its conclusions and--

**(A)** if it determines that the sentence is too high and the appeal has been filed under subsection (a), it shall set aside the sentence and remand the case for further sentencing proceedings with such instructions as the court considers appropriate, subject to subsection (g);

**(B)** if it determines that the sentence is too low and the appeal has been filed under subsection (b), it shall set aside the sentence and remand the case for further sentencing proceedings with such instructions as the court considers appropriate, subject to subsection (g);

**(3)** the sentence is not described in paragraph (1) or (2), it shall affirm the sentence.

**(g) Sentencing upon remand.**--A district court to which a case is remanded pursuant to subsection (f)(1) or (f)(2) shall resentence a defendant in accordance with section 3553 and with such instructions as may have been

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

given by the court of appeals, except that--

**(1)** In determining the range referred to in subsection 3553(a)(4), the court shall apply the guidelines issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, and that were in effect on the date of the previous sentencing of the defendant prior to the appeal, together with any amendments thereto by any act of Congress that was in effect on such date; and

**(2)** The court shall not impose a sentence outside the applicable guidelines range except upon a ground that--

**(A)** was specifically and affirmatively included in the written statement of reasons required by section 3553(c) in connection with the previous sentencing of the defendant prior to the appeal; and

**(B)** was held by the court of appeals, in remanding the case, to be a permissible ground of departure.

**(h) Application to a sentence by a magistrate judge.**--An appeal of an otherwise final sentence imposed by a United States magistrate judge may be taken to a judge of the district court, and this section shall apply (except for the requirement of approval by the Attorney General or the Solicitor General in the case of a Government appeal) as though the appeal were to a court of appeals from a sentence imposed by a district court.

**(i) Guideline not expressed as a range.**--For the purpose of this section, the term "guideline range" includes a guideline range having the same upper and lower limits.

**(j) Definitions.**--For purposes of this section--

**(1)** a factor is a "permissible" ground of departure if it--

**(A)** advances the objectives set forth in section 3553(a)(2); and

**(B)** is authorized under section 3553(b); and

**(C)** is justified by the facts of the case; and

**(2)** a factor is an "impermissible" ground of departure if it is not a permissible factor within the meaning of subsection (j)(1).

CREDIT(S)

(Added Pub.L. 98-473, Title II, § 213(a), Oct. 12, 1984, 98 Stat. 2011; amended Pub.L. 99-646, § 73(a), Nov. 10, 1986, 100 Stat. 3617; Pub.L. 100-182, §§ 4 to 6, Dec. 7, 1987, 101 Stat. 1266, 1267; Pub.L. 100-690, Title

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

VII, § 7103(a), Nov. 18, 1988, 102 Stat. 4416, 4417; Pub.L. 101-647, Title XXXV, §§ 3501, 3503, Nov. 29, 1990, 104 Stat. 4921; Pub.L. 101-650, Title III, § 321, Dec. 1, 1990, 104 Stat. 5117; Pub.L. 103-322, Title XXXIII, § 330002(k), Sept. 13, 1994, 108 Stat. 2140; Pub.L. 108-21, Title IV, § 401(d) to (f), Apr. 30, 2003, 117 Stat. 670, 671.)

UNCONSTITUTIONALITY OF SUBSEC. (E)

&lt;Mandatory aspect of subsec. (e) of this section held unconstitutional by United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).&gt;

Current through P.L. 112-197 approved 11-27-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

28 U.S.C.A. § 1291                                                                                      Page 1

c

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
      Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 83. Courts of Appeals (Refs & Annos)
      **§ 1291. Final decisions of district courts**

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 929; Oct. 31, 1951, c. 655, § 48, 65 Stat. 726; July 7, 1958, Pub.L. 85-508, § 12(e), 72 Stat. 348; Apr. 2, 1982, Pub.L. 97-164, Title I, § 124, 96 Stat. 36.)

Current through P.L. 112-197 approved 11-27-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Federal Rules of Criminal Procedure, Rule 32                                    Page 1

**c**

United States Code Annotated Currentness
  Federal Rules of Criminal Procedure for the United States District Courts (Refs & Annos)
    VII. Post-Conviction Procedures
      → → **Rule 32. Sentencing and Judgment**

**(a) [Reserved.]**

**(b) Time of Sentencing.**

  **(1) In General.**The court must impose sentence without unnecessary delay.

  **(2) Changing Time Limits.**The court may, for good cause, change any time limits prescribed in this rule.

**(c) Presentence Investigation.**

  **(1) Required Investigation.**

    **(A) In General.**The probation officer must conduct a presentence investigation and submit a report to the court before it imposes sentence unless:

      **(i)** 18 U.S.C. § 3593(c) or another statute requires otherwise; or

      **(ii)** the court finds that the information in the record enables it to meaningfully exercise its sentencing authority under 18 U.S.C. § 3553, and the court explains its finding on the record.

    **(B) Restitution.** If the law permits restitution, the probation officer must conduct an investigation and submit a report that contains sufficient information for the court to order restitution.

  **(2) Interviewing the Defendant.**The probation officer who interviews a defendant as part of a presentence investigation must, on request, give the defendant's attorney notice and a reasonable opportunity to attend the interview.

**(d) Presentence Report.**

  **(1) Applying the Advisory Sentencing Guidelines.**The presentence report must:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ADD.29

**(A)** identify all applicable guidelines and policy statements of the Sentencing Commission;

**(B)** calculate the defendant's offense level and criminal history category;

**(C)** state the resulting sentencing range and kinds of sentences available;

**(D)** identify any factor relevant to:

  **(i)** the appropriate kind of sentence, or

  **(ii)** the appropriate sentence within the applicable sentencing range; and

**(E)** identify any basis for departing from the applicable sentencing range.

**(2) Additional Information**. The presentence report must also contain the following:

**(A)** the defendant's history and characteristics, including:

  **(i)** any prior criminal record;

  **(ii)** the defendant's financial condition; and

  **(iii)** any circumstances affecting the defendant's behavior that may be helpful in imposing sentence or in correctional treatment;

**(B)** information that assesses any financial, social, psychological, and medical impact on any victim;

**(C)** when appropriate, the nature and extent of nonprison programs and resources available to the defendant;

**(D)** when the law provides for restitution, information sufficient for a restitution order;

**(E)** if the court orders a study under 18 U.S.C. § 3552(b), any resulting report and recommendation;

**(F)** a statement of whether the government seeks forfeiture under Rule 32.2 and any other law; and

**(G)** any other information that the court requires, including information relevant to the factors under 18

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

U.S.C. § 3553(a).

**(3) Exclusions.** The presentence report must exclude the following:

    **(A)** any diagnoses that, if disclosed, might seriously disrupt a rehabilitation program;

    **(B)** any sources of information obtained upon a promise of confidentiality; and

    **(C)** any other information that, if disclosed, might result in physical or other harm to the defendant or others.

**(e) Disclosing the Report and Recommendation.**

    **(1) Time to Disclose.** Unless the defendant has consented in writing, the probation officer must not submit a presentence report to the court or disclose its contents to anyone until the defendant has pleaded guilty or nolo contendere, or has been found guilty.

    **(2) Minimum Required Notice.** The probation officer must give the presentence report to the defendant, the defendant's attorney, and an attorney for the government at least 35 days before sentencing unless the defendant waives this minimum period.

    **(3) Sentence Recommendation.** By local rule or by order in a case, the court may direct the probation officer not to disclose to anyone other than the court the officer's recommendation on the sentence.

**(f) Objecting to the Report.**

    **(1) Time to Object.** Within 14 days after receiving the presentence report, the parties must state in writing any objections, including objections to material information, sentencing guideline ranges, and policy statements contained in or omitted from the report.

    **(2) Serving Objections.** An objecting party must provide a copy of its objections to the opposing party and to the probation officer.

    **(3) Action on Objections.** After receiving objections, the probation officer may meet with the parties to discuss the objections. The probation officer may then investigate further and revise the presentence report as appropriate.

**(g) Submitting the Report.** At least 7 days before sentencing, the probation officer must submit to the court and to the parties the presentence report and an addendum containing any unresolved objections, the grounds for those objections, and the probation officer's comments on them.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(h) Notice of Possible Departure from Sentencing Guidelines.** Before the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission, the court must give the parties reasonable notice that it is contemplating such a departure. The notice must specify any ground on which the court is contemplating a departure.

**(i) Sentencing.**

  **(1) In General.** At sentencing, the court:

   **(A)** must verify that the defendant and the defendant's attorney have read and discussed the presentence report and any addendum to the report;

   **(B)** must give to the defendant and an attorney for the government a written summary of--or summarize in camera--any information excluded from the presentence report under Rule 32(d)(3) on which the court will rely in sentencing, and give them a reasonable opportunity to comment on that information;

   **(C)** must allow the parties' attorneys to comment on the probation officer's determinations and other matters relating to an appropriate sentence; and

   **(D)** may, for good cause, allow a party to make a new objection at any time before sentence is imposed.

  **(2) Introducing Evidence; Producing a Statement.** The court may permit the parties to introduce evidence on the objections. If a witness testifies at sentencing, Rule 26.2(a)-(d) and (f) applies. If a party fails to comply with a Rule 26.2 order to produce a witness's statement, the court must not consider that witness's testimony.

  **(3) Court Determinations.** At sentencing, the court:

   **(A)** may accept any undisputed portion of the presentence report as a finding of fact;

   **(B)** must--for any disputed portion of the presentence report or other controverted matter--rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing; and

   **(C)** must append a copy of the court's determinations under this rule to any copy of the presentence report made available to the Bureau of Prisons.

  **(4) Opportunity to Speak.**

   **(A) By a Party.** Before imposing sentence, the court must:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(i)** provide the defendant's attorney an opportunity to speak on the defendant's behalf;

**(ii)** address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence; and

**(iii)** provide an attorney for the government an opportunity to speak equivalent to that of the defendant's attorney.

**(B) By a Victim.** Before imposing sentence, the court must address any victim of the crime who is present at sentencing and must permit the victim to be reasonably heard.

**(C) In Camera Proceedings.** Upon a party's motion and for good cause, the court may hear in camera any statement made under Rule 32(i)(4).

## (j) Defendant's Right to Appeal.

**(1) Advice of a Right to Appeal.**

**(A) Appealing a Conviction.** If the defendant pleaded not guilty and was convicted, after sentencing the court must advise the defendant of the right to appeal the conviction.

**(B) Appealing a Sentence.** After sentencing--regardless of the defendant's plea--the court must advise the defendant of any right to appeal the sentence.

**(C) Appeal Costs.** The court must advise a defendant who is unable to pay appeal costs of the right to ask for permission to appeal in forma pauperis.

**(2) Clerk's Filing of Notice.** If the defendant so requests, the clerk must immediately prepare and file a notice of appeal on the defendant's behalf.

## (k) Judgment.

**(1) In General.** In the judgment of conviction, the court must set forth the plea, the jury verdict or the court's findings, the adjudication, and the sentence. If the defendant is found not guilty or is otherwise entitled to be discharged, the court must so order. The judge must sign the judgment, and the clerk must enter it.

**(2) Criminal Forfeiture.** Forfeiture procedures are governed by Rule 32.2.

CREDIT(S)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

(As amended Feb. 28, 1966, eff. July 1, 1966; Apr. 24, 1972, eff. Oct. 1, 1972; Apr. 22, 1974, eff. Dec. 1, 1975; July 31, 1975, Pub.L. 94-64, § 3(31)-(34), 89 Stat. 376; Apr. 30, 1979, eff. Aug. 1, 1979, Dec. 1, 1980; Oct. 12, 1982, Pub.L. 97-291, § 3, 96 Stat. 1249; Apr. 28, 1983, eff. Aug. 1, 1983; Oct. 12, 1984, Pub.L. 98-473, Title II, § 215(a), 98 Stat. 2014; Nov. 10, 1986, Pub.L. 99-646, § 25(a), 100 Stat. 3597; Mar. 9, 1987, eff. Aug. 1, 1987; Apr. 25, 1989, eff. Dec. 1, 1989; Apr. 30, 1991, eff. Dec. 1, 1991; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 29, 1994, eff. Dec. 1, 1994; Sept. 13, 1994, Pub.L. 103-322, Title XXIII, § 230101(b), 108 Stat. 2078; Apr. 23, 1996, eff. Dec. 1, 1996; Apr. 24, 1996, Pub.L. 104-132, Title II, § 207(a), 110 Stat. 1236; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 29, 2002, eff. Dec. 1, 2002; Apr. 30, 2007, eff. Dec. 1, 2007; Apr. 23, 2008, eff. Dec. 1, 2008; Mar. 26, 2009, eff. Dec. 1, 2009; Apr. 26, 2011, eff. Dec. 1, 2011.)

RULE APPLICABLE TO OFFENSES COMMITTED PRIOR TO NOV. 1, 1987

This rule as in effect prior to amendment by Pub.L. 98-473 read as follows:

**"Rule 32. Sentence and Judgment**

**"(a) Sentence.**

**"(1) Imposition of Sentence.** Sentence shall be imposed without unreasonable delay. Before imposing sentence the court shall

**"(A)** determine that the defendant and the defendant's counsel have had the opportunity to read and discuss the presentence investigation report made available pursuant to subdivision (c)(3)(A) or summary thereof made available pursuant to subdivision (c)(3)(B);

**"(B)** afford counsel an opportunity to speak on behalf of the defendant; and

**"(C)** address the defendant personally and ask the defendant if the defendant wishes to make a statement in the defendant's own behalf and to present any information in mitigation of punishment.

The attorney for the government shall have an equivalent opportunity to speak to the court.

**"(2) Notification of Right to Appeal.** After imposing sentence in a case which has gone to trial on a plea of not guilty, the court shall advise the defendant of the defendant's right to appeal, and of the right of a person who is unable to pay the cost of an appeal to apply for leave to appeal in forma pauperis. There shall be no duty on the court to advise the defendant of any right of appeal after sentence is imposed following a plea of guilty or nolo contendere. If the defendant so requests, the clerk of the court shall prepare and file forthwith a notice of appeal on behalf of the defendant.

**"(b) Judgment.**

**"(1) In General.** A judgment of conviction shall set forth the plea, the verdict or findings, and the adjudication and sentence. If the defendant is found not guilty or for any other reason is entitled to be discharged,

judgment shall be entered accordingly. The judgment shall be signed by the judge and entered by the clerk.

"(2) **Criminal Forfeiture.** When a verdict contains a finding of property subject to a criminal forfeiture, the judgment of criminal forfeiture shall authorize the Attorney General to seize the interest or property subject to forfeiture, fixing such terms and conditions as the court shall deem proper.

"(c) **Presentence Investigation.**

"(1) **When Made.** The probation service of the court shall make a presentence investigation and report to the court before the imposition of sentence or the granting of probation unless, with the permission of the court, the defendant waives a presentence investigation and report, or the court finds that there is in the record information sufficient to enable the meaningful exercise of sentencing discretion, and the court explains this finding on the record.

"The report shall not be submitted to the court or its contents disclosed to anyone unless the defendant has pleaded guilty or nolo contendere or has been found guilty, except that a judge may, with the written consent of the defendant, inspect a presentence report at any time.

"(2) **Report.** The presentence report shall contain--

"(A) any prior criminal record of the defendant;

"(B) a statement of the circumstances of the commission of the offense and circumstances affecting the defendant's behavior;

"(C) information concerning any harm, including financial, social, psychological, and physical harm, done to or loss suffered by any victim of the offense; and

"(D) any other information that may aid the court in sentencing, including the restitution needs of any victim of the offense.

"(3) **Disclosure.**

"(A) At a reasonable time before imposing sentence the court shall permit the defendant and the defendant's counsel to read the report of the presentence investigation exclusive of any recommendation as to sentence, but not to the extent that in the opinion of the court the report contains diagnostic opinions which, if disclosed, might seriously disrupt a program of rehabilitation; or sources of information obtained upon a promise of confidentiality; or any other information which, if disclosed, might result in harm, physical or otherwise, to the defendant or other persons. The court shall afford the defendant and the defendant's counsel an opportunity to comment on the report and, in the discretion of the court, to introduce testimony or other information relating to any alleged factual inaccuracy contained in it.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**"(B)** If the court is of the view that there is information in the presentence report which should not be disclosed under subdivision (c)(3)(A) of this rule, the court in lieu of making the report or part thereof available shall state orally or in writing a summary of the factual information contained therein to be relied on in determining sentence, and shall give the defendant and the defendant's counsel an opportunity to comment thereon. The statement may be made to the parties in camera.

**"(C)** Any material which may be disclosed to the defendant and the defendant's counsel shall be disclosed to the attorney for the government.

**"(D)** If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons or the Parole Commission.

**"(E)** Any copies of the presentence investigation report made available to the defendant and the defendant's counsel and the attorney for the government shall be returned to the probation officer immediately following the imposition of sentence or the granting of probation, unless the court, in its discretion otherwise directs.

**"(F)** The reports of studies and recommendations contained therein made by the Director of the Bureau of Prisons or the Parole Commission pursuant to 18 U.S.C. §§ 4205(c), 4252, 5010(e), or 5037(c) shall be considered a presentence investigation within the meaning of subdivision (c)(3) of this rule.

**"(d) Plea Withdrawal.** If a motion for withdrawal of a plea of guilty or nolo contendere is made before sentence is imposed, imposition of sentence is suspended, or disposition is had under 18 U.S.C. § 4205(c), the court may permit withdrawal of the plea upon a showing by the defendant of any fair and just reason. At any later time, a plea may be set aside only on direct appeal or by motion under 28 U.S.C. § 2255.

**"(e) Probation.** After conviction of an offense not punishable by death or by life imprisonment, the defendant may be placed on probation if permitted by law.

**"(f) [Revocation of Probation.]** (Abrogated Apr. 30, 1979, eff. Dec. 1, 1980)."

For applicability of sentencing provisions to offenses, see Effective Date and Savings Provisions, etc., note, section 235 of Pub.L. 98-473, as amended, set out under section 3551 of Title 18, Crimes and Criminal Procedure.

Amendments received to 11-1-12

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Westlaw.

Federal Rules of Evidence Rule 104, 28 U.S.C.A.                                    Page 1

c

United States Code Annotated Currentness
    Federal Rules of Evidence (Refs & Annos)
        Article I. General Provisions (Refs & Annos)
            **Rule 104. Preliminary Questions**

**(a) In General.** The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege.

**(b) Relevance That Depends on a Fact.** When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later.

**(c) Conducting a Hearing So That the Jury Cannot Hear It.** The court must conduct any hearing on a preliminary question so that the jury cannot hear it if:

  **(1)** the hearing involves the admissibility of a confession;

  **(2)** a defendant in a criminal case is a witness and so requests; or

  **(3)** justice so requires.

**(d) Cross-Examining a Defendant in a Criminal Case.** By testifying on a preliminary question, a defendant in a criminal case does not become subject to cross-examination on other issues in the case.

**(e) Evidence Relevant to Weight and Credibility.** This rule does not limit a party's right to introduce before the jury evidence that is relevant to the weight or credibility of other evidence.

CREDIT(S)

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1930; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 26, 2011, eff. Dec. 1, 2011.)

Amendments received to 12-1-12

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ADD.38

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Federal Rules of Evidence Rule 401, 28 U.S.C.A.                                      Page 1

C

United States Code Annotated Currentness
  Federal Rules of Evidence (Refs & Annos)
    Article IV. Relevance and Its Limits
      **Rule 401. Test for Relevant Evidence**

Evidence is relevant if:

**(a)** it has any tendency to make a fact more or less probable than it would be without the evidence; and

**(b)** the fact is of consequence in determining the action.

CREDIT(S)

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1931; Apr. 26, 2011, eff. Dec. 1, 2011.)

Amendments received to 12-1-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Westlaw.

c

United States Code Annotated Currentness
    Federal Rules of Evidence (Refs & Annos)
        Article IV. Relevance and Its Limits
            **Rule 402. General Admissibility of Relevant Evidence**


Relevant evidence is admissible unless any of the following provides otherwise:


• the United States Constitution;


• a federal statute;


• these rules; or


• other rules prescribed by the Supreme Court.


Irrelevant evidence is not admissible.


CREDIT(S)

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1931; Apr. 26, 2011, eff. Dec. 1, 2011.)


Amendments received to 12-1-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Federal Rules of Evidence Rule 403, 28 U.S.C.A.    Page 1

**c**

United States Code Annotated Currentness
    Federal Rules of Evidence (Refs & Annos)
        Article IV. Relevance and Its Limits
            **Rule 403. Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons**

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

CREDIT(S)

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1932; Apr. 26, 2011, eff. Dec. 1, 2011.)

Amendments received to 12-1-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Westlaw.

**C**

United States Code Annotated Currentness
  Federal Rules of Evidence (Refs & Annos)
    Article VIII. Hearsay (Refs & Annos)
      ➡➡ **Rule 801. Definitions That Apply to This Article; Exclusions from Hearsay**

**(a) Statement.** "Statement" means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion.

**(b) Declarant.** "Declarant" means the person who made the statement.

**(c) Hearsay.** "Hearsay" means a statement that:

  **(1)** the declarant does not make while testifying at the current trial or hearing; and

  **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement.

**(d) Statements That Are Not Hearsay.** A statement that meets the following conditions is not hearsay:

  **(1) A Declarant-Witness's Prior Statement.** The declarant testifies and is subject to cross-examination about a prior statement, and the statement:

    **(A)** is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition;

    **(B)** is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or

    **(C)** identifies a person as someone the declarant perceived earlier.

  **(2) An Opposing Party's Statement.** The statement is offered against an opposing party and:

    **(A)** was made by the party in an individual or representative capacity;

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ADD.43

**(B)** is one the party manifested that it adopted or believed to be true;

**(C)** was made by a person whom the party authorized to make a statement on the subject;

**(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

**(E)** was made by the party's coconspirator during and in furtherance of the conspiracy.

The statement must be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E).

CREDIT(S)

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1938; Pub.L. 94-113, § 1, Oct. 16, 1975, 89 Stat. 576; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 11, 1997, eff. Dec. 1, 1997; Apr. 26, 2011, eff. Dec. 1, 2011.)

Amendments received to 12-1-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Local Rule 34.0. Oral Argument**

**(a) Party's Statement.** *Any party who desires  to do so may include, either in the opening or answering brief as the case may be, a statement limited to one-half page setting forth the reasons why oral argument should, or need not, be heard.  If such a statement is included, it must be inserted in the brief immediately after the Table of Contents and Table of Authorities and immediately before the first page of the brief and must be captioned "REASONS WHY ORAL ARGUMENT SHOULD [NEED NOT] BE HEARD" as  appropriate.  The inclusion of this statement will not be counted in computing the maximum permitted length of the brief.*

**(b) Notice of Argument**.  *If the court concludes that oral argument is unnecessary based on the standards set forth in Fed. R. App. P. 34(a)(2), counsel shall be so advised.  The court's decision to dispense with oral argument may be announced at the time that a decision on the merits is rendered.*

**(c) Argument.**

    **(1) Presentation.** *Parties may expect the court to have some familiarity with the briefs.  Normally the court will permit no more than 15 minutes per side for oral argument.  It is counsel's responsibility to keep track of time.  Where more than one counsel argues on one side of a case, it is counsel's further responsibility to assure a fair division of the total time allotted.  One or more cases posing the same issues, arising from the same factual context, will be treated as a single case for the purposes of this rule.*

    **(2) Rebuttal.** *Allowance of time for rebuttal is within the discretion of the presiding judge, but often appellant will be allowed to reserve a few minutes on request made at the outset of opening argument.  However, counsel is expected to cover all anticipated issues in opening argument.  Reserved rebuttal time is for the purpose of answering contentions made in the other side's oral argument.  Any time allowed to be reserved by the presiding judge will be deducted from that party's allotted time for opening argument.*

**Local Rule 34.1.  Terms and Sittings**

**(a) Terms.**  *The court shall not hold formal terms but shall be deemed always open for the purpose of docketing appeals and petitions, making motions, filing records, briefs and appendices, filing opinions and entering orders and judgments.  Where a federal holiday falls on a Monday, the general order is that the court shall commence its sitting on Tuesday.*

# 2011 FEDERAL SENTENCING

# GUIDELINES MANUAL

## CHAPTER ONE - INTRODUCTION, AUTHORITY, AND GENERAL APPLICATION PRINCIPLES

### PART B - GENERAL APPLICATION PRINCIPLES

**§1B1.11.    Use of Guidelines Manual in Effect on Date of Sentencing (Policy Statement)**

(a)    The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.

(b)    (1)    If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed.

(2)    The Guidelines Manual in effect on a particular date shall be applied in its entirety.  The court shall not apply, for example, one guideline section from one edition of the Guidelines Manual and another guideline section from a different edition of the Guidelines Manual.  However, if a court applies an earlier edition of the Guidelines Manual, the court shall consider subsequent amendments, to the extent that such amendments are clarifying rather than substantive changes.

(3)    If the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the

Guidelines Manual became effective, the revised edition of the
Guidelines Manual is to be applied to both offenses.