No. 12-1461

IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT
_____

UNITED STATES OF AMERICA,
APPELLEE

v.

TAREK MEHANNA,
APPELLANT
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
_____

BRIEF FOR THE UNITED STATES
_____

CARMEN M. ORTIZ
 United States Attorney
 District of Massachusetts

JOHN P. CARLIN
 Acting Assistant Attorney
  General
 National Security Division

JOSEPH F. PALMER
 Attorney
 National Security Division

MYTHILI RAMAN
 Acting Assistant Attorney General
 Criminal Division

DENIS J. MCINERNEY
 Acting Deputy Assistant Attorney General
 Criminal Division

ELIZABETH D. COLLERY
 Attorney, Appellate Section
 Criminal Division
 U.S. Department of Justice
 950 Pennsylvania Ave., N.W., Room 1264
 Washington, DC  20530
 (202) 353-3891
 liza.collery@usdoj.gov

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT. ........................................................... 1

STATEMENT OF THE ISSUES. ............................................................. 1

STATEMENT OF THE CASE. ................................................................ 3

STATEMENT OF FACTS. ...................................................................... 6

    1.    Overview. ............................................................................ 6

    2.    Mehanna Radicalizes: "Make Death What You Seek". ...................... 7

    3.    Mehanna's "Good Crew". .................................................... 10

    4.    The 9/11 Attacks: "This Mission So Blessed". ................................ 10

    5.    Mehanna Goes To Yemen In Search Of Al-Qa'ida And Jihad: "We're Actually Doing it". ................................................ 11

    6.    Doing What We Can "While We're Stuck Here". ............................ 19

        A.    Mehanna Trolls For New Jihadists Among Local Youth. ................................................................. 19

        B.    Mehanna Joins the "Media Wing" of Al-Qa'ida In Iraq. ...................................................................... 21

    7.    Maldonado Calls Mehanna To Jihad In Somalia: "There's No Other Life Except For This". ............................... 28

    8.    Mehanna Attempts To Avoid Detection, Lies To The FBI And Works To Get Everyone "On The Same Page". ................. 29

    9.    The Defense Case. ............................................................... 32

SUMMARY OF ARGUMENT. ............................................................. 34

ARGUMENT. .................................................................................... 41

I.    MEHANNA'S "NON-SPEECH" CHALLENGES LACK
MERIT. ................................................................................ 41

    A.    Overwhelming Evidence Regarding The Yemen Trip
Supports Mehanna's Convictions On Counts I-IV. ................. 41

        1.    Standard Of Review. ...................................................... 41

        2.    The Purpose Of The Yemen Trip. ................................. 42

        3.    An Intent To Commit Murder. ..................................... 46

        4.    A Substantial Step. ........................................................ 47

        5.    An Al-Qa'ida Link. ........................................................ 48

        6.    Mehanna's Claim That He Did Not Intend Or
Agree To Kill While Abroad. ........................................ 50

        7.    The "Legal Impossibility" Claim. .................................. 51

    B.    The Attorney General Was Not Plainly Required To
Issue A Certification Under 18 U.S.C. 2332(d) In
Connection With Counts II and III. .......................................... 54

    C.    The Court Should Reject Mehanna's Variance Claims
And Evidentiary Challenges. .................................................... 55

        1.    Standards of Review. ..................................................... 55

        2.    Co-Conspirators In The United Kingdom. .................... 56

        3.    Evidence Regarding The Domestic Attacks. ................. 58

4. Abousamra's Trips To Pakistan. ................................. 59

5. Mehanna's Discussion With Maldonado And Hammami. ................................................. 60

6. Abuzahra's Statements To Masood About Why He Returned From Abroad. ........................... 61

7. Abousamra's Statements Before And After The Yemen Trip. ................................................ 62

II. THE COURT SHOULD REJECT MEHANNA'S FIRST AMENDMENT ARGUMENTS. ..................................... 63

A. Mehanna's Sufficiency-Of-The-Evidence Challenge. ............. 63

1. The Jury's General Guilty Verdicts On Counts I-III Eliminate Any Sufficiency Challenge Related To Mehanna's "Speech" Activities. ....................................................... 63

2. The Evidence Relating To Mehanna's Propaganda Campaign Was Sufficient To Sustain The Jury's Verdicts On Counts I-III. ..................................... 65

a. *Holder v. Humanitarian Law Project*. ................. 65

b. The Sufficiency Of The Evidence. ........................ 68

B. Mehanna's Jury Instruction Challenges. .................................. 71

1. No Instructional Error Occurred. ..................................... 73

2. Any Instructional Error Relating To Mehanna's Propaganda Activities Was Harmless. ............................ 77

III.   MEHANNA'S TRIAL ERROR CLAIMS LACK MERIT. ............... 79

A.   The District Court Properly Admitted Evidence
Under Fed. R. Evid. 403. ......................................................... 79

B.   No *Brady* Violation Occurred. ................................................... 89

C.   The District Court Did Not Abuse Its Discretion In
Excluding Expert Testimony. .................................................... 90

1.   Background. .................................................................... 90

2.   Discussion. ..................................................................... 92

IV.   MEHANNA'S LIES ABOUT MALDONADO WERE
MATERIAL. ........................................................................................ 94

V.   MEHANNA'S "SPILLOVER" CLAIM LACKS MERIT. ............... 97

VI.   MEHANNA'S BELOW-GUIDELINES SENTENCE SHOULD
BE UPHELD. ....................................................................................... 98

A.   The Sentencing Proceeding. ...................................................... 98

B.   Discussion. ................................................................................. 101

CONCLUSION. ................................................................................................ 104

CERTIFICATE OF COMPLIANCE. ............................................................... 106

CERTIFICATE OF SERVICE. ........................................................................ 107

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bachellar v. Maryland,* , 397 U.S. 564 (1970). ...................................................... 71

*Brady v. Maryland*, 373 U.S. 83 (1963). ............................................................ 3, 89

*Brandenburg v. Ohio*, 395 U.S. 444 (1969)............................................................ 67

*Brogan v. United States*, 522 U.S. 398 (1998)........................................................ 96

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993).......................................................................... 91

*Dennis v. United States*, 341 U.S. 494 (1951). ...................................................... 64

*Griffin v. United States*, 502 U.S. 46 (1991)................................................... 64, 71

*Hedgpeth v. Pulido*, 555 U.S. 57 (2008)............................................................... 77

*Holder v. Humanitarian Law Project*, 130 S.Ct. 2705 (2010). ........................ passim

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). ........................................... 92

*Kungys v. United States*, 485 U.S. 759 (1988)........................................................ 95

*McConnell v. Federal Election Commission*, 540 U.S. 93 (2003).......................... 69

*Neder v. United States*, 527 U.S. 1 (1999)....................................................... 77, 78

*Peugh v. United States*, Supreme Court No. 12-42............................................... 103

*Pinkerton v. United States*, 328 U.S. 640 (1946).................................................... 47

*Skilling v. United States*, 130 S.Ct. 2896 (2010)................................................... 77

*Smith v. Cain*, 132 S.Ct. 627 (2012). ....................................................... 89

*United States v. Abu Jihaad*, 630 F.3d 102 (2d Cir. 2010) . ............................... 84, 87

*United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008). .................................... 87

*United States v. Allen*, 670 F.3d 12 (1st Cir. 2012). ................................... 72

*United States v. Amawi*, 695 F.3d 457 (6th Cir. 2012). ............................... 47

*United States v. Bailey*, 405 F.3d 102 (1st Cir. 2005) .................................. 72

*United States v. Bedore*, 455 F.2d 1109 (9th Cir. 1972) ............................... 96

*United States v. Benkahla*, 530 F.3d 300 (4th Cir. 2008). .................................... 87

*United States v. Burgos*, 254 F.3d 8 (1st Cir. 2001) . ................................... 47

*United States v. Capes*, 486 F.3d 711 (1st Cir. 2007) ................................... 64

*United States v. Chiaradio*, 684 F.3d 265 (1st Cir. 2012). .................................... 41

*United States v. Coppola*, 671 F.3d 220 (2d Cir. 2012),
    *cert. denied*, 133 S.Ct. 843 (2013). ........................................................ 78

*United States v. Cruzado-Laureano*, 404 F.3d 470 (1st Cir. 2005). ..................... 102

*United States v. David*, 940 F.2d 722 (1st Cir. 1991). ..................................... 74

*United States v. DeCicco*, 439 F.3d 36 (1st Cir. 2006). ............................... 55

*United States v. DeCologero*, 530 F.3d 36 (1st Cir. 2008) . ................................. 90

*United States v. Dellosantos*, 649 F.3d 109 (1st Cir. 2011) .................................... 58

*United States v. Diaz*, 300 F.3d 66 (1st Cir. 2002). ................................... 42

*United States v. Dixon*, 449 F.3d 194 (1st Cir. 2006). ............................... 49

*United States v. Doyon*, 194 F.3d 207 (1st Cir. 1999). ............................................ 48

*United States v. Edgar*, 82 F.3d 499 (1st Cir. 1996). ............................................... 95

*United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011),
   *cert. denied,* 133 S.Ct. 525 (2012). .......................................... 82, 84, 86

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011). ........................................ 47

*United States v. Felton*, 417 F.3d 97 (1st Cir. 2005),
   *cert. denied*, 132 S.Ct. 2378 (2012). ..................................................... 86

*United States v. Gentles*, 619 F.3d 75 (1st Cir. 2010). ........................................... 80

*United States v. Gilman*, 478 F.3d 440 (1st Cir. 2007). ....................................... 102

*United States v. Goergen*, 683 F.3d 1 (1st Cir. 2012). .......................................... 101

*United States v. Hallock*, 941 F.2d 36 (1st Cir. 1991). ......................................... 56

*United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004) . .................................. 87

*United States v. Hassoun*, 476 F.3d 1181 (11th Cir. 2007) . ................................. 52

*United States v Hirst*, 2012 WL 3583044 (N.D. Cal. Aug. 20, 2012). ................... 96

*United States v. Innamorati*, 996 F.2d 456 (1st Cir. 1993). ................................... 90

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) . ................................. 53

*United States v. Kumar*, 617 F.3d 612 (2d Cir. 2010). ......................................... 103

*United States v. Maloney*, 71 F.3d 645 (7th Cir. 1995). ........................................ 75

*United States v. Mangual-Santiago*, 562 F.3d 411 (1st Cir. 2009). ....................... 55

*United States v. Maryea*, 704 F.3d 55 (1st Cir. 2013). .......................................... 70

*United States v. McBane*, 433 F.3d 344 (3d Cir. 2005). ........................................ 95

*United States v. McKeeve*, 131 F.3d 1 (1st Cir. 1997). ........................................ 82

*United States v. Medina-Martinez*, 396 F.3d 1 (1st Cir. 2005). ........................... 42

*United States v. Meises*, 645 F.3d 5 (1st Cir. 2011). .......................................... 43

*United States v. Merlino*, 592 F.3d 22 (1st Cir. 2010). ....................................... 42

*United States v. Mubayyid*, 658 F.3d 35 (1st Cir. 2011). ............................... 55, 86

*United States v. Najera Jimenez*, 593 F.3d 391 (5th Cir. 2010). ......................... 96

*United States v. Neder*, 197 F.3d 1122 (11th Cir. 1999). ..................................... 96

*United States v. Nestor*, 574 F.3d 159 (3d Cir. 2009). ....................................... 75

*United States v. Newton*, 326 F.3d 253 (1st Cir. 2003). ..................................... 57

*United States v. Olano*, 507 U.S. 725 (1993). .................................................... 56

*United States v. Olbres*, 61 F.3d 967 (1st Cir. 1995). ........................................ 42

*United States v. Ortland*, 109 F.3d 539 (9th Cir. 1997). .................................. 103

*United States v. Paulino*, 445 F.3d 211 (2d Cir. 2006). ..................................... 88

*United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977) . ............................... 57

*United States v. Pierre*, 484 F.3d 75 (1st Cir. 2007) .................................... 56, 58

*United States v. Rivera-Donate*, 682 F.3d 120 (1st Cir. 2012). .......................... 61

*United States v. Rodriguez*, 525 F.3d 85 (1st Cir. 2008). ................................... 56

*United States v. Rodriguez*, 630 F.3d 39 (1st Cir. 2010). ........................... 101, 104

*United States v. Saccoccia*, 58 F.3d 754 (1st Cir. 1995)..................................... 59, 62

*United States v. Safavian*, 649 F.3d 688 (D.C. Cir. 2011)........................................ 96

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998)............................................ 87

*United States v. Sasso*, 695 F.3d 25 (1st Cir. 2012) ............................................. 72

*United States v. Sebaggala*, 256 F.3d 59 (1st Cir. 2001)........................................ 95

*United States v. Seng Tan*, 674 F.3d 103 (1st Cir. 2012)........................................ 55

*United States v. Service Deli Inc.*, 151 F.3d 938 (9th Cir. 1998)............................ 95

*United States v. Shaw*, 670 F.3d 360 (1st Cir. 2012). .............................................. 42

*United States v. Shay*, 57 F.3d 126 (1st Cir. 1995). ............................................... 92

*United States v. Shinderman*, 515 F.3d 5 (1st Cir. 2008). ....................................... 80

*United States v. Siddiqui*, 699 F.3d 690 (2d Cir. 2012). ......................................... 54

*United States v. Siddons*, 660 F.3d 699 (3d Cir. 2011)........................................... 103

*United States v. Skilling*, 638 F.3d 480 (5th Cir. 2011),
   *cert. denied*, 132 S.Ct. 1905 (2012). ................................................................. 78

*United States v. Spock*, 416 F.2d 165 (1st Cir. 1969). ............................................. 68

*United States v. Stefanik*, 674 F.3d 71 (1st Cir.),
   *cert. denied*, 132 S.Ct. 2118 (2012). ................................................................. 72

*United States v. Stevens*, 640 F.3d 48 (1st Cir. 2011)............................................. 95

*United States v. Symonevich*, 688 F.3d 12 (1st Cir. 2012)....................................... 72

*United States v. Tavares*, 705 F.3d 4 (1st Cir. 2013)................................. 55, 78, 103

*United States v. Tobin*, 480 F.3d 53 (1st Cir. 2007). ................................... 71

*United States v. Trainor*, 477 F.3d 24 (1st Cir. 2007). ............................... 97

*United States v. Turner*, 551 F.3d 657 (7th Cir. 2008). ............................ 96

*United States v. Weiss*, 630 F.3d 1263 (10th Cir. 2010). ....................... 103

*United States v. White*, 270 F.3d 356 (6th Cir. 2001). .............................. 96

*United States  v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ................................ 54

*United States v. Zannino*, 895 F.2d 1 (1st Cir. 1990). ............................... 57

*Yates v. United States*, 354 U.S. 298 (1957) ............................................... 65

## FEDERAL STATUTES and RULES

18 U.S.C. 956 ................................................................... 2, 4, 5, 79

18 U.S.C. 1001 .......................................................................... 5

18 U.S.C. 1001(a)(2) ............................................................. passim

18 U.S.C. 2332 ..................................................................... 4, 50

18 U.S.C. 2332(b) . ............................................................... 50, 54

18 U.S.C. 2332(d). ............................................................ 1, 35, 54

18 U.S.C. 2339A. ................................................................. passim

18 U.S.C. 2339A(b)(1). ............................................................. 66

18 U.S.C. 2339B. ...................................................................... 4

18 U.S.C. 2339B(a)(1). ............................................................. 66

18 U.S.C. 3231 ................................................................................... 1

18 U.S.C. 3553A ......................................................................... 30, 100

18 U.S.C. 3742(a). .............................................................................. 1

28 U.S.C. 1291 .................................................................................... 1

Fed. R. Crim. P. 52(b) .................................................................. 54, 56

Fed. R. Evid. 403. ....................................................................... 3, 38, 79

Fed. R. Evid. 801(d)(2)(E) ........................................................ 36, 59, 61

Fed. R. Evid. 804(b)(3). ..................................................................... 59

## FEDERAL SENTENCING GUIDELINES

Sentencing Guidelines Ch. 3 Pt. D ....................................................... 98

Sentencing Guidelines § 5, Part A, n.2. .............................................. 98

Sentencing Guidelines § 1B1.11 ................................................ 101, 102

Sentencing Guidelines § 2A1.5 .......................................... 98, 101, 104

Sentencing Guidelines § 3A1.2(a)(1)(A) ............................................. 99

## MISCELLANEOUS

*Webster's Third New International Dictionary* (1993). .......................... 69

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment of conviction and sentence. The district court (Hon. George A. O'Toole, Jr.) had jurisdiction under 18 U.S.C. 3231 and entered judgment against defendant Tarek Mehanna on April 13, 2012. D432.[1] Mehanna filed a timely notice of appeal on April 13, 2012. D433. This Court has jurisdiction under 28 U.S.C. 1291 and 18 U.S.C. 3742(a).

## STATEMENT OF THE ISSUES

1. Whether the evidence regarding Mehanna's plan to travel overseas to receive training from and fight for Al-Qa'ida was sufficient to support Mehanna's convictions for conspiring to provide and attempting to provide material support to terrorists and for conspiring to murder persons overseas (Counts I-IV).

2. Whether the district court plainly erred in failing *sua sponte* to find that Counts II and III, which charge Mehanna with conspiring to provide and providing material support to terrorists under 18 U.S.C. 2339A, required the Attorney General to issue a written certification pursuant to 18 U.S.C. 2332(d).

3. Whether all participants in Mehanna's conspiracy to murder persons

---

[1] "D" refers to the docket number below; "JA" and "SJA" refer to the joint appendix and supplemental joint appendix respectively. Because Mehanna and his associates used multiple aliases and email addresses, a Chart of Identities is attached as an addendum.

overseas in violation of 18 U.S.C. 956 were themselves overseas and, if so, whether that fact would make it "legally impossible" for that conspiracy to serve as the contemplated offense for Mehanna's convictions in Count II and III for conspiring to provide and providing material support to terrorists in violation of 18 U.S.C. 2339A.

4.      Whether the evidence against Mehanna prejudicially varied from the facts alleged in the indictment.

5.      Whether the district court abused its discretion in admitting (1) evidence regarding Abousamra's trips to Pakistan; (2) testimony regarding a discussion between Mehanna, Maldonado and Hammami in Egypt in 2006; (3) Masood's statements to Abuzahra regarding why Masood abandoned the Yemen trip; and (4) statements from Abousamra before and after the Yemen trip; and, if so, whether any relief is required under the harmless or plain error standards.

6.      Whether, given the jury's general guilty verdicts on Counts I-III, this Court needs to determine if the evidence relating to Mehanna's propaganda campaign was sufficient to sustain those counts, and, if so, whether this evidence sufficed to support Mehanna's convictions for Counts I-III.

7.      Whether the district court erred in refusing to give Mehanna's proposed First Amendment jury instructions.

8.      Whether the district court abused its discretion in refusing to exclude evidence under Federal Rule of Evidence 403, and, if it did, whether any error was harmless.

9.      Whether the district court abused its discretion in rejecting Mehanna's claim for disclosure of exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963).

10.      Whether the district court abused its discretion in excluding expert testimony and, if it did, whether any error was harmless.

11.      Whether Mehanna's false statements regarding Maldonado's whereabouts and terrorist activities were material.

12.      Whether, assuming any of Mehanna's convictions are reversed, convictions on the remaining counts must also be reversed because of prejudicial spillover of evidence.

13.      Whether Mehanna's below-Guidelines sentence was imposed in violation of the Ex Post Facto Clause.

## STATEMENT OF THE CASE

On June 17, 2010, a federal grand jury sitting in the District of Massachusetts returned a Second Superseding Indictment against defendant Tarek Mehanna (JA1-40), charging him with the following offenses:

Count I charged Mehanna and Ahmad Abousamra with conspiring beginning in 2001 to provide material support and resources to Al-Qa'ida, a foreign terrorist organization (FTO), in violation of 18 U.S.C. 2339B. This count alleged overt acts relating to, *inter alia*, efforts by Mehanna and/or Abousamra to obtain military training from terrorists in Pakistan and Yemen in order to fight and kill U.S. nationals; to recruit others in the Boston-area to the terrorist cause; to translate and distribute Al-Qa'ida messages intended to inspire violent jihad; and to knowingly provide false information to the Federal Bureau of Investigation (FBI). JA1-10.

Count II charged Mehanna and Abousamra with conspiring beginning in 2001 to provide material support and resources to terrorists and to conceal such support, knowing and intending that the material support was to be used in preparation for and in carrying out violations of (1) 18 U.S.C. 956 (conspiracy to kill in a foreign country); and (2) 18 U.S.C. 2332 (extraterritorial homicide of a U.S. national), in violation of 18 U.S.C. 2339A. It alleged overt acts involving, *inter alia*, the same activities alleged in Count One. JA10-18.

Count III charged Mehanna and Abousamra with providing and attempting to provide (and with aiding and abetting the provision of) material support to terrorists, and with concealing such support, knowing and intending that the

-4-

material support was to be used in preparation for and in carrying out violations of Sections 956 and 2332, in violation of 18 U.S.C. 2339A.  JA19.

Count IV charged Mehanna and Abousamra with conspiring to kill in a foreign country, in violation of 18 U.S.C. 956.  It alleged overt acts relating to, *inter alia*, efforts by Mehanna and/or Abousamra to obtain military training from terrorists in Pakistan and Yemen in order to fight and kill U.S. nationals.  JA20-22.

Count V charged Mehanna and Abousamra with conspiring to make materially false statements and to conceal material information concerning matters within the jurisdiction of the Executive Branch of the United States, in violation of 18 U.S.C. 371 and 1001.  JA23-25.

Count VI charged Mehanna with making false statements regarding the whereabouts and activities of Daniel Maldonado, in violation of 18 U.S.C. 1001(a)(2).  JA26-27.

Count VII charged Mehanna with making false statements in connection with a terrorism investigation, in violation of 18 U.S.C. 1001(a)(2).  The false statements charged related to the purpose and intended destination of Mehanna's trip to Yemen in 2004.  JA28-29.

After 37 days of trial (between October 24, 2011 and December 20, 2011),
the jury returned a guilty verdict on all counts. JA192. On April 12, 2012, the
district court sentenced Mehanna to 210 months' imprisonment and seven years of
supervised release. D432.

## STATEMENT OF FACTS

1.  Overview

Tarek Mehanna led a double life. Raised as a "typical American kid,"
JA1945/109, Mehanna embraced radical Islam in his teens and never looked back.
While living comfortably in the Boston suburbs and studying pharmacy, Mehanna
seethed over perceived transgressions against Muslims and secretly plotted
revenge. In 2004, he traveled to Yemen, intending to train with Al-Qa'ida and
fight against Americans in Iraq. When his plan failed, Mehanna devoted himself
to indoctrinating other Muslims on the need for violence and to advancing Al-
Qa'ida's recruitment efforts. Through At-Tibyan Publications, a group working
directly with Al-Qa'ida, Mehanna produced English-language propaganda urging
violence against the West. Along the way, he repeatedly lied to government
officials, falsely claiming, *inter alia*, that he had traveled to Yemen to attend
school and that a co-conspirator who had joined a terrorist group in Somalia was
residing in Egypt instead.

2.     Mehanna Radicalizes:  "Make Death What You Seek."

Born in 1982 to Egyptian parents residing in the United States, Mehanna grew up in the Boston suburbs.  JA1200, JA890.  Around 2000, Mehanna embraced Salafism, a fundamentalist branch of Islam devoted to "doctrinal purity."  JA1836/42; *see* JA1201, JA1555/59-JA1556/60, JA1592/130, JA1701/128-29.  Although many Salafis avoid politics, JA1628/21, JA1836/42-43, Mehanna's Salafism was explicitly political and violent.  Mehanna believed that Islam required him to engage in physical fighting (jihad) on behalf of the Muslim nation (Ummah) and he hoped to be martyred for this cause.  JA1635/49-50; *see* JA769 (Mehanna poem: "Make your path be none other than Islaam's highest peak, Whose mountain is climbed by making death what you seek."), JA1129 (Muslims should stand up to tyrants so they can "attain[ ] martyrdom").  As Mehanna later wrote, "from day one my practice of Islam was always associated with the absent obligation [*i.e.*, jihad]."  JA1197.[2]

---

[2]The Arabic word "jihad" (often translated as "struggle") can refer to non-violent activities.  JA1824/43.  Mehanna and his co-conspirators, however, used it to refer to physical fighting.  *See, e.g.*, JA1468/21, JA1616/116, JA1699/121; *see also* JA1649/133 (Salafi-Jihadis see armed conflict as the primary means for establishing their goals), JA1824/43 ("religiously legitimate" warfare), JA248, JA254 (book Mehanna translated defines "jihad" as "physically fighting the disbelievers with the sword" and "terrorism").  Accordingly, we use "jihad" here the way Mehanna did.

Mehanna's "creed" required loyalty to other Muslims and enmity towards "non-believers." JA1158, JA1201, JA1080.  Mehanna's own enmity was primarily directed at the United States, a homeland he despised and yearned to leave.[3]  Mehanna believed the United States had inflicted untold suffering on Muslims worldwide, JA696, JA1557/65, and was properly subject to retaliatory violence, including suicide attacks.[4]

 Even before the 9/11 attacks, Mehanna's inspiration was Osama Bin Laden, the founder of the Al-Qa'ida terrorist network.  Mehanna described Bin Laden as "the reason I started practicing [my religion]" and as "my real father," and noted that "every time I see him speak or read anything about him, I love him more than I did before."  JA1078, *see* SJA9; *see also* JA1649/135.  Mehanna also embraced jihadist propaganda, which fundamentally shaped his outlook.  JA1201 (viewing

---

[3]*See, e.g.*, JA1201 ("I am counting the days until I can step on a plane out of this country for good."), JA974 (Americans are "the dirtiest people"), JA1152 (United States laws are "the laws of Satan"); *see also* JA1035 (Mehanna tells a co-conspirator who might renounce his U.S. citizenship that it could prove useful for a terrorist operation).

[4]Mehanna approved of suicide bombings as long as the benefits exceeded the harm, JA1618/125, JA1642/71, JA695, and even sought (unsuccessfully) historical evidence that American colonists had used suicide bombings against the British.  JA1691/55, SJA77-78; *see also* JA693, JA771/1 (in late 2003, Mehanna posts his admiration for the Bali, Indonesia suicide bombers on an extremist web forum).

jihadist video in 1999 "pointed me in the right direction"). He amassed an extensive library of these materials, which he disseminated to others. JA1448/22-JA1450, JA1548/31, JA1616/116, JA1649/135, JA1726/83.

Mehanna was particularly fond of Al-Qa'ida's propaganda videos, which he later helped to create. These videos appeal directly to western Muslims for personnel and other support. JA1778/140-41, JA1804/106-07. Mehanna's "favorite" video was "The State of the Ummah," an early release that preceded the 9/11 attacks. JA1778/9, JA556 ("that's what started it all"). This feature-length production reviews "the sorry state of the Muslim nation," reciting in anguished tones a litany of grievances against the world. JA786. Bin Laden and his deputies then identify the "cause" of this suffering, *i.e.*, "the dislike of fighting and the love of the worldly life" among Muslims. JA786/20:55. Next, they call on viewers to come train in Taliban-controlled Afghanistan ("the land of jihad") and to achieve martyrdom through terrorist acts against the United States. JA787/9:38, 16:21. Such acts, "The State of the Ummah" promises, "have cleansed our nation of its disgrace." JA787/36:01, *see id.* at 36:23 ("We are terrorists and terror is an obligation in the Book of Allah.").[5]

---

[5]Watching videos of U.S. casualties in Afghanistan and Iraq made Mehanna "jubilant." JA1619/126; *see also* JA1481/72, JA1483/80, JA485. One such video showed the mutilated corpses of American soldiers, which Mehanna gleefully

3.    Mehanna's "Good Crew"

Mehanna's radicalism found no support either at home or among the leaders

at his mosque.  JA479-80, SJA60, SJA8.  But Mehanna nonetheless located a

"good crew" of like-minded young men.  JA1078, JA1468/21.  From 2000 to early

2004, his inner circle included Ahmad Abousamra, a charismatic and opinionated

Syrian; Kareem Abuzahra, a computer science student from a wealthy Palestinian

family; and Hassan Masood, the son of a local Pakistani Imam.  JA1493/122,

JA1544/12-1545/18, JA1554/52, JA1683/126-27, JA1698/115-1699/120,

JA1704/141.  Together, this group watched jihadist videos, which inspired them to

action.  JA1665/55, JA1549/32.  The men also discussed ways they might

participate in jihad, a topic they avoided with others.  JA1698/116-JA1702/132.

4.    The 9/11 Attacks:  "This Mission So Blessed."

The events of September 11, 2001, solidified Mehanna's support for Bin

Laden.  JA1564/131.  Watching news reports in a Dunkin Donuts, Mehanna and

Abousamra fought hard to suppress their smiles.  JA1724/72-73.  Later, Mehanna

penned a eulogy to the "martyrs" who undertook "this mission so blessed":  "On

that morning you became our hero, The day you turned twin towers into ground

---

described as "Texas BBQ."  JA1191.  Mehanna also watched and disseminated
videos showing the beheadings of contractor Nicholas Berg, JA1485/91, and
journalist Daniel Pearl.  JA694, JA1549/33, JA1797/78-79.

zero!"  JA691, JA1471/35; *see also* JA696 (Mehanna celebrates 9/11 anniversary with a tribute to the "victims" of U.S. "terrorism").[6]  True to his "State of the Ummah" worldview, Mehanna saw the 9/11 attacks as just retaliation for "what had happened in Arab lands."  JA1495/31, JA1545/16-17, JA1618/122, JA1683/129, JA1701/127.

     5.     <u>Mehanna Goes To Yemen In Search Of Al-Qa'ida And Jihad:</u>
                 <u>"We're Actually Doing It."</u>

Mehanna and his group constantly sought ways to discharge their personal duty to engage in jihad.  JA1701/128, JA1619/127.  When the United States invaded Afghanistan in the fall of 2001, the men debated how to respond to this "unjustified attack."  JA1545/17-1546/20, JA1619/127-29, JA1701/126-27.  Mehanna concluded that trying to enter Afghanistan through Pakistan would lead to certain arrest.  JA1619/129.  Abousamra, however, twice journeyed to Pakistan hoping to secure paramilitary training and participate in jihad.  JA1518/48,

---

      [6]Mehanna revered the 9/11 hijackers and studied their lives.  SJA12-18, JA1057; *see also* JA1650/136 (Mehanna distributes video regarding 9/11 "martyrs"), JA938.  As for the victims, Mehanna dismissed them as "disbelievers," not worthy of the mercy of Allah.  SJA129; *see also* SJA14 (discussing a movie about the airplane that crashed in Pennsylvania on 9/11, Mehanna asks: "One question: how did it end?  hahhhahahahahahahahahahaahahaahaha").

JA1546/20-1547/27, JA1584/100-01, JA1660/34, JA1702/133.[7]  Although Abousamra met up with a terrorist group, he was turned away.  JA1546/23, JA1547/26.  After a Pakistanti contact (Abdulmajid) suggested that he try instead to accomplish something in the United States, Abousamra came home in December 2002.  JA1518/48, JA1547/26-27.  Abousamra remained in contact with Abdulmajid and kept Mehanna and Abuzahra informed about these communications.  JA1566/22, JA1730/99.

When the United States invaded Iraq in March 2003, Mehanna and his crew decided they had to act.  In keeping with Abdulmajid's advice, they "discuss[ed] doing something domestically," JA1703/136-1704/138, JA1547/27-1548/29, and came up with the idea of firing machine guns in a shopping mall.  JA1704/140-1705/142, JA1680/113.  Abuzahra visited Daniel Maldonado, a Salafist Muslim whom he thought might have access to guns.  JA1705/142-43, JA1622/141.  When Maldonado indicated that he could not supply automatic weapons, interest in the shopping mall plan waned.  JA1705/145-1706/147; *see also* JA1622/141-1623/142.  Mehanna, Abuzahra and Abousamra also talked about attacking

---

[7]Before leaving, Abousamra consulted with Masood, whose uncle had founded the Pakistani terrorist organization Lashkar e Taiba.  JA1546/20, JA1559/77, JA1660/34.  Masood planned to accompany Abousamra to Pakistan but backed out.  JA1546/21; *see also* JA1729/95 (Abuzahra provided money for trip to "participat[e] in jihad").

Hanscom Air Force Base and assassinating Attorney General John Ashcroft. JA1704/139-40, JA1706/147-48.

Ultimately, Mehanna and the others concluded that they had to "go and defend [their] faith" in Iraq. JA1703/134; *see also* JA1550/37-39, JA1564/133-1565/136, JA1585/102, JA1619/127, JA1707/6. Joining the insurgency in Iraq, however, required both military training and a safe route to the war, neither of which was easy to find. JA1794/65 (Al-Qa'ida training camps were difficult to locate after 9/11), JA1619/129, JA1703/135-36, JA1854/81. Yemen seemed like one possible route, given its generally lawless atmosphere, the presence of Arab veterans of the Afghan war, and its proximity to Iraq. JA1585/102, JA1707/5-6; *see* JA213; *see generally* JA1801/92-93.[8]

Through internet conversations, Abousamra discovered that Jason Pippin, a Salafi-Jihadi in California, might have useful Yemeni contacts. JA1550/39, JA1575/64, JA1576/67, JA1577/73, JA1707/4-5. In late 2003, Abousamra flew to California to meet Pippin. JA1707/7-1708/11. Abousamra told Pippin that he intended to participate in jihad in Iraq and wanted to obtain paramilitary training in Yemen first. JA1576/66, JA1583/97, JA1585/102.

---

[8]Mehanna kept a November 2003 document entitled "How to Reach the Battlegrounds," authored by the founder of Al-Qa'ida in the Arabian Peninsula, in his room. JA242, JA1776/134.

Pippin, who had lived in Yemen and trained at a terrorist camp in Pakistan, gave Abousamra contact information for two Salafi-Jihadis who might help: a teacher and an Egyptian perfume salesman who had connections with Al-Qa'ida. JA1583/97-1584/99, JA1599/70-1600/75, JA1708/9-10. Pippin also told Abousamra how best to enter Yemen and advised him to say that he intended to visit the Dar al-Mustafa school. JA1585/105-1586/106. Pippin proposed this "cover story" because this school was apolitical and "diametrically opposed to the ideology of the Salafi-Jihadis." JA1586/106, JA1601/92, JA1833/80-82.

Abousamra reported back to Mehanna and Abuzahra, and the three men prepared in earnest to leave for Yemen and jihad. JA1709/12, JA1756/74. They obtained visas and Abuzahra purchased three round-trip tickets, concluding that one-way travel would be too suspicious. JA1711/23-1713/29. To prepare physically, they went hiking. JA1711/23, JA1550/36. Mehanna joined an online discussion about whether a son should leave for jihad against his parents' wishes. JA774. Mehanna also solicited money for the trip from Tariq al-Daour, a Salafi-Jihadi based in London. JA607; *see also* JA1676/96, JA1715/39. Mehanna assured al-Daour that "[i]ts one of those things that Allah will give us rizq [*i.e.*, reward us] for, trust me." *Ibid.*; *see also* JA1718/50.

-14-

The men agreed that, if questioned by authorities, they would falsely claim they intended to visit "some kind of benign school" in Yemen. JA1709/13-1710/16, JA1713/29. On January 30, 2004, Mehanna printed information from the website of Dar al-Mustafa, the moderate school Pippin had identified, to bring along on the trip. SJA1, JA1451/60-61, JA1709/13, JA1709/15.

None of the men informed his family that he was departing for Yemen. JA1551/40, JA1563/107.[9] The airline tickets were sent to Mehanna's house because he could retrieve them from the mailbox without his family discovering them. JA1716/32. The men also scheduled their trip for the Muslim holiday of Eid, when their families would be distracted and Mehanna's parents would be out of the country. JA1563/107-08, JA1709/14.

On February 1, 2004, Mehanna, Abousamra and Abuzahra gathered at Mehanna's house to leave. JA1551/40, JA1714/32-33. Abuzahra had withdrawn several thousand dollars and the men divided it up to avoid having to declare it. JA1712/27. Mehanna gave his younger brother Tamer a note for his family and a bag of things he did not want discovered, including information about how to

---

[9]Abuzahra, however, transferred money out of his name in an attempt to protect his assets if the government uncovered the purpose of his trip. JA1711/23-1712/24, JA1713/31. He also left behind a video for his two children to remember him by. JA1551/43, JA1713/31, JA1714/34.

make a bomb. JA1714/35, JA807/CA00533; *see also* JA1549/35. Masood drove during the "very somber" airport trip. JA1551/40-41, JA1715/36.

At Logan Airport, the men were interviewed and provided the pre-arranged lie about a Yemeni school. JA1519/57, JA1715/38. They then flew from Boston to Abu Dhabi. JA1518/48-49, JA1716/40-41. On the way, Mehanna expressed excitement that they were finally doing what they had discussed for so long. JA1716/40 ("We're actually doing it.").

In Abu Dhabi, Mehanna sent his brother an email asking him to "make du'aa [supplication] for us," and claiming that he did not care about the "stupid things" that might be said by "whoever found out," because "[o]ur only purpose in life is to please Allah." JA699, JA1718/48-49. Also in Abu Dhabi, Abuzahra received emails from his family that prompted him to return home. JA1551/43, JA1717/44-46. He gave most of the money to Mehanna and Abousamra to finance their jihad but took the information on the Dar al-Mustafa school, reasoning that he "might need that [paperwork] on [his] way back," while Mehanna and Abousamra were unlikely to return at all. JA1718/50-51. Abuzahra did show this paperwork to airport officials on his return, claiming that he had cut short a trip to the school. JA1520/65, JA1718/51, JA1195.

-16-

Mehanna and Abousamra flew on to Yemen where they spent a week trying to locate a terrorist training camp. JA805/CA00518, JA847, JA849-853, JA1518/48-49, JA1551/43, JA1565/136, JA1620/131-32, JA1643/75, JA1660/32, JA1723/69. In the city of Ma'rib, they found the Egyptian perfume seller that Pippin had identified. But he told them that "all that stuff [*i.e.*, the training camps] is gone ever since the planes hit the twin towers." JA853-55; *see also* JA1551/43-1552/44, JA1643/76.

Abousamra and Mehanna left Yemen together and Abousamra eventually made his way to Iraq, intending to fight against U.S. forces. JA1487/96, JA1518/48, JA1552/45, JA1660/33, JA1723/69-70. Abousamra later related that he stayed in Fallujah, Iraq, during heavy fighting but never managed to join in. JA1486/95-1487/97, JA1552/45-46, JA1723/71. He returned to the United States in August 2004. JA1518/49, JA1523/92-1526/102.

Mehanna returned home.[10] When questioned at Logan Airport, Mehanna falsely claimed that he had visited Dar al-Mustafa and another school, and that Abousamra was still in Yemen. JA1521/80-1522/82. Mehanna resumed the pharmacy studies he had abandoned. JA1518/49, JA1216, JA855 (Mehanna

---

[10]Mehanna later indicated that he came back because his parents called, because he viewed going to Iraq as a "waste of time," and because he was disillusioned by his lack of success in Yemen. JA1659/31-1660/32.

complains that he "left [his] life behind" to pursue Pippin's leads).  Years later, Mehanna's parents were still distraught about the trip.  SJA52, JA1068, JA1620/132, JA1492/118-19 (father concerned with Mehanna's "extreme views" and his Yemen trip).

Although Mehanna openly discussed the trip within his inner circle, JA1659/29-30, JA1662/40, he worried that news of it had reached unreliable ears. JA1486/95, JA1673/87-1675/93, SJA50 ("people that [we] don't even know know about that which is not good"), JA1017, SJA92-93 (expressing concern that someone unreliable "knows about [Mehanna's] and [Abousamra's] field trip" "to the YMCA").  And he lamented that he had been unsuccessful.  JA1643/76; *see* JA853.  But Mehanna insisted that the trip constituted "the best two weeks of [his] life," because "just for once, ... I'm not, like, sitting on my butt being a manfiq [*i.e.*, hypocrite], telling people to do something I'm not doing."  JA864-65.

If nothing else, the Yemen trip allowed Mehanna to prove his jihadist bona fides.  When a potential bride made clear that she would reject any suitor with a lackluster commitment to jihad and martyrdom, Mehanna pointed to the Yemen trip.  SJA139, JA1201.  After assuring the woman of his devotion to jihad, Mehanna confided that "I went for an interview and was rejected by that company and sent back because I had no references to vouch for me, as they don't just hire

-18-

anyone of[f] the street."  JA1201.[11]

### 6.  Doing What We Can "While We're Stuck Here"

Mehanna's commitment to jihad never dimmed.  To the contrary, he continued to ponder how he could train with Al-Qa'ida and fight against his countrymen abroad.  *See, e.g.*, JA1068 and JA1506/36-37 (discussing another attempt to "go donate blood," *i.e.*, fight), JA1009, JA1014 (encouraging Abousamra to reach out to his Pakistani contact and then also suggesting that they try to contact the Egyptian perfume seller again), JA1033, JA991 (Mehanna seeks introduction to veteran of jihad:  "I'd like to speak to him ... he might help.").  In the meantime, "while we're stuck here," JA864/CA00408, Mehanna found other ways to support Al-Qa'ida's cause.

### A.  Mehanna Trolls For New Jihadists Among Local Youth.

Mehanna bemoaned the small size of his "good crew," especially after Abuzahra distanced himself after returning from their Yemen trip.  *See, e.g*, JA1125, JA922, JA1720/57-58.  Mehanna thus took it upon himself to recruit new members.  JA1125 ("At this point, we are doing one-on-one efforts, like befriend a person, slip stuff in here and there."); *see also* JA1201(Mehanna notes his "main

---

[11]Later, after the two were engaged, Mehanna urged his fiancée:  "DO NOT tell your mother that I was there as it had to do with that job interview."  JA484.

focus ... on the local youth"). Mehanna used his Yemen trip and his propaganda work for Al-Qa'ida, *see infra* at 21-27, to build his credibility with potential recruits. *See, e.g.*, SJA120-21, SJA92-93, JA1059, JA1486/94-95.

After returning from Yemen, Mehanna became close to two Salafi-Jihadi converts, Daniel Maldonado and Daniel Spaulding. JA1490/110, JA1615/113, JA1641/58, JA1649/133, JA1679/109, JA1722/64. And he devoted countless hours to courting others. *See, e.g.*, JA1467/17-1493/1234, JA1498/75, JA1078, JA1110, JA1134, JA1145, JA1149, JA1165; *see also* SJA27 (Mehanna and Spaulding discuss who they have been "working on"). Along the way, Mehanna theorized about how best to "doctrine-ize" new recruits. JA966. The key, he concluded, was to move "slowly," "lay[ing] down the basics ... in a general sense" before "switch[ing] it over" to a more specific discussion of jihad. SJA87; *see ibid.* ("[O]bviously, I'm not going to go in there with my 'I (l) Shaykh Usama shirt on'"), JA1666/56 (Mehanna explains to Spaulding the need to "build up a

-20-

certain foundation" before broaching the "necessity and obligation" of jihad), JA1111.[12]

Mehanna fed his recruits a steady stream of increasingly violent propaganda intended to inspire them towards jihad. *See, e.g.*, JA1471/34, JA1666/56-1667/60, SJA27 ("I lent [one potential recruit] the state of the ummah cd and after he saw it he told me 'Things are much clearer now.'"), JA1095 (transmitting video of U.S. marine being blown up by a bomb). In December 2005, Mehanna accompanied other young men to Ground Zero. JA1476/54-1477/56. In a photograph taken at the site, Mehanna and a recruit, both grinning, imitate the mujahideen fighters in jihadi videos by holding up a single finger to symbolize the one God of Islam. JA698, JA1477/56.

## B.    Mehanna Joins The "Media Wing" Of Al-Qa'ida In Iraq.

Mehanna also threw himself into producing English-language jihadist propaganda, hoping to recruit others to support Al-Qa'ida. This pursuit coincided with a change in Al-Qa'ida's own media strategy. Frustrated with the Al Jazeera network, which broadcast only short excerpts of its propaganda, JA1778/140-41,

---

[12]Ominously for his parents, Mehanna's potential recruits included Tamer, his only sibling. JA985 ("I am trying to get him out of his mindlessness [towards religion]"), JA1177-1182.

JA1856/90, Al-Qa'ida began posting its materials directly on jihadist websites. *Ibid.*, JA1779/5, JA1780/8, JA1854/81.

An internet forum called At-Tibyan Publications proved critical to Al-Qa'ida's media efforts. JA1785/31. Organized around 2004, At-Tibyan quickly became the premier English language Salafi-Jihadi web forum. JA1456/45, JA1632/36, JA1785/31, JA1809/57. Access to At-Tibyan was password-protected and persons suspected of disloyalty were ejected from the site. JA1458/53, JA1460/83-84, JA1655/14, JA1817/115, JA17185/31, JA1809/57, JA967. For its members, At-Tibyan provided a discussion forum for English-speaking jihadists and a library of existing English-language jihadist material. It also produced new translations of such materials (including Al-Qa'ida propaganda). JA1456/46-1459/59, JA1785/31-1786/33.

In early 2005, Al-Qa'ida in Iraq (AQI) asked At-Tibyan to translate its online magazine. JA705 ("AQ IN IRAQ ASKED ME TO CONTACT TP AND ASK YOU GUYS TO WORK ON TRANSLATING [the magazine]"), JA1540/20, JA1785/31-1786/32. AQI's request was relayed through Younis Tsouli, a radical jihadist in London who distributed material for AQI and served as a "central hub" for contacting the terrorist organization. JA1786/32-33; *see also* JA1574/61 (materials translated by At-Tibyan came from other websites that served as

clearinghouses for people affiliated with Al-Qa'ida, JA1854/80 (Al-Qa'ida piggybacked on Tsouli's sites). Tsouli purchased the web space (domain name irhaby007.ca) that housed At-Tibyan and other forums. JA1536/6-1537/11, JA1538/15.[13]

Around the same time that At-Tibyan began translating Al-Qa'ida's propaganda at Al-Qa'ida's behest, Mehanna became influential at At-Tibyan. Upon joining At-Tibyan, Mehanna began posting his own translations. His work caught the eye of At-Tibyan's editors and, on April 4, 2005, Ehsanul Sadequee asked Mehanna to join the translation team. JA715, JA1539/19.[14]

Thereafter, Mehanna proved invaluable to At-Tibyan. In addition to his translations, Mehanna also performed production tasks, suggesting how to compose or digitally edit media, prioritizing projects, and editing works translated by others. *See, e.g.*, JA1458-1459, JA440 (providing pictures for translation of

---

[13]In October 2005, Scotland Yard executed search warrants at the residences of Tariq al Daour, *see supra* at 14, Waseem Mughal and Tsouli. JA1534/118. At the time, Tsouli was engaged in a chat session with Ehsanul Sadequee, an editor at At-Tibyan. The arrest of these men was a cause for "depress[ion]" for Mehanna and associates. *See, e.g.,* SJA110. Later, Mehanna worried that the same fate would befall him and an At-Tibyan colleague. JA942 ("I just hope it isn't Ismyy [Mughal] and DJ [al Daour] for us.").

[14]When Sadequee disappeared in March 2006, Mehanna joyfully speculated that he had "made it," *i.e.*, gone to jihad. JA958; *see also* JA935 (Mehanna states "maybe one day there will be an At-Tibyan brigade").

AQI recording), JA931 (prioritizing), JA956 (editing translation of AQI video). In addition, Mehanna served as a moderator, controlling the messages that were posted on the site. JA1458/55-1459/58; *see also* JA1484/86-1485/88 and JA1097 (Mehanna helps potential recruits obtain access to At-Tibyan site).

Mehanna produced an impressive volume of propaganda, including:

\* A complete translation with digital graphics of a 65-page book entitled "39 Ways to Serve and Participate in Jihad," written by the leader of Al-Qa'ida's media wing in Saudi Arabia. JA244; *see* SJA133 ("I translated that"), JA1454/67, JA1455/80-81, JA1789/44-1790/49, JA1815/94-95. This book equates "jihad" with "terrorism," JA248, and provides an instructional guide for those wishing to assist the cause. *See, e.g.*, JA288 (urging people with technical knowledge to "hack" American, Jewish, modern and secularist websites as a form of "electronic jihad").

\* The translation and editing (along with At-Tibyan collaborators) of the hour-long AQI video "The Expedition of Umar Hadid." JA309; *see* JA1455/83; *see also* JA1063. This video mixes speeches of Al-Qa'ida members, including Bin Laden (JA309/32:43), with depictions of, and praise for, suicide bombers who have killed Americans in

Iraq.  JA309/52:28.  It repeatedly exhorts listeners to "come join the
Jihad in the land of Iraq," and to attack Americans.  JA309/53.58,
JA1455/83.

* A translation of the AQI recording "Such are the Messengers Tested,"
by the leader of AQI, Abu Musab al-Zarqawi.  JA413, JA1789/47.

* A partial translation of a manuscript entitled "The Ruling Regarding
Killing One's Self to Protect Information," which was based in part
upon an essay by Al-Qa'ida's al-Zawahiri.  JA453.

* An English language version of the AQI video "Wa Yakoon," which
Mehanna edited after its translation and which states that it is from
"Your brothers in the Media Branch, The Organisation of Al Qa'edah
in the Land of Iraq."  JA310, JA1204 (translation), *see* JA956.

Mehanna knew that At-Tibyan was translating materials at Al-Qa'ida's
request.  On October 10, 2005, Aboo Mahmoud Al-Muraabit, an At-Tibyan
administrator, sent Mehanna a private message enclosing a video of Al-Qa'ida
leader Dr. Ayman al-Zawahiri.  JA765, JA1540/22-23.[15]  Al-Muraabit informed

_____

[15]Mehanna received translation assignments principally through Sadequee
and Al-Muraabit.  *See, e.g.,* JA715 (private message from Sadequee to Mehanna),
JA413, JA440, JA442, JA453, JA477 (emails to Sadequee with translations or
photographs to be included in videos), JA940, JA952, JA956 (chats re: additional
projects).

Mehanna that "the ikhwaan [*i.e.*, brothers] from the cloud people are asking us if

we can translate this msg from the al doctoor [al-Zawahiri] regarding curryland

[Pakistan]."  Al-Qa'ida's media wing was named "As-Sahaab," which translates as

"the cloud," and the enclosed video clearly bore its logo.  JA1540/22-23,

JA1778/141.

Knowing that At-Tibyan's translators worked for Al-Qa'ida, Mehanna

continued to help create English-language versions of Al-Qa'ida propaganda.

Indeed, Mehanna collaborated on an introduction to the very al-Zawahiri video

that the "cloud people" had asked At-Tibyan to translate.  JA960.  Mehanna was

pleased to contribute to AQI's propaganda effort.  When an At-Tibyan colleague

informed Mehanna that their group had been described online as AQI's "media

wing," JA924, Mehanna demurred but only on modesty grounds:  "[M]an, I don't

think we deserve that title, maybe if we are lucky we get to clean their

toilets."  JA925.

Mehanna's proudest contribution to Al-Qa'ida's propaganda efforts was

producing an English language video version of the recording "The Expedition of

Umar Hadid."  JA309.  When Al-Muraabit provided Mehanna the "Umar Hadid"

piece in Arabic, he made clear that it had been obtained through back channels:

"DON'T SHARE UNTIL RELEASED ON TP OFFICIALLY OR I'LL GET IN

TROUBLE LOL." JA717, JA1787/37. Indeed, AQI did not officially release the "Umar Hadid" recording until two days after Mehanna received it. JA1787/38. Mehanna and his At-Tibyan colleagues held up their end of At-Tibyan's partnership with Al-Qa'ida by creating an English language version of the Umar Hadid release. JA1059, JA1787/38. The final product was titled "At Tibyan Publications presents: The Expedition of Shaykh Umar Hadid May Allah have Mercy on Him, Released by the Al Quaidah Network in the Land of the Two Rivers [*i.e.,* Iraq]." JA309.

To Mehanna, his work with At-Tibyan served only one purpose: to recruit others to jihad. Informed that his "Umar Hadid" video was popular, Mehanna replied, "I just hope it leads to action[.]" JA954; *see also* JA963 (Mehanna hopes the "39 Ways" book "makes an impact"). In a more pessimistic mood, Mehanna complained that he had "wasted a week of [his] life" doing this video because it was being watched by "bedroom mujahiden" who were not willing to be martyred for the cause. JA500.[16]

---

[16]Mehanna and Abousamra joked about ways to increase Al-Qa'ida membership and about how the United States was losing to the Al-Qa'ida propaganda machine. JA1024.

7.   Maldonado Calls Mehanna To Jihad In Somalia:  "There's No Other Life Except For This."

As Daniel Maldonado adopted the Salafi-Jihadist mind-set, he and Mehanna became best friends.  JA1490/110, JA1615/113, JA1637/58, JA1649/134.  Around November 2005, Maldonado moved to Egypt with his pregnant wife and two young children.  JA1625/9.  Mehanna visited him there in August 2006.  JA1518/49, JA1628/23, JA1630/28.  Three months later, Maldonado took his family to Somalia during a civil war, hoping to participate in jihad and live in an Islamic state.  JA1632/37-38.

In Somalia, Maldonado went south for military training with Al Shabaab, a terrorist organization that included Al-Qa'ida members.  JA1633/40-1634/44.  On December 12, 2006, Maldonado called Mehanna three times to persuade him to come to Somalia.  JA618-662, JA1634/46-1636/56; *see* JA1636/53 (Maldonado viewed Mehanna as "the most apt to possibly take my advice and come").  In recorded conversations, Maldonado described Somalia as a paradise, *see, e.g.*, JA655 ("[t]his is the life, man, there's no other life except for this"), and explained in coded language that he was training for jihad.  JA656 ("[R]ight now I'm in a cooking school I just make peanut butter and jelly."); *see infra* at 30 (discussing code terms).  Maldonado and Mehanna discussed such details as who

-28-

might pay for Mehanna's trip to Somalia, visas and flights, and how to enter Somalia through the airport. *Ibid.*[17]

Four days later, the FBI questioned Mehanna about Maldonado. Mehanna repeatedly lied, claiming, *inter alia*, that he had last heard from Maldonado two weeks earlier; that Maldonado was living in Egypt; and that Maldonado was employed maintaining a website. JA1606/118. Later, after a newspaper report about his phone conversations with Maldonado appeared, Mehanna expressed concern to Spaulding about having lied to the FBI. JA1680/112; *see also* JA866 (Mehanna admits that "lying to them [the FBI] in and of itself is a crime").

8.   Mehanna Attempts To Avoid Detection, Lies To The FBI And Works To Get Everyone "On The Same Page."

Throughout 2000-2007, Mehanna and his fellow jihadists attempted to hide their activities from others, especially law enforcement. JA1492/117-18, JA1004. The group swapped ideas about computer security and employed various strategies to hide their online activities. *See, e.g.*, JA945, JA969, JA1002 ("I'm trying to keep my comp free from any stuff"), JA1026, SJA46, JA1174, JA1454/66. In

---

[17]Within a few days, Maldonado moved to the front lines. After surviving an attack by Ethiopian troops, he was ultimately arrested in Kenya. JA1638/60-61. Meanwhile, his wife died of malaria attempting to flee. JA1637/58-59. In 2007, Maldonado pleaded guilty to terrorism-related charges, agreed to cooperate with the government, and was sentenced to 10 years' imprisonment. JA1614/108.

addition, they used coded language, such as "peanut butter and jelly," to refer to

"jihad," SJA35, JA1489/107-1490/108, JA1672/83; "YMCA" to refer to Yemen,

SJA92-93; and "Bob" or "Brian" to refer to the FBI.  JA1552/46, SJA46, JA508,

JA669.

    After the Yemen trip, Mehanna constantly warned others not to disclose

certain information online.  *See, e.g.*, SJA35 ("don't reveal everything online that

can be used against u"), SJA108 ("Take it easy on line"), SJA121 ("Use hikmah

[*i.e.*, wisdom] online."), JA764 (Mehanna urges At-Tibyan member to "exercise

relative safety" when using his email address), SJA125 (Mehanna tells a

correspondent that he's "being watched" ); *see also* JA1621/134-45 (after Yemen,

Mehanna was "more security minded").  And he worried about whether certain

associates were government informants or otherwise untrustworthy.  JA1665/53

(Mehanna warns Spaulding to be careful of what he says around a recruit),

JA1672/83-84, SJA34, JA996, JA967 (Mehanna suspends At-Tibyan account of

suspected "rat"), JA510 (Mehanna speculates about who might be cooperating

with the FBI regarding Maldonado).[18]

---

[18]News that "hypocrites" had cooperated with the government outraged
Mehanna.  *See, e.g.*, SJA100 (hoping Muslim informant who helped foil bomb plot
would be raped by someone with sexually transmitted diseases).  After Maldonado
was arrested, Mehanna and Omar Hammami, another American who was fighting
in Somalia, attempted to identify who might have informed against Maldonado, so

Once they became aware of an FBI investigation, Mehanna and his crew attempted to mislead the government and cover their tracks. In a December 12, 2006 interview, Abousamra falsely claimed, *inter alia*, that he had gone to Yemen to attend the Dar al-Mustafa school. JA1602/101-04. In his own FBI interview four days later, Mehanna falsely claimed that he, too, had gone to Yemen to attend school; that no one helped them plan the trip; and that, while in Yemen, he had visited Dar al-Mustafa. JA1605/113-15. Mehanna also lied about Abousamra's Iraq trip, claiming that Abousamra was looking for work as a translator. JA1605/116.

Mehanna and his compatriots also conspired "to make sure that [they] [were] all ... on the same ... page." JA677. In several recorded conversations in late 2006 to early 2007, they rehearsed their stories and attempted to determine who knew about the Yemen trip. JA1733/110-1738/129, JA1743/21, JA788-867.[19]

On December 26, 2006, Abousamra left for Syria on a round trip ticket. JA1610/33, JA1611/46; *see also* JA1494/5, JA1518/49, JA1553/48. At Logan

---

that, as Hammami put it, "[Mehanna] can hunt him down." JA516.

[19]In October 2006, Abuzahra decided to cooperate with the government. Thereafter, he wore a recording device during conversations with Mehanna, Abousamra and others. JA1732/105-1733/110.

airport, he claimed to be going on a one-month vacation. JA1611/46. He has never returned. *Ibid*.; JA842 (Mehanna jokes on January 12, 2007, that Abousamra has gone to Syria for the Eid holiday "and the next Eid and the Eid after that").

After receiving his pharmacy degree in 2008, JA1446/78, Mehanna also made plans to leave. On November 8, 2008, he was arrested at Logan Airport as he attempted to depart for Saudi Arabia. JA1453/22.

9.    The Defense Case

Mehanna did not testify at trial and presented no fact witnesses. Instead, he contested his guilt through opening and closing statements, cross-examination, and six expert witnesses.

With respect to the Yemen trip, Mehanna acknowledged that Abousamra and Abuzahra intended to obtain terrorist training and fight in Iraq. JA1444/70-1445/72. But, Mehanna argued, he merely went to Yemen during a "semester break" to visit schools he hoped to someday attend. JA1444/71; *see* JA1947/116, JA1950/127.

As for his propaganda activities, Mehanna argued that he "advocated ... independently of Al-Qa'ida" against the war in Iraq and thought he was exercising "the freedom granted him by the First Amendment." JA1445/73, JA1446/77; *see*

-32-

JA1944/106-1945/107, JA1952/137.  Mehanna contended that he translated

jihadist propaganda to help "other people to understand the other point of view."

JA1445/74-75.  And despite claiming credit at the time for translating "Umar

Hadid," *see, e.g.*, JA1063, JA499, Mehanna claimed at trial that someone else

must have done this translation because it used some British terms or spellings.

JA1934/66-1937/78, JA1942/96, JA1951/132.  In any event, Mehanna claimed,

his propaganda activities did not render material support to Al-Qa'ida because

people did not join the terrorist organization through the internet.  JA1854/80,

JA1854/83, JA1856/89.

Mehanna acknowledged that he lied to the FBI about Maldonado's

whereabouts but argued that his lies were not material because the government

already knew that Maldonado was in Somalia.  JA1950/30-1951/31.

More generally, Mehanna sought to distance himself from his radical views,

asserting, for example, that he was "shocked and confused" by 9/11, JA1443/67;

that he "understood" the U.S. decision to "seek justice" in Afghanistan, *ibid.*; and

that he admired Bin Laden principally for resisting the Soviet Union's occupation

of Afghanistan.  JA1496/43-1497/47, JA1558/70-71.

In a similar vein, Mehanna claimed that he was less dangerous than others

(especially Abousamra), JA1747/56, JA1750/34, JA1948/119-120, JA1949/125;

-33-

that he was less dangerous than he had once been, JA1690/37, JA1943/102,

JA1946/112-13, and that, perhaps, he was not dangerous at all.  The latter

argument focused on Mehanna's claim that he felt bound by a covenant to obey

U.S. law (the "*Aman*" claim).  JA1681/116-1682/120, JA1824/41-43, JA1942/98,

JA1946/114-1947/115.  He also claimed that his views diverged from Al-Qa'ida's,

JA1943/99-101, and that he was kicked off At-Tibyan due to his "moderate"

opinions.  JA1938/79, JA1942/98-1943/99, JA1951/134.

Finally, Mehanna complained that he had been prosecuted by a vindictive

government simply for declining to cooperate with the FBI.  JA1949/125 (Feds are

"'evil malicious people'"), JA1948/120-1951/131 (suggesting that Mehanna had

been "set up" by the FBI); *see also* Br. 18-19 (repeating this claim).

## SUMMARY OF ARGUMENT

The evidence at trial established overwhelmingly that Mehanna conspired

with Abuzahra, Abousamra and others to travel to Yemen to receive training from

Al-Qa'ida and to fight against U.S. soldiers in Iraq (Counts I-IV).  Mehanna's own

recorded statements, as well as testimony from co-conspirators Abuzahra,

Maldonado, Masood and Spaulding, directly confirmed the trip's purpose.  That

testimony was corroborated by circumstantial evidence, including the

conspirators' strenuous efforts to control information about the trip.  Mehanna's

alternative theory – that the others went to Yemen for jihad while he wanted only to investigate an Islamic school – was contradicted both by the evidence (including Pippin's testimony that he was the one who invented using Yemeni schools as a cover story) and by common sense. Mehanna's specific claims of missing evidentiary links lack merit: Mehanna's own statements were more than sufficient to establish that Mehanna specifically intended to murder U.S. soldiers and that his plan contemplated supporting Al-Qa'ida, and his travel to Yemen and ensuing hunt for training camps there established a "substantial step" towards completing the crime.

Mehanna's claims that Sections 956 and 2332 could not serve as the contemplated offenses for his material support convictions are wrong. Because Mehanna's attempted and intended provision of support took place both within the United States and in Yemen, and because the actual and intended recipients of that support were both in the United States and abroad, the geographical requirements in Sections 956 and 2332 were satisfied. Mehanna's reliance on the Attorney General certification requirement in 18 U.S.C. 2332(d) is misplaced because that requirement applies only to prosecutions under Section 2332 itself.

There was no prejudicial variance between the evidence at trial and the indictment. The existence of co-conspirators in the United Kingdom and the fact

-35-

that Mehanna's group considered carrying out domestic terrorist attacks were fully consistent with the purpose and parameters of the conspiracy set forth in the indictment.

The district court properly admitted statements by Mehanna's co-conspirators. All of the challenged statements were during and in furtherance of a conspiracy and properly admissible under Fed. R. Evid. 801(d)(2)(E). Contrary to Mehanna's claim, the relevant conspiracies were not focused exclusively on the Yemen trip and did not automatically end upon Mehanna's return; the record establishes that Mehanna's conspiracies continued for years after the Yemen trip and encompassed additional objectives, including the concealment of the conspirators' activities. Moreover, admission of the challenged statements was harmless in light of the overwhelming evidence, which included both Mehanna's own incriminating statements and unchallenged statements by the same co-conspirators.

The First Amendment provides no basis for reversing Mehanna's convictions. First, the jury's general guilty verdict on Counts I-III eliminates any sufficiency challenge to those counts based on Mehanna's propaganda activities. Because the evidence was more than sufficient to support Mehanna's convictions based on the government's other, non-speech theories, including Mehanna's

-36-

Yemen trip, this Court need not consider whether the evidence of Mehanna's propaganda activities also supported those same convictions. In any event, because the evidence amply established that Mehanna engaged in propaganda activities "in coordination with, or at the direction of, a foreign terrorist organization," *Holder v. Humanitarian Law Project* (*HLP*), 130 S.Ct. 2705, 2722 (2010), Mehanna's convictions were lawful. Mehanna's own statements showed that his propaganda activities were in response to Al-Qa'ida's call and that he was pleased to be associated with Al-Qa'ida through his work. Moreover, Mehanna knew that At-Tibyan translated propaganda in direct response to Al-Qa'ida's requests, and he performed translations to further At-Tibyan's goal of assisting Al-Qa'ida.

The district court did not err in refusing to give Mehanna's proposed First Amendment instruction. The court's instruction correctly stated the law and tracked the Supreme Court's language in *HLP*. The court's instruction made clear that only conduct in coordination with or at the direction of a terrorist organization violated the statute and that independent advocacy, even if done with the purpose of advancing its goals, did not violate the statute. That instruction was sufficient to ensure that Mehanna was not convicted for any activity protected by the First Amendment. Moreover, Mehanna's proposed instruction was not substantively

-37-

correct, because it stated erroneously that "coordination" requires "direct contact" with the terrorist organization. In any event, any instructional error was harmless. The overwhelming evidence related to the Yemen trip, together with the jury's guilty verdict on Count VII (establishing that the jury rejected Mehanna's defense that he went to Yemen to investigate schools) and Count IV (establishing that Mehanna participated in a conspiracy to kill U.S. troops in Iraq), make clear that the jury must have found all the facts necessary to convict Mehanna on Counts I-III based on the Yemen conduct alone.

The district court properly rejected Mehanna's demand that the government produce evidence that he had declined a government agent's solicitation to commit terrorism crimes. The government has no such evidence. In response to Mehanna's related motion in this Court, the government previously submitted under seal material establishing that the district court did not abuse its discretion in rejecting Mehanna's discovery request.

The district court did not abuse its broad discretion under Fed. R. Evid. 403 in admitting Al-Qa'ida videos and other jihadist materials that Mehanna viewed, commented on, or distributed; or in admitting Mehanna's online discussions about his jihadist views. Much of the evidence Mehanna claimed was unfairly prejudicial came from his own computer, and was highly probative of his intent to

support Al-Qa'ida. The evidence was also powerfully probative in refuting Mehanna's claim that his own interpretation of Islam precluded him from supporting Al-Qa'ida or terrorism. In response to repeated defense objections throughout the trial, the district court's analysis of the potential for unfair prejudice was careful and well-considered. And the court's admission of the disputed materials was consistent with rulings in other terrorism cases, which have permitted evidence of terrorism-related materials where they are probative to establish a defendant's knowledge, intent, and motive.

The district court did not abuse its discretion in excluding two of the eight expert witnesses that Mehanna offered at trial. The points that the experts would have supported – that Al-Qa'ida videos were not effective in producing recruits and that government expert Evan Kohlmann's opinions were not based on scientific standards – were of questionable relevance because whether the videos were actually successful in generating Al-Qa'ida recruits was not at issue in the case. In addition, the evidence was cumulative and its exclusion was harmless, because defense expert Dr. Marc Sageman gave the same opinions as would have been expressed by the excluded experts.

Mehanna's lies about Maldonado's whereabouts and terrorist activities were "material" for purposes of 18 U.S.C. 1001(a)(2). The statements had a natural

tendency to influence a government investigation; in fact Maldonado and his activities were the subject of the investigation at issue. Mehanna's claim that his statements were not material because they failed to sidetrack the government's investigation conflicts with well-settled law.

The district court's imposition of a below-Guidelines sentence of 210 months did not violate the Ex Post Facto Clause. The court's application of a November 2004 Guidelines amendment does not implicate ex post facto principles because the offenses charged in Counts I-IV continued well beyond that date. And even if none of Mehanna's conduct after he returned from Yemen applies to Counts I-IV, the "one-book rule" permits application of the November 2004 amendment because the conduct underlying the false statement counts continued at least through 2006. This rule applies to a series of offenses, like Mehanna's, that are properly "grouped" under the Guidelines. Finally, any error was harmless. The district court made clear at sentencing that it would have imposed the same sentence based on the sentencing factors in 18 U.S.C. 3553A, regardless of whether or not the November 2004 amendment was applicable.

# ARGUMENT

## I.  MEHANNA'S "NON-SPEECH" CHALLENGES LACK MERIT.

Mehanna argues first (Br. 22-35) that "The Government's Non-Speech Theories Cannot Support the Convictions under Counts I-IV."  This section of his brief jumbles together sufficiency challenges, evidentiary arguments, variance claims, and other arguments (some no longer than a sentence or two).  Although difficult to parse, we have divided it into 13 actual or potential claims.  Each lacks merit.[20]

### A.  *Overwhelming Evidence Regarding The Yemen Trip Supports Mehanna's Convictions On Counts I-IV.*

#### 1.  **Standard Of Review**

Mehanna raises six arguments as to why the evidence regarding his Yemen trip did not support his convictions on Counts I-IV.  The denial of a motion for judgment of acquittal is reviewed *de novo*.  *United States v. Chiaradio*, 684 F.3d 265, 281 (1st Cir. 2012); *see* JA132 (Rule 29 motion), JA189 (same).  Defendants bear a "heavy burden" in mounting a sufficiency challenge.  *United States v.*

---

[20]An amicus brief submitted by the National Association of Criminal Defense Lawyers (NACDL) and signed by a former Mehanna attorney attempts to raise additional claims including a bill of particulars challenge (Br. 11, 30) and a constructive amendment claim (Br. 29).  As these claims are not properly raised by an amicus, we do not respond to them.

*Medina-Martinez*, 396 F.3d 1, 5 (1st Cir. 2005). The Court "'scrutinizes the evidence in the light most compatible with the verdict, resolve[s] all credibility disputes in the verdict's favor, and then reach[es] a judgment about whether a rational jury could find guilt beyond a reasonable doubt.'" *United States v. Merlino*, 592 F.3d 22, 29 (1st Cir. 2010) (quoting *United States v. Olbres*, 61 F.3d 967, 970 (1st Cir. 1995)). The Court must examine all the evidence submitted to the jury, regardless of whether it was properly admitted, *United States v. Diaz*, 300 F.3d 66, 77 (1st Cir. 2002), and must consider "all reasonable inferences drawn therefrom." *United States v. Shaw*, 670 F.3d 360, 362 (1st Cir. 2012).

### 2. The Purpose Of The Yemen Trip

Mehanna appears to argue that the government failed to prove that he traveled to Yemen for an unlawful purpose. Br. 22, 29, 30 (Yemen case "thin" and "frail"). In fact, the evidence overwhelmingly showed that Mehanna went to Yemen for terrorist training and planned to kill U.S. troops in Iraq.

1. Mehanna himself repeatedly acknowledged the illicit purpose of his Yemen trip. In a recorded conversation, for example, Mehanna described how he and Abousamra crisscrossed Yemen searching for Pippin's contacts and expressed frustration that their venture failed. JA853 ("I was in a very bad psychological state because [Pippin] kinda got our hopes up ...."), JA855 (after learning that

terrorist camps were gone, Mehanna thought, "I've left my life behind ... because [Pippin] didn't know what the heck he was talking about").  Likewise, in an obvious reference to the Yemen trip, Mehanna told his future fiancée that he had "interview[ed]" for jihad.  *See supra* at 18-19.  And in speaking of what his parents knew about Yemen, Mehanna conceded:  "they know I didn't go there to graze goats."  JA882/CA00446.[21]

    2.    Mehanna's inner circle corroborated these statements at trial.

Abuzahra described the trip from beginning to end, leaving no doubt that he, Mehanna and Abousamra shared a common goal.  JA1697/110 ("We went there for the purpose of finding a terrorist training camp," and hoped "[e]ventually to go get into Iraq."), JA1703/134 (Abuzahra, Mehanna and Abousamra agreed to "[p]articipate in Jihad against the U.S."), JA1716/40 (on plane, Mehanna expresses excitement that "we're actually doing it").[22]

---

[21]Tellingly, Mehanna never suggested that his goal differed from that of Abousamra or Abuzahra, even after he knew the FBI was investigating.  Instead, all three men continued to discuss the trip in terms of what "we" did.  *See, e.g.*, JA876 (regarding what Abousamra told Maldonado, Mehanna states "I don't think ... Ahmad sat down and said look *we* went to this place to fight."), JA877 (after Abuzahra observes that "the way *we* left [for Yemen] it was very obvious what was going on," Mehanna agrees).

[22]The government's proof regarding the Yemen trip did not "rest mainly" on Abuzahra.  Br. 30.  But even if it had, Abuzahra's testimony alone would have been sufficient to convict.  *United States v. Meises*, 645 F.3d 5, 12 (1st Cir. 2011).

Mehanna told Maldonado that the three men were hoping to "make it to somewhere where there was fighting," *i.e.*, "Iraq." JA1620/131; *see also* JA872, JA876 (Mehanna acknowledges that "Dan [*i.e.* Maldonado] knows everything" and worries that "he [can't] keep his mouth shut").

Mehanna told Masood that he was going to Yemen because "there was an obligation for Muslims to stand up and fight against invasion of Iraq and the U.S. forces in Iraq." JA1550/39; *see* JA1550/37 (Masood: "They wanted to go to Yemen because they wanted to find training camps there" and "[f]ight in Iraq."), JA1565/135. After Mehanna returned from Yemen, he told Masood that he and Abousamra had a hard time locating their contacts and were ultimately told they could not get training in Yemen. JA1551/43-1552/45, JA1565/135-36.

Spaulding, too, testified that, according to Abousamra, he and Mehanna went to Yemen for "terrorist training." JA1659/28-1660/32. In addition, Mehanna told Spaulding that he was "disillusioned with their lack of success." *Ibid.*[23]

---

[23]Ali Aboubakr, a young recruit whom Mehanna did not fully trust, was later told that Mehanna had "gone to a school to go learn in Yemen." JA1486/94, JA1665/53. But even Aboubakr understood the real purpose of the trip. JA1068 (Aboubakr and Mehanna discuss going to Yemen to "donate blood"); *see also* JA1500/148 (Aboubakr testifies he does not know anyone who went to Yemen to study).

3.      Other evidence also confirmed that Mehanna went to Yemen for jihad, including:  (1) Pippin's testimony that he invented the "visiting Yemeni schools" story as a ruse, *see supra* at 14; (2) Mehanna's decision to abandon pharmacy school mid-semester;[24] (3) the fact that Abuzahra (a Salafi-Jihadi on a martyrdom mission) paid for Mehanna's trip, *see supra* at 14; (4) Mehanna's promise to a British jihadist that God would reward him for sponsoring Mehanna's trip, *see supra* at 14; (5) Mehanna's instructions to Tamer to dispose of incriminating evidence after he left, *see supra* at 15-16; (6) Mehanna's drama-filled email from Abu Dhabi, *see supra* at 16; (7) Mehanna's obsession with who "knew"about the Yemen trip, *see supra* at 18; (8) Mehanna's online discussion just before the Yemen trip about who could engage in jihad, *see supra* at 14; and (9) Mehanna's contempt for moderate Islam, *see, e.g.,* JA1628/21, SJA40, SJA41, which included the Dar al-Mustafa school.

As for Mehanna's "*Aman*" claim, he presented no substantial evidence that, at the time of his Yemen trip, he believed that Muslims living in the United States

---

[24]Why would Mehanna miss two weeks of classes to visit foreign schools he might attend sometime in the distant future?  To fix this flaw in his defense, Mehanna claimed that the Yemen trip occurred during a "semester break." JA1445/72, JA1748/109-110.  After the government disproved this assertion at trial, JA1766/19-20, JA1216, Mehanna admitted at sentencing that it was false. Presentence Report 47.

could not engage in jihad. In fact, Mehanna's pre-Yemen writings make a mockery of this defense. JA691 (Mehanna poem praises 9/11 hijackers for "deceiv[ing] the enemy as you dwelt in their lands, Waiting for Allaah to punish them by your hands").

Accordingly, the jury correctly rejected Mehanna's incredible claim that he traveled to Yemen to check out some schools. As Mehanna himself put it: "people are not freakin idiots." JA879 (explaining to Abuzahra how Maldonado knew about the purpose of the Yemen trip).

### 3.  An Intent To Commit Murder

Mehanna contends that his "vaguely aspirational" plans with Abousamra did not amount to an intent to commit murder. Br. 27 (no "concrete object [was] in view"), 18. In fact, the evidence overwhelmingly demonstrated that (1) Mehanna's goal was to enter Iraq to fight U.S. soldiers, JA1620/131; (2) Mehanna believed he had a religious duty to engage in violent jihad in Iraq, JA1550/37-39, JA1565/135; (3) Mehanna steeped himself in propaganda that portrayed killing Americans as the cure for Muslim problems, *see, e.g.*, JA786 and JA787; and (4) Mehanna harbored intense antipathy towards American soldiers whom he viewed as "valid targets," JA1725/77, JA1564/132, JA1721/61 (Mehanna's status message portrayed mutilated corpses of U.S. soldiers). This evidence more than

sufficed to show an intent to murder. *United States v. Amawi*, 695 F.3d 457, 475-

77 (6th Cir. 2012) (evidence sufficient to show Section 956 conspiracy where,

*inter alia*, defendant stated that he "wanted to go perform jihad against the U.S.

troops overseas").

### 4.  A Substantial Step

Mehanna also contends (Br. 33-35) that the evidence relating to Count III

failed to show a "substantial step" towards completing a Section 2339A crime.

*See United States v. Burgos*, 254 F.3d 8, 12 (1st Cir. 2001) (attempt requires a

"substantial step").  Although Count III charges an attempt, it incorporated other

theories of liability too, including aiding and abetting and co-conspirator liability

under *Pinkerton v. United States*, 328 U.S. 640 (1946).  Thus, even if correct,

Mehanna's "substantial step" argument would not undermine this conviction.

And it is not correct.  "[S]ubstantial step analysis necessarily begins with a

proper understanding of the crime being attempted."  *United States v. Farhane*,

634 F.3d 127, 147 (2d Cir. 2011).  Here, contrary to Mehanna's claim (Br. 34), the

attempted crime was not murder but the provision of material support to be used in

preparation for or in carrying out murder.

In going to Yemen in search of jihad, Mehanna took a substantial step

toward completing this crime.  "[T]he defendant does not have to get very far

along the line toward ultimate commission of the object crime in order to commit the attempt offense." *United States v. Doyon*, 194 F.3d 207, 211 (1st Cir. 1999). Indeed, "the defendant's arrival at the scene ready to commit the crime has been found adequate to constitute a substantial step[.]" *Ibid.* Although *Doyon* suggests that "some debate" might be appropriate if a defendant *merely* traveled to the anticipated scene with a "very general" intent, *id.* at 212, here, of course, there can be no debate: Mehanna's intent was highly specific and he not only traveled to Yemen, he hunted down Pippin's contacts in order to commit murder in Iraq. Given the overwhelming evidence of his intent beforehand, *see supra* at 7-16, and his actions once there, Mehanna's Yemen trip went far beyond a "substantial step" toward a material support offense. JA1973/62 (district court notes that Yemen trip was "no less a serious attempt for its failure").[25]

### 5. An Al-Qa'ida Link

Mehanna argues (Br. 22) that the Yemen evidence failed to support Count I (Conspiracy to Provide Material Support to Al-Qa'ida) because (1) "[t]here was no evidence of an Al-Qa'ida presence in Yemen in February, 2004"; and (2) there

---

[25]Mehanna claims that "his return flight home was a 'complete and voluntary renunciation' of [his] plan[.]" Br. 35. Even if Mehanna could raise a new defense on appeal (he cannot), he never renounced his plan. JA865 ("I didn't regret it for a second"); *Doyon*, 194 F.3d at 212 (affirmative defense of voluntary abandonment not available to defendant "whose attempt was frustrated").

was no evidence of "an al-Qaida link to Mehanna's Yemen plans."

But the evidence did show an Al-Qa'ida presence in Yemen in February 2004. JA1801/93, JA1805/9-10, JA1818/119-21, JA1835/9-10. Indeed, Mehanna himself described Ma'rib in Yemen as "a wild land ... full of bandits and al-Qa'ida." JA1118. In any event, whether Al-Qa'ida was *actually* in Yemen does not matter because a defendant can conspire to commit a factually impossible offense. *United States v. Dixon*, 449 F.3d 194, 202 (1st Cir. 2006).

Further, the jury could infer that Al-Qa'ida was one of the terrorist groups that Mehanna hoped to find on his trip. Al-Qa'ida operated terrorist training camps in Yemen in the early 2000s, JA1805/9, JA1818/119-20, JA1830/63-1831/70, and Mehanna knew it operated there: his "favorite" video, "The State of the Ummah," ends with Al-Qa'ida's bombing of the U.S.S. Cole in Aden, Yemen in 2000. JA787; *see* JA1511/70; *see also* JA1774/126, JA1801/92-93 (describing Yemen's "very important role in Al-Qa'ida since its inception"). Moreover, the Egyptian perfume seller, who was one of Pippin's sources with whom Mehanna met in Yemen, had an Al-Qa'ida connection, as he was affiliated with a group that had merged with Al-Qa'ida. JA1599/71.

Nor can there be any doubt that, had he located an Al-Qa'ida camp, Mehanna would eagerly have joined up. Mehanna adored Al-Qa'ida and

worshiped Osama Bin Laden, its leader, as his "true father." *See supra* at 8. Moreover, his statement to his future fiancée that he was turned away by "that company" is likely a reference to Al-Qa'ida. *See supra* at 18-19; *see also* JA1798/81 ("company" often used as code for a jihad organization such as Al-Qa'ida. Evidence of Mehanna's intentions can also be found in the Egyptian perfume seller's response to his inquiries: "all that stuff is gone ever since the planes hit the twin towers." JA853-855. This clear allusion to Al-Qa'ida's most spectacular terrorist attack further confirms that Mehanna's Yemen plan included (even if it was not limited to) providing material support to Al-Qa'ida.

### 6. Mehanna's Claim That He Did Not Intend Or Agree To Kill While Abroad

Counts II and III charged Mehanna with conspiring and attempting to provide material support in preparation for, or in carrying out, *inter alia*, a violation of 18 U.S.C. 2332. Section 2332(b) makes it a crime for someone "outside the United States [to] attempt[ ] to kill, or engage[ ] in a conspiracy to kill, a national of the United States." Mehanna argues (Br. 27-28) that the evidence failed to show a Section 2332(b) crime because (1) "there was no evidence of foreign conspirators"; and (2) "the only evidence of any *foreign* agreement was the objective evidence that the group disbanded ... before any actual plan to kill could be formed abroad."

Mehanna is wrong from the start. Counts II and III did not require proof that, while abroad, Mehanna conspired or attempted to kill a U.S. national. Instead, to be guilty on these counts, Mehanna need only have conspired or attempted in the United States to provide material support in preparation for or in carrying out a Section 2332(b) offense. And even if Counts II and III did require such proof, the trial evidence more than sufficed. Mehanna and Abousamra first conspired to kill U.S. troops while in the United States but that conspiracy continued during their week-long hunt in Yemen for terrorist training and Abousamra's further journey to Fallujah, Iraq. Accordingly, although not required, the evidence proved that Mehanna violated Section 2332(b).

### 7. The "Legal Impossibility" Claim

Mehanna contends that it was "legally impossibl[e]" for Section 956 (conspiracy to kill abroad) to serve as the contemplated offense for his material support convictions under Section 2339A. In Mehanna's view, the intended recipients of the material support he conspired to provide were "by definition ... contemplated to be abroad," Br. 26, and so it was impossible for them to violate Section 956, which requires that the defendant conspire "within the United States."

Mehanna cites no authority for this argument.  More fundamentally, the premise on which he relies –  that the potential violators of Section 956 to whom he conspired to provide support were necessarily abroad – is false.  Among others, Mehanna conspired to provide support to Abousamra and Abuzahra, who conspired *in the United States* (as the jury found in convicting Mehanna on Count IV), to violate Section 956 by killing U.S. soldiers in Iraq.  Mehanna provides no reason (statutory or otherwise) why the U.S.-based conspiracy to kill Americans abroad that Abousamra, Abuzahra, and Mehanna formed (and for which Mehanna was separately convicted), cannot serve as the contemplated offense for Mehanna's convictions under Section 2339A.  To the extent that Mehanna may be assuming that his convictions on Counts II-IV are multiplicitous, any such claim is both forfeited and incorrect.  A defendant who joins a conspiracy and who also conspires to provide material support to such a conspiracy may properly be punished under both Section 956  and Section 2339A because those offenses require proof of distinct elements.  *United States v. Hassoun*, 476 F.3d 1181, 1185-89 (11th Cir. 2007) (separate convictions for Section 2339A (including conspiracy) and underlying Section 956 predicate offense were not multiplicitous, despite factual overlap in proof).  The factual distinction between the Section 2339A offenses and the underlying Section 956 offense is especially clear where,

as here, the Section 2339A offense is based in part on concealment of the material support.

Even if Mehanna intended to provide material support only to Al-Qa'ida terrorists outside the United States, that support would still have been intended "to be used in preparation for, or in carrying out, a violation of section ... 956" and therefore violate Section 2339A. While the predicate Section 956 conspiracy began with the agreement among Mehanna and his group in the United States to attack U.S. soldiers in Iraq, they intended to continue that conspiracy overseas and to include within it the Al-Qa'ida terrorists to whom they intended to provide themselves as support. That support was therefore intended to be used in carrying out the group's continuing violation of Section 956, and it makes no difference that the intended recipients of the material support were abroad. *See United States v. Jayyousi*, 657 F.3d 1085, 1104-05 (11th Cir. 2011) (upholding convictions under Section 2339A for supporting Section 956 predicate conspiracy where recipients of the material support were terrorist groups overseas).

Finally, even if some error existed (none does), the problem would not be one of "legal impossibility" but rather a mere insufficiency of proof. Because the government charged and proved an alternative theory of liability on Counts II and

III involving Section 2332(b), this failure of proof would have no effect on the
jury's general verdicts. *See infra* at 64-65.

> B. *The Attorney General Was Not Plainly Required To Issue A
> Certification Under 18 U.S.C. 2332(d) In Connection With Counts II
> And III.*

For the first time, Mehanna suggests (Br. 28) that Section 2332 cannot serve
as the contemplated crime for his material support convictions on Counts II and III
because the Attorney General did not certify under Section 2332(d) that these
offenses were "intended to coerce, intimidate, or retaliate against a government or
civilian population." On its face, Section 2332(d)'s certification requirement
applies only to a "prosecution for any offense described in this section," *i.e.*, a
prosecution under Section 2332 itself. Since Counts II and III both charged
crimes under Section 2339A, Section 2332(d)'s certification requirement is
inapplicable. At the very least, the district court did not plainly err in failing *sua
sponte* to require a certification. *See United States v. Siddiqui*, 699 F.3d 690, 700
(2d Cir. 2012) (certification must be filed "either at the time or before the filing of
*the first instrument charging a violation of § 2332*") (emphasis added); *United
States v. Yousef*, 327 F.3d 56, 116 (2d Cir. 2003) ("Section 2332(d) limits the
Justice Department's prosecution of crimes under § 2332 ...."); Fed. R. Crim. P.
52(b).

C.    *The Court Should Reject Mehanna's Variance Claims And Evidentiary Challenges.*

Mehanna alleges several variances and makes related evidentiary claims. Br. 30-34.  These arguments (a few preserved, most not) provide no basis for overturning his convictions on Counts I-IV.

1.    **Standards of Review**

a.    "A variance occurs when ... the evidence adduced at trial proves different facts than those alleged in the indictment." *United States v. Mangual-Santiago*, 562 F.3d 411, 421 (1st Cir. 2009) (internal citation and quotations omitted).  Where a variance exists, reversal is required only if the defendant shows prejudice.  *United States v. Tavares*, 705 F.3d 4, 16 (1st Cir. 2013).  "Prejudice in this context is found when, for example, 'the variance ... le[ft the defendant] so in the dark about the charge against h[im] that [ ] he could not prepare a defense or plead double jeopardy to stop a second prosecution for the same crime.'"  *Ibid.* (quoting *United States v. Seng Tan*, 674 F.3d 103, 110 (1st Cir. 2012)).

A variance claim that is preserved in the district court is subject to *de novo* review.  *United States v. Mubayyid*, 658 F.3d 35, 54 (1st Cir. 2011).  An unpreserved variance claim is reviewed for plain error.  *United States v. DeCicco*, 439 F.3d 36, 43-44 (1st Cir. 2006).  Under the plain error test, the defendant must

prove (1) an error; (2) which was "clear and obvious"; (3) that affected substantial rights; and (4) that, absent reversal, would cause a miscarriage of justice. *United States v. Olano*, 507 U.S. 725, 732 (1993); Fed. R. Crim. P. 52(b).

       b.    "[A]dequately preserved objections to rulings admitting or excluding evidence [are reviewed] for abuse of discretion." *United States v. Rodriguez*, 525 F.3d 85, 95 (1st Cir. 2008). An error is harmless if it is "highly probable that the error did not influence the verdict." *Ibid.* (internal citations and quotations omitted). Evidentiary challenges not preserved by a timely objection at trial are reviewed for plain error only. *Ibid.*

### 2.    Co-Conspirators In The United Kingdom

    Mehanna complains of variance (Br. 30) because the indictment did not name his British co-conspirators. This claim was arguably preserved below. D374. But an indictment need not identify all co-conspirators. *United States v. Pierre*, 484 F.3d 75, 80-83 (1st Cir. 2007); *United States v. Hallock*, 941 F.2d 36, 41 (1st Cir. 1991). Moreover, the indictment here notified Mehanna of the existence of unnamed co-conspirators. *See, e.g.*, JA1 (Mehanna and Abousamra conspired with others "known and unknown to the Grand Jury"). And, it alleged as overt acts Mehanna's propaganda activities on Al-Qa'ida's behalf, in which his British co-conspirators participated. *See, e.g.*, JA5-8. Accordingly, Mehanna fails

to show any prejudicial "variance" between the indictment and the trial evidence.

Although Mehanna complains (Br. 30) that some information relating to these British co-conspirators was produced three weeks before trial, he advances no related legal claim. Likewise, in a separate section of his brief (Br. 59), Mehanna suggests that the district court admitted statements from seven individuals (including the British co-conspirators) in violation of the co-conspirator exception to the hearsay rules. *See also* NACDL Br. 20-22. The district court found that these individuals were co-conspirators, JA1914 (charge conference), and Mehanna's entirely perfunctory argument to the contrary does not suffice to show "clear error" on appeal. *United States v. Newton*, 326 F.3d 253, 257 (1st Cir. 2003) (deferential standard of review for *Petrozziello* rulings "places a heavy burden on a defendant"); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (perfunctory arguments deemed waived).[26]

---

[26]Mehanna also criticizes the government for naming Bin Laden and other Al-Qa'ida leaders as "unindicted co-conspirators." Br. 30, 58-59, *see also* NACDL Br. 11, 18, 22-24. The district court found that no findings under *United States v. Petrozziello*, 548 F.2d 20, 22-23 (1st Cir. 1977), were necessary as to Al-Qa'ida leaders because Mehanna was unable to identify any statements from them that were admitted for their truth. JA1905-15. Mehanna has not corrected this deficiency on appeal.

### 3.    Evidence Regarding The Domestic Attacks

Mehanna also claims variance (Br. 31) because evidence that his group considered domestic attacks after Abousamra's Pakistani contact suggested this approach, *see supra* at 12, was not disclosed in the indictment.  This claim was not preserved below.  No plain error occurred because an indictment need not preview all of the government's trial evidence.  Nor did this testimony vary from the indictment's theories.  Count I alleged a conspiracy, "[b]eginning in or about 2001," between Mehanna, Abousamra and others to provide material support to Al-Qa'ida.  JA1.  The group's discussions in 2003 about possible domestic attacks were fully consistent with that theory.  *Pierre*, 484 F.3d at 80-83.

Mehanna's reliance (Br. 19, 25) on *United States v. Dellosantos*, 649 F.3d 109 (1st Cir. 2011), is entirely misplaced.  *See also* NACDL Br. 11, 24-27.  In *Dellosantos*, the government charged a "Maine-based conspiracy to distribute *both* cocaine *and* marijuana" but the evidence as to two defendants showed their involvement in a separate Massachusetts-based conspiracy to distribute cocaine. *Id.* at 125.  Those two defendants were tried with 16 other defendants and "subjected ... to voluminous testimony relating to unconnected crimes in which they took no part."  *Ibid.*  Here, Mehanna was the sole defendant at trial and the evidence all related to crimes in which he participated as charged in the indictment.

### 4.    **Abousamra's Trips To Pakistan**

Next, Mehanna challenges (Br. 31) the evidence about Abousamra's trips to Pakistan in 2002.  *See supra* at 11-12.  This evidence, *inter alia*, shed light on the purpose of the later Yemen trip and explained communications between Mehanna and Abousamra in 2006 when they tried to renew Abousamra's Pakistani contacts in another attempt at jihad.  JA1008, JA1033, JA1584/100-01.  The evidence was admitted without objection.

Mehanna objects to Abousamra's statements to Masood about his Pakistan trips.  JA1546/20-1547/27.  These statements were admissible as co-conspirator statements.  Mehanna had joined a conspiracy to provide material support to terrorists at the time the statements were made, JA556, JA786, JA787, JA1196, JA1078, JA1727/85, JA1730/96, and even if he had not, the statements would still be admissible.  Fed. R. Evid 801(d)(2)(E); *United States v. Saccoccia*, 58 F.3d 754, 778 (1st Cir. 1995) (defendant who joins existing conspiracy effectively adopts co-conspirator declarations previously made).  These statements were also admissible as statements against Abousamra's interest under Fed. R. Evid. 804(b)(3).

Moreover, even if Abousamra's statements to Masood were inadmissible hearsay, Mehanna suffered no prejudice because Abousamra made similar

admissible statements to others. JA1584/100-01 (Abousamra tells Pippin about Pakistan trips as part of his efforts to obtain Yemen contacts); JA1660/34 (Abousamra tells Spaulding about his two trips to Pakistan). Further, no relief would be appropriate under the plain error standard because Mehanna's failure to object to this testimony was likely strategic. Testimony about Abousamra's earlier trips to Pakistan supported Mehanna's claim that Abousamra was more fervent than Mehanna was, *see supra* at 32-34, and might have permitted the jury to infer (or so Mehanna may have reasoned) that the two went to Yemen with different goals in mind.

### 5. Mehanna's Discussion With Maldonado And Hammami.

Mehanna objects (Br. 31-32) to Maldonado's testimony (JA1630/28-30) that, in August 2006, Maldonado met in Egypt with Mehanna and Hammami and talked about Somalia and other topics. *See supra* at 28. No objection was preserved.

Mehanna complains that this conversation "had nothing to do with Yemen." Br. 32. While this is true, it did relate to Maldonado's subsequent trip to Somalia, which was the critical backdrop to the false statement charges in Counts V and VI. Accordingly, admitting this testimony was not plain error.

6.     **Abuzahra's Statements To Masood About Why He Returned From Abroad**

Mehanna argues (Br. 32-33) that Masood should not have been allowed to testify about Abuzahra's statement that he (Abuzahra) abandoned the Yemen trip because "his wife found out" and he "couldn't leave [her] and he didn't want to go." JA1551/43. Over defense objection, this testimony was correctly admitted as a co-conspirator statement under Fed. R. Evid. 801(d)(2)(E). *Ibid.* ("update on the status of the conspiracy" is admissible); *accord United States v. Rivera-Donate*, 682 F.3d 120, 132 (1st Cir. 2012); *see also* JA1732/105-06 (Abuzahra continues coverup in August 2006 by lying to the FBI).

In any event, any error could only have been harmless. Abuzahra's reason for coming home had no obvious bearing on why Mehanna himself went to Yemen. Moreover, any adverse inference that might be drawn from Abuzahra's statement was a mere drop in an overflowing bucket of incriminating proof that included Mehanna's own admissions to Masood about his search in Yemen for a terrorist training camp and his statement to Spaulding that Abuzahra "chickened out" on the Yemen trip. JA1551/43-1552/45, JA1659/28.

7.     **Abousamra's Statements Before And After The Yemen Trip**

Finally, Mehanna suggests (Br. 33) that his conspiracy with Abousamra lasted only during the Yemen trip so that any statements Abousamra made before or after that trip were not co-conspirator statements.  This argument lacks merit.  The indictment alleges several longstanding conspiracies between Mehanna and Abousamra, JA1-40, and the evidence supported these allegations.  In particular, and contrary to Mehanna's claim, Br. 33, his group had already agreed to "do something" before Abousamra's visit to Pippin in late 2003, JA1703/134-1706/147, JA1707/4-5, and even if it had not, Abousamra's statements would still have been admissible.  *Saccoccia*, 58 F.3d at 778.  Moreover, after the Yemen trip, Mehanna and Abousamra continued to conspire by, *inter alia*, seeking to participate in jihad and attempting to conceal their activities.  JA1008, JA1019, JA1033; *see* JA1722/65-1723/69 (district court finds conspiracy with Abousamra did not end after Yemen trip).  And, even if error had occurred, it would have been harmless given all of Mehanna's own incriminating statements regarding the Yemen trip.  *See supra* at 18-19.

## II.    THE COURT SHOULD REJECT MEHANNA'S FIRST AMENDMENT ARGUMENTS.

While the United States was battling Al-Qa'ida insurgents in Iraq, Mehanna created English-language versions of Al-Qa'ida propaganda that, *inter alia*, urged Muslims to employ suicide bombings against American forces. *See supra* at 24-25. In so doing, Mehanna intended to render material support to Al-Qa'ida and he understood that he was working at Al Qa'ida's behest. *See supra* at 25-26. Mehanna nonetheless argues (Br. 35-53) that his material support convictions on Counts I-III must be reversed because the First Amendment protected these activities. He is wrong. No related sufficiency-of-the-evidence challenge can be raised on appeal and the evidence was sufficient in any event. Likewise, the district court's jury instructions fully protected Mehanna's First Amendment rights and if instructional error had occurred (none did), it was harmless.

### A.    *Mehanna's Sufficiency-Of-The-Evidence Challenge*

#### 1.    **The Jury's General Guilty Verdicts On Counts I-III Eliminate Any Sufficiency Challenge Related To Mehanna's "Speech" Activities.**

Mehanna's First Amendment challenge is limited to Counts I-III. Br. 35.[27]

---

[27]These counts involve two material support statutes (Sections 2339A and Section 2339B), which raise different potential First Amendment issues. Mehanna directs his First Amendment arguments primarily to Section 2339B, which proscribes the knowing provision of material support to an FTO. Section 2339A

These counts permitted the jury to convict based upon multiple theories, including Mehanna's Yemen trip.  JA1924/25 (jury instructed that it must "unanimously agree as to the manner in which the defendant conspired to provide material support and resources").  In *Griffin v. United States*, 502 U.S. 46, 59-60 (1991), the Supreme Court held that a general guilty verdict cannot be overturned for insufficient evidence as long as the evidence sufficiently supported any one ground for conviction.  Because the government's evidence on its non-speech related theories, including Mehanna's Yemen trip, more than sufficed to support Counts I-III, *see supra* at 41-53, *Griffin* eliminates any need to reach Mehanna's sufficiency challenge to his propaganda-related activities.  *See United States v. Capes*, 486 F.3d 711, 717-19 (1st Cir. 2007).

In arguing to the contrary (Br. 36), Mehanna quotes *Yates v. United States*,

---

does not prohibit providing material support to an FTO but makes it a crime to knowingly provide material support in preparation for or in carrying out one of several specified crimes.  Mehanna makes no effort to show why speech-related material support that otherwise violates Section 2339A would be protected under the First Amendment.  *See Dennis v. United States*, 341 U.S. 494, 545 (1951) (Frankfurter, J., concurring) ("[O]ur decisions [distinguish] between the statement of an idea which may prompt its hearers to take unlawful action, and advocacy that such action be taken.").  In any event, this Court need not decide how the First Amendment may apply to Section 2339A because the district court used the same defendant-friendly definition of material support for Counts II and III (the Section 2339A charges) as it did for Count I (the Section 2339B charge), *i.e.*, the requirement of "coordination" with an FTO.  JA1923/22-24, JA1924/26, JA1925/28, 31.

354 U.S. 298, 312 (1957), which stated that reversal is required where "'the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected[.]'"  But *Griffin* clarified that this language does not apply to sufficiency claims.  502 U.S. at 51-60.[28]

### 2. The Evidence Relating To Mehanna's Propaganda Campaign Was Sufficient To Sustain The Jury's Verdicts On Counts I-III.

Although the Court need not reach this issue, the government's evidence on its alternative theory regarding Mehanna's propaganda campaign also proved his guilt.

### a. *Holder v. Humanitarian Law Project*

Mehanna asks this Court to consider whether Congress can prohibit material support to FTOs that takes the form of political speech.  Br. 35-54.  The Supreme Court recently addressed this issue in *Holder v. Humanitarian Law Project*, 130 S.Ct. 2705 (2010) (*HLP*).

In *HLP*, organizations and individuals who wished to facilitate the lawful, nonviolent purposes of designated FTOs brought a pre-enforcement challenge to

---

[28]Other theories of liability supported by sufficient evidence included Mehanna's efforts to conceal the provision of material support by, *inter alia*, lying about the whereabouts and activities of Abousamra and Maldonado.  *See supra* at 17, 29; JA1938/82.

Section 2339B.  They claimed, *inter alia*, that they wanted to engage in "political advocacy" on behalf of FTOs, 130 S.Ct. at 2714, and argued that Section 2339B's prohibition on providing "material support" to such organizations violated the First Amendment to the extent that it precluded them from doing so.  *Id.* at 2716.

The Court held first that the statutory prohibition on providing material support in the form of "personnel" or "service[s]" did not extend to advocacy undertaken "entirely independently of the foreign terrorist organization."  *HLP*, 130 S.Ct. at 2721-22; *see* 18 U.S.C. 2339A(b)(1) (defining "material support" to include "any ... service" and "personnel"); 18 U.S.C. 2339B(a)(1).  "[S]ervice," the Court concluded, refers to "concerted activity, not independent advocacy," and Section 2339B's requirement that the "service" be rendered "to" an FTO "indicates a connection between the service and the foreign group."  130 S.Ct. at 2721-22.  Accordingly, "a person of ordinary intelligence" "would understand the term 'service' to cover advocacy *performed in coordination with, or at the direction of, a foreign terrorist organization*."  *Id.* at 2722 (emphasis added).  Because the plaintiffs had not provided any "specific articulation" of the political advocacy in which they hoped to engage, the Court left to another day "questions of exactly how much direction or coordination" the statute requires.  *Ibid.*; *see id.* at 2728-29.

The Court then found that Section 2339B was consistent with the First Amendment, even under strict scrutiny review. *HLP*, 130 S.Ct. at 2722-30. Congress, it reasoned, was justified (1) in determining that even peaceful aid to an FTO could "serve[ ] to legitimize and further their terrorist means"; and (2) in drawing a line at "material support coordinated with or under the direction of an [FTO]." *Id.* at 2725-26. Noting that the State Department also concurred in Congress's findings, the Court stated that the Executive Branch's evaluation "is entitled to deference" given the "sensitive and weighty interests of national security and foreign affairs" at stake. *Id.* at 2727. Finding that Section 2339B (including its exclusion of "activities not directed to, coordinated with, or controlled by foreign terrorist groups") reflected a "careful balancing of interests," the Court rejected the plaintiffs' claims that, as applied to their proposed activities, the statute "violate[s] the freedom of speech." *Id.* at 2728-30.[29]

---

[29]Mehanna and amici devote considerable attention to *Brandenburg v. Ohio*, 395 U.S. 444 (1969), and its "imminent lawless action" test. Br. 37-40, 46; Brief of Amici Curiae American Civil Liberties Union, et al., (ACLU Br.) 4-5, 7, 12-15, 21; Brief of Amicus Curiae Center for Constitutional Rights (CCR Br.) 3 n.1, 22-23, 28 n.7. But *HLP*, not *Brandenburg*, provides the specific standard for how the First Amendment applies to speech that knowingly provides material support to an FTO. *HLP*, 130 S.Ct. at 2733 (Breyer, J., dissenting) (recognizing that, under *HLP*, the material support statute lawfully prohibits speech even where "[n]o one contends" that the speech in question "can be prohibited as incitement under *Brandenburg*").

b.    The Sufficiency Of The Evidence

Under *HLP*, translation services render "material support" if they are "directed to, coordinated with, or controlled by foreign terrorist groups."  130 S.Ct. at 2728.  The standard of review for sufficiency-of-the-evidence claims is discussed *supra* at 41-42.  The evidence here easily meets that standard.[30]

First, Mehanna's translation activities were specifically "directed to" Al-Qa'ida.  As noted, Mehanna's Salafi-Jihadi beliefs were, from the earliest days, fueled by Al-Qa'ida's propaganda.  *See supra* at 8-9.  Mehanna not only adopted Al-Qa'ida's worldview, but sought, even while "stuck" in the United States, to answer its calls for aid.  *See supra* at 19-27.  Thus, while working for At-Tibyan,

---

The ACLU also argues (Br. 9-22) that *HLP* does not apply to "pure political advocacy."  This is wrong.  *HLP*, 130 S.Ct. at 2729 ("[P]laintiffs propose to 'engage in political advocacy on behalf of Kurds ...'"); *id.* at 2731-32 (Breyer, J., dissenting) (case involves "the communication and advocacy of political ideas").

[30]Citing to *United States v. Spock*, 416 F.2d 165 (1st Cir. 1969), Mehanna contends that *strictissimi juris* review applies here.  Br. 21.  This doctrine requires particular proof that a defendant charged with conspiracy has embraced the unlawful purposes of a "bifarious undertaking involving both legal and illegal conduct."  *Spock*, 416 F.2d at 172.  Mehanna cites no case applying it to a conspiracy to supply material support to terrorists.  *See HLP*, 130 S.Ct. 2725-30 (Congress may properly prohibit supporting even peaceful non-violent activities of FTO).  And even if it applied, Mehanna's "unambiguous statements" and his own deeds demonstrated his specific intent to advance the illegal goals of both At-Tibyan and Al-Qa'ida.  *Spock*, 416 F.2d at 173; *see supra* at 8-10, 23-27, and *infra* at 70-71.

Mehanna primarily translated Al-Qa'ida propaganda and considered it an honor to be associated with the terrorist organization through his work. *See supra* at 23-27.

Second, Mehanna conspired and attempted to provide translation services that were "coordinated with" Al-Qa'ida.[31] *HLP* used the term "coordinated" to describe "concerted" rather than "independent" activity. 130 S.Ct. at 2721-22. This distinction comports with the common understanding of the word. *Webster's Third New International Dictionary* 501 (1993) (defining "coordinate" as "to bring into a common action, movement, or condition"). As in *HLP* itself, this case presents no occasion to determine the outer limits of "coordination" because the term easily extends to services rendered to an FTO at the organization's own behest. *See McConnell v. Federal Election Comm'n*, 540 U.S. 93, 221-22 (2003) ("Congress has always treated expenditures made 'at the request or suggestion of' a [political] candidate as coordinated"). Whether or not they constitute political speech, translation services requested by an FTO are not "independent advocacy" on its behalf.[32]

---

[31]Mehanna argues (Br. 43-44, 45-47) that he did not conspire to provide either "personnel" or "expert advice and assistance" to Al-Qa'ida in connection with his propaganda activities. These arguments are irrelevant because he conspired to provide it with "services."

[32]The ACLU (Br. 16) suggests that "pure political advocacy" is not the kind of "fungible support" that can further the unlawful ends of an FTO. But Mehanna

Here, the evidence showed that At-Tibyan translated propaganda in direct response to Al-Qa'ida requests.  *See supra* at 22, 25-27; JA705, JA765, JA1540/20, JA1785/31-1786/32.[33]  Further, it showed that Mehanna knew At-Tibyan coordinated with Al-Qa'ida, JA765, and that, through his translations, he intended to further At-Tibyan's goal of aiding Al-Qa'ida.  JA960, JA923-24.  Standing alone, this evidence sufficed.  JA1924/26 (jury instructed that to find Mehanna guilty on Count I conspiracy, it must find he "willfully joined in" an agreement "to provide material support or resources to Al-Qa'ida"); *United States v. Maryea*, 704 F.3d 55, 73 (1st Cir. 2013) (defendant must participate in the conspiracy knowingly and voluntarily).  The evidence regarding Mehanna's propaganda activities also supported his conviction on Count III (a substantive violation of Section 2339A) on several theories, including aiding and abetting his At-Tibyan colleagues.

Although the evidence did not need to show that Mehanna worked on specific translation projects that he knew were undertaken at Al-Qa'ida's behest, it

provided Al-Qa'ida with translation services and it is entirely foreseeable how such services could further Al-Qa'ida's goals.

[33]An amicus brief submitted on behalf of, *inter alia*, scholars in the field of Islam ("Scholars' Br.") asserts (p.5) that "a reasonable person could not conclude that *at-Tibyan* was an outlet of an FTO[.]"  The trial record, which that brief fails to address, proved otherwise.

did.  *See United States v. Tobin*, 480 F.3d 53, 58 (1st Cir. 2007) (conspiracy

offense does not require that defendant actually commit the contemplated crime).

First, Mehanna made suggestions for improvements to the Al-Zawahiri video,

knowing that Al-Qa'ida had asked At-Tibyan to translate it.  JA960.  Second, he

translated the "Umar Hadid" video, knowing that At-Tibyan had obtained it prior

to its official release from Al-Qa'ida and around the same time that Al-Qa'ida had

asked At-Tibyan to translate the Al-Zawahiri video.  *See supra* at 25-27.  Viewed

in the light most favorable to the government, the jury could infer that Mehanna

translated "Umar Hadid," knowing he was doing so at Al-Qa'ida's behest.[34]

B.    *Mehanna's Jury Instruction Challenges*

Mehanna also challenges the jury instructions on First Amendment grounds.

Br. 47-53.  The jury's general guilty verdict does not eliminate such claims

because they allege "legal error."  *Griffin*, 502 U.S. at 58; *Bachellar v. Maryland*,

397 U.S. 564, 570-71 (1970); *United States v. Bailey*, 405 F.3d 102, 109-10 (1st

Cir. 2005).

---

[34]The assumption that Mehanna translated only "publicly available" materials and that he placed his translations "on the Internet for the English-speaking world to see" is incorrect.  *See, e.g.*, CAR Br. 18.  The "Umar Hadid" video, for example, does not appear to have been publicly available when Mehanna translated it.  JA931; *see* JA1779/5, JA1810/71-1813/84, JA1818/121-1820/128.  Moreover, At-Tibyan provided limited access to Mehanna's translations for a supportive jihadi audience.  *See supra* at 22; JA1788/42-43.

"Preserved claims of instructional error are assessed on appeal under a bifurcated framework." *United States v. Sasso*, 695 F.3d 25, 29 (1st Cir. 2012). The Court "review[s] de novo questions about whether the instructions conveyed the essence of the applicable law and review[s] for abuse of discretion questions about whether the court's choice of language was unfairly prejudicial." *Ibid.*; *accord United States v. Allen*, 670 F.3d 12, 15 (1st Cir. 2012). In either case, the Court "look[s] to the challenged instructions in relation to the charge as a whole, asking whether the charge in its entirety – and in the context of the evidence – presented the relevant issues to the jury fairly and adequately." *United States v. Stefanik*, 674 F.3d 71, 76 (1st Cir.) (citation omitted), *cert. denied*, 132 S.Ct. 2118 (2012). A district court's refusal to give a specific instruction is erroneous only if the requested instruction was "(1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." *United States v. Symonevich*, 688 F.3d 12, 24 (1st Cir. 2012). Even if a particular instruction was erroneous, reversal is not warranted if the error was harmless. *See Sasso*, 695 F.3d at 29.

### 1. **No Instructional Error Occurred.**

In keeping with *HLP*, the district court clarified the meaning of "material support" in the following manner:

> Now, this is important. Persons who act independently of a foreign terrorist organization to advance its goals or objectives are not considered to be working under the organization's direction or control. A person cannot be convicted under this statute when he's acting entirely independently of a foreign terrorist organization. This is true even if the person is advancing the organizations's goals and objectives. Rather, for a person to be guilty under this count, a person must be acting in coordination with or at the direction of a designated foreign terrorist organization, here as alleged in Count 1, al-Qa'ida.

> You need not worry about the scope or effect of the guarantee of free speech contained in the First Amendment to our Constitution. According to the Supreme Court, this statute already accommodates that guarantee by punishing only conduct that is done in coordination with or at the direction of a foreign terrorist organization. Advocacy that is done independently of the terrorist organization and not at its direction or in coordination with it does not violate the statute.

> Put another way, activity that is proven to be the furnishing of material support or resources to a designated foreign terrorist organization under the statute is not activity that is protected by the First Amendment; on the other hand, as I've said, independent advocacy on behalf of the organization, not done at its direction or in coordination with it, is not a violation of the statute. JA1924/24-25.

Mehanna challenges this instruction on three grounds. First, he contends that the district court should have instructed the jury (in accordance with his Proposed Instruction No.7) that "the person must have a direct connection to the

[terrorist] group and be working directly with the [terrorist] group" to violate Section 2339B. Br. 49-50; *see id.* at 47 (government must prove that Mehanna was "functionally within [Al-Qa'ida's] command structure" or had "face-to-face" meetings with Al-Qa'ida), *see* CCR Br. 18 ("direct (and likely sustained) engagement with [an FTO]"); *see also* JA166-168, JA1957/169 (preserving this claim).

This argument fails because Mehanna's proposed instruction was not "substantively correct." *See United States v. David*, 940 F.2d 722, 738 (1st Cir. 1991) (court may refuse to give incorrect, misleading or incomplete instruction). To "coordinate" with an FTO, one need not "work[ ] directly with" the FTO or be "told by the terrorist group itself to do the specific act." JA167 (proposed instruction). "Coordination," rather, can occur through intermediaries. Nothing in the term "coordination" itself requires "direct contact," and it would be a pointless anachronism to insist on "face-to-face" engagement in an age when people often work or socialize entirely over the internet. JA1776/135-1777/136 (Al-Qa'ida increasingly communicates over the internet).

Nor would Congress have intended such a result. To the contrary, limiting Section 2339B only to instances where material support involves "direct contact" with an FTO would largely gut the statute. And any prosecutions that remained

-74-

would become hopelessly sidetracked into debates over how "direct" the defendant's contact with the FTO needs to be and who counts as a "representative" of the FTO. *See* JA1775/130 (Al-Qa'ida has "become increasingly decentralized" since 9/11).

Finally, Mehanna's proposed instruction also conflicts with general principles of criminal law, which do not allow a defendant to escape liability by acting through an intermediary. *See, e.g., United States v. Maloney*, 71 F.3d 645, 650 (7th Cir. 1995) (upholding conviction of judge who accepted bribes through "bag men"); *United States v. Nestor*, 574 F.3d 159, 161-62 (3d Cir. 2009) (use of an adult intermediary to attempt to persuade a child to have sex does not provide a defense).

Next, Mehanna argues that, by failing to further define "coordination," the district court permitted the jury to convict him "for the content of [his] speech, even where there was no relationship to any FTO or terrorist." Br. 50; *see* NACDL Br. 7 (claiming this "prosecution ... effectively criminalized unpopular thought"). This is incorrect. The court's instructions required that, in order to convict, the jury had to find that Mehanna conspired or intended to engage in coordinated activity with Al-Qa'ida, and further explained that independent advocacy on behalf of the FTO did not violate the law. This instruction conveyed

the essence of the applicable law (as construed in *HLP*), precluded the jury from convicting Mehanna based solely on proof that he translated Al-Qa'ida propaganda, and protected his First Amendment rights.[35]

Moreover, the district court cannot be faulted for not further defining "coordination," given that Mehanna's own attempts to do so ranged from wrong (individual must be "told by the terrorist group itself to do the specific act") to worse (defendant must have a "contractual" or "employment" relationship with the terrorist organization, *i.e.*, "both a pre-arrangement and a *quid pro quo*"). JA160, JA167. Indeed, had the district court provided examples of "coordinated" services to include, say, translations for Al-Qa'ida at Al-Qa'ida's behest, Mehanna would undoubtedly have objected. In any event, there was no need to further define "coordination" as this non-statutory term merely confirms the common sense understanding of what rendering "services" "to" an FTO means. *HLP*, 130 S.Ct. at 2722 ("[A] person of ordinary intelligence would understand the term 'service' to

---

[35]The Scholars' Brief makes the unlikely claim (Br. 3) that this prosecution criminalizes activities in which they "regularly engage." We doubt that these scholars regularly translate Al-Qa'ida propaganda in coordination with the terrorist organization itself, publish translations as joint productions with Al-Qa'ida, or release translations of Al-Qa'ida propaganda only on password-protected jihadi websites.

cover advocacy performed in coordination with, or at the direction of, a foreign terrorist organization.").

Finally, Mehanna faults the district court for "direct[ing] the jurors *not* to consider [his] First Amendment rights." Br. 51. But the court's First Amendment instructions were entirely correct. The First Amendment is not a set of vague ideals that individual jurors may interpret as they see fit; it is a source of law that can be (and, here, has been) construed by the Supreme Court. Given *HLP*, the district court correctly informed the jury that the line Section 2339B draws between independent advocacy and coordinated activity is consistent with the First Amendment.

### 2.    Any Instructional Error Relating To Mehanna's Propaganda Activities Was Harmless.

Where (1) the jury has been instructed on a single count on alternative theories of guilt; (2) the instructions as to one theory are invalid; and (3) the jury returns a general guilty verdict, the instructional error may nonetheless be harmless. *Hedgpeth v. Pulido*, 555 U.S. 57, 60-62 (2008) (per curiam); *see, e.g., Skilling v. United States*, 130 S.Ct. 2896, 2934-35 (2010). In those circumstances, reviewing courts conduct the same harmless-error analysis as when the trial court fails to instruct on an element of an offense. *Hedgpeth*, 555 U.S. at 60-61 (citing *Neder v. United States*, 527 U.S. 1 (1999)). Under that analysis, an instructional

error is harmless if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error[.]" *Neder*, 527 U.S. at 18. That standard is satisfied if the evidence of guilt on a proper theory was "overwhelming," *id.* at 17, 19; *United States v. Skilling*, 638 F.3d 480, 483 (5th Cir. 2011), *cert. denied*, 132 S.Ct. 1905 (2012), or if the jury's verdicts on other counts demonstrate that it found facts establishing the defendant's guilt on the properly instructed theory. *See, e.g.*, *United States v. Coppola*, 671 F.3d 220, 237-38 (2d Cir. 2012), *cert. denied*, 133 S.Ct. 843 (2013).

First, the government's evidence regarding the Yemen trip – one of the theories underlying Counts I-III – was "overwhelming." *See supra* at 43-53. Second, the jury's verdict on Count VII confirms that it rejected Mehanna's defense that he went to Yemen to "check out" the Dar al-Mustafa school. Count VII charged Mehanna with making materially false statements to the FBI regarding (1) the purpose of the Yemen trip; (2) whether Mehanna, Abousamra and Abuzahra planned the trip without assistance and entirely on-line; and (3) whether Mehanna had visited Dar al-Mustafa. Moreover, because Section 1001 requires that a false statement be "material," Count VII further alleged that Mehanna traveled abroad "to find and receive military-type training at a terrorist training camp and to thereafter participate in violent jihad and terrorism against

-78-

the United States."  JA29.  The jury's guilty verdict on Count VII confirms that,

consistent with the overwhelming evidence, it adopted the government's theory

regarding the Yemen trip and rejected Mehanna's defense.

Third, the jury also convicted Mehanna on Count IV, which charged that he

and Abousamra conspired to kill in a foreign country in violation of 18 U.S.C.

956.  Like Count VII, Count IV had nothing to do with Mehanna's propaganda

campaign.  Moreover, Section 956 was one of the contemplated offenses for the

material support charges in Counts II and III.  Given the evidence presented at

trial, the jury could not rationally have concluded that Mehanna and Abousamra

conspired to kill in a foreign country in violation of Section 956, but did not

conspire or attempt to provide material support to be used in preparation for, or in

carrying out, a Section 956 offense.  For all these reasons, any instructional error

regarding Mehanna's propaganda activities was harmless.

III.    MEHANNA'S TRIAL ERROR CLAIMS LACK MERIT.

A.    *The District Court Properly Admitted Evidence Under Fed. R. Evid.
            403.*

Mehanna argues that the district court should have excluded certain

"inflammatory" evidence consisting mainly of the jihadist media that Mehanna

consumed and his online discussions of jihadist ideas.  Br. 54-59 (citing Fed. R.

Evid. 403).  But the district court was well within its discretion in admitting the

disputed evidence, which was highly probative of Mehanna's intent to support Al-Qa'ida – the key issue in the case.

Under Rule 403, a district court may exclude relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice." *United States v. Gentles*, 619 F.3d 75, 87 (1st Cir. 2010). The lower court's balancing judgments under Rule 403 are "typically battlefield determinations" that are afforded "great deference" on appeal. *United States v. Shinderman*, 515 F.3d 5, 16-17 (1st Cir. 2008); *Tavares*, 705 F.3d at 15-16 (this Court defers to the district court's balancing except in "extraordinarily compelling circumstances").

The gravamen of Mehanna's claim is that the district court permitted the jury to see too much of the jihadist media that Mehanna and his co-conspirators read, watched, commented on, edited, translated, or produced. However, as the district court found, all of that material was powerfully probative on the central question before the jury: whether Mehanna and his co-conspirators intended to support Al-Qa'ida and its attacks on U.S. troops in Iraq. Evidence that Mehanna immersed himself in Al-Qa'ida propaganda, as well as evidence that he devoted countless hours over many years to online discussions and promotion of his jihadist opinions, corroborated the testimony of Abuzahra and others that

Mehanna shared Al-Qa'ida's goals and that his actions – including his travel to Yemen and his media activity – were intended to support terrorism.

Mehanna's defense made the details of his opinions on Islam, jihad, terrorism, Iraq, and Al-Qa'ida and its leaders especially relevant. At trial, Mehanna argued that, although he agreed with Al-Qa'ida that Muslims had the right to defend their lands from invaders, he embraced moderate theories of Islam (including the notion of *Aman*) that prevented him from fighting U.S. soldiers or supporting terrorist attacks against civilians. *See supra* at 34. Given that nuanced defense, the details of Mehanna's actual beliefs were relevant.[36] More directly, this evidence demonstrated Mehanna's devotion to Al-Qa'ida, his support for its terrorist attacks both here and in Iraq, and his personal commitment to martyrdom

_____

[36]Mehanna's brief repeats the claim that his opinions, including his belief in *Aman*, were more moderate than Al-Qa'ida's. Br. 7-8, 29, 31, 62. However, the evidence (much of it hearsay) regarding Mehanna's differences of opinion with allegedly more extreme jihadists was equivocal, and focused principally on a dispute over which U.S. civilians Al-Qa'ida could justifiably murder – anyone who pays taxes (the extreme view), or only civilians who more directly support the U.S. presence in a Muslim land (Mehanna's view). *See, e.g.,* JA1560/89, JA1690/37-39, JA1750/34-37, JA738, JA745. Moreover, Mehanna's "moderate" Dr. Jekyll was dominated by his more extreme Mr. Hyde, who made numerous statements praising Al-Qa'ida's indiscriminate murders of civilians. *See supra* at 8-11, 20 & n.14. Finally, even the "moderate" Mehanna never suggested that attacking U.S. troops in Iraq – the conduct involved in this case – was not legitimate, and never retracted, even in his allocution, his support for the "Mujahidin" fighting against U.S. soldiers overseas. JA1971-1972.

and jihad. It therefore made it more probable that he intended to aid Al-Qa'ida by fighting in Iraq and by inspiring others to do the same.

Despite Mehanna's contrary claims (Br. 54-56), evidence that he admired Bin Laden and other Al-Qa'ida leaders, that his worldview was heavily influenced by Al-Qa'ida's *State of the Ummah* video and other propaganda, and that he approved of 9/11 and other attacks all undermined his claim that he was ideologically opposed to participating in jihad against U.S. soldiers and to spreading Al-Qa'ida's message. *See United States v. El-Mezain*, 664 F.3d 467, 509-10 (5th Cir. 2011) (upholding admission of evidence from defendants' computers and premises that tended to show support for Hamas and undermine claim that defendants were acting independently of Hamas, because "[e]vidence which tends to rebut a defendant's claim of innocent action is unlikely to be unduly prejudicial"), *cert. denied,* 133 S.Ct. 525 (2012); *cf. United States v. McKeeve*, 131 F.3d 1, 13-14 (1st Cir. 1997) ("Trials are meaty affairs, and appellate courts should not insist that all taste be extracted from a piece of evidence before a jury can chew on it."). Also, as the district court noted, the sheer volume of Mehanna's propaganda and commentary was itself probative, as it tended to show his "obsessiveness." JA1759/104-1760/107; *see also* JA1762/116, JA1767/81-82.

Mehanna asserts (Br. 57) that the district court allowed the trial to run "off the rails."  To the contrary, the district court handled Mehanna's trial with care and skill, and kept it well within permissible bounds.  On numerous occasions, it carefully balanced the probative value and danger for unfair prejudice of evidence the defense claimed was inflammatory, considering both the effect of the particular exhibit and the overall, cumulative effect of the admitted evidence.  *See, e.g.*, JA1465/8, JA1503/7-1504/9, JA1507/48-1510/62, JA1527/4-1531/21, JA1542/4-7, JA1687/4-1688/11, JA1767/81-82.  In considering the evidence, the court entertained extensive argument from Mehanna on multiple occasions and frequently required the government to establish the probative purpose of a challenged exhibit by, for example, showing that Mehanna specifically distributed, edited, or expressed approval of the material.  *See, e.g.*, JA1507/49-JA1509/59, JA1527/7, JA1612/98-1614/107, JA1758/101.  And, in some instances, the court either excluded evidence or made clear that exhibits were admitted only after graphic or potentially inflammatory content was redacted.  *See, e.g.*, JA1465/9-10 (redaction of discussion about inferior status of women), JA1692/58 (excluding prejudicial language about beheadings from Mehanna's instant message), JA1688/10 (government's redaction of images of Zarqawi and of corpses minimized risk of unfair prejudice), JA1762/117 (requiring redaction of

Abousamra's comment about "rap[ing] a female infidel"); *see also* JA1529/13, JA1530/18, JA1647/124-127.

Mehanna contends (Br. 56) that "thumbnail" images obtained from his computer lack probative value because they might have been automatically saved by his web browser. But whether or not Mehanna deliberately downloaded these images, their presence on his computer supports an inference that he frequented and supported websites that carried them. JA1709/104 (district court concludes thumbnails have "some value"); *see El-Mezain*, 664 F.3d at 509-10 (rejecting Rule 403 challenge to similar "thumbnail" images of Hamas violence on computers of company accused of providing material support to Hamas); *United States v. Abu Jihaad*, 630 F.3d 102, 113 n.12, 133-34 (2d Cir. 2010) (admitting terrorist videos defendant had ordered and materials from websites he had visited as relevant to motive and intent, even though defendant had not yet received the videos and government could not prove he actually viewed the website materials). Mehanna was free to – and did – argue that the thumbnails were not probative. In fact, he presented an expert witness who explained how thumbnails are created, JA1849/15-16, and dismissed them as irrelevant in his closing argument.

JA1941/93 (thumbnails are "tiny pictures" that "weren't even downloaded").[37]

Mehanna argues (Br. 57)  that the district court should have excluded an email he sent to Masood and Abousamra linking a video (which the jury did not see) showing Al-Qa'ida's beheading of journalist Daniel Pearl.  He contends that this e-mail was sent more than a year before his group began concrete preparations for the Yemen trip.  Be that as it may, the email corroborated Masood's testimony that he, Mehanna, and Abousamra watched Al-Qa'ida videos as a group and discussed ways they could personally participate in jihad.  JA1547/25-1549/35.  And it cast doubt on Mehanna's claim that his own concept of jihad was limited to defending the borders of Muslim nations.  The probative value is clear, and the potential for unfair prejudice, as the district court found, was low because the video itself was not shown.  JA1542/5-7.  Mehanna is similarly mistaken (Br. 57) in contending that videos he watched and discussed in the spring of 2006 lacked

---

[37]The thumbnails included approximately 30 photos of the World Trade Center on 9/11.  JA1767/81-82.  These images were not admitted to inflame the jury nor were they likely to do so.  JA1508/52 (district court notes that these images were on "national TV" and suggests that "people are inured to [it] at this point").  Instead, they were admitted to prove Mehanna's motive and intent.  JA1767/82) (district court notes "the accumulation of repetitive images says something about the [defendant's] state of mind"); *see also* JA1955/150 (government rebuttal closing: "We didn't show you pictures of 9/11 to scare you. ... Who has 30 pictures of the planes crashing into the Towers?  Is that Aman there?").

probative value.  Even if those videos did not tend to shed light on Mehanna's intent when he traveled to Yemen in 2004, and even assuming they were not properly admissible to prove the material support allegations related to Mehanna's media activities, the evidence was still probative to show that in 2006 Mehanna and Abousamra continued their conspiracy to go abroad and fight after returning from Yemen and Iraq.  *See supra* at 19.

The district court's evidentiary rulings were entirely consistent with rulings in other terrorism-related cases.  This and other courts have regularly upheld district courts' discretion to admit evidence of terrorist propaganda videos and other terrorism-related materials in order to prove the defendants' knowledge, intent, and motive, including in cases, unlike this one, where the defendants had no intention to conduct or support a terrorist group's violent activities.  *See, e.g.*, *United States v. Felton*, 417 F.3d 97, 101-02 (1st Cir. 2005) (probative value of propaganda materials showing defendants' white-supremacist views was not substantially outweighed by its risk of prejudice, because "[u]nfortunately for the defendants, evidence of their beliefs and associations was highly relevant"); *Mubayyid*, 658 F.3d at 56, 72-73 (rejecting defendant's claim that evidence filled with "blood curdling" advocacy of "violent jihad" was so "extensive, inflammatory, and prejudicial" as to require reversal); *El-Mezain*, 664 F.3d at 507-

11 (upholding admission of evidence related to Hamas violence including videotapes, photographs, posters, and images found on computers as relevant to defendants' intent to support Hamas); *Abu-Jihaad*, 630 F.3d at 133-34 (pro-jihadist videos, including depictions of violence, were probative of defendant's intent and not unduly prejudicial); *United States v. Salameh*, 152 F.3d 88, 110–11 (2d Cir. 1998) (video depicting embassy bombing and instructions for making explosives was relevant to motive and nature of conspiratorial agreement); *United States v. Hammoud*, 381 F.3d 316, 342 (4th Cir. 2004) (affirming admission of videotapes depicting Hizballah military operations and rallies as probative of defendant's knowledge of group's unlawful activities and his motives in raising funds for it); *United States v. Benkahla*, 530 F.3d 300, 309-10 (4th Cir. 2008) (upholding admission of numerous videos and photographs over defendant's claim that the evidence was "well beyond" what was necessary to establish materiality of false statements: "lengthy testimony about various aspects of radical Islam was appropriate, and indeed necessary, for the jury 'to understand the evidence,' and 'determine the fact[s].'").

Mehanna's reliance on *United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008) is misplaced. Br. 57-58. In *Al-Moayad*, the Second Circuit held that the district court should have excluded a witness's description of his experiences at an

Al-Qa'ida training camp, including footage of Bin Laden visiting the camp,

because there was no connection between the witness and the defendant and the

witness went far beyond his proffered purpose of merely authenticating a

document. *Id.* at 163. Moreover, the Second Circuit noted that the district court

failed to conduct any analysis of the evidence's probative value or to balance it

against the potential for unfair prejudice. *Al-Moayad* is thus inapplicable: the

evidence there, unlike here, had virtually no discernible probative value, and the

district court did not engage in any discretionary balancing to which the court of

appeals could defer.[38]

Finally, even if some of this evidence should have been excluded, any error

was harmless in light of the separate and overwhelming evidence of the purpose of

Mehanna's Yemen excursion, including the mutually corroborating testimony of

co-conspirators Abuzahra, Masood, and Pippin. *See supra* at 43-45; *see also*

*supra* at 28-30, 33 (overwhelming evidence of false statement conviction related

to Maldonado).

---

[38]Mehanna contends (Br. 57-58) that the district court should have excluded
any evidence that involved conduct more inflammatory than the charged crimes.
However, as the case Mehanna cites makes clear, that principle is one of the
factors courts consider in weighing admissibility of evidence of prior bad acts *by
the defendant*. *See United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006).

-88-

B.     *No* Brady *Violation Occurred.*

Mehanna claims (Br. 61-63) that the district court should have required the government to produce evidence that he refused to engage in criminal acts when solicited by a government agent.  *See also* JA1971/56 (Mehanna claims at sentencing that "the government ... sent an undercover agent to try to ensnare me in one of their little fake terror plots, and I refused").  The government has repeatedly denied that any such evidence exists, most recently when Mehanna unsuccessfully moved this Court to release transcripts of *ex parte* conversations between the government and the district court.  Government Opposition filed 10/25/12.  After conducting an *in* camera review, the district court found that no evidence relevant to defendant's request was "discoverable under *Brady v. Maryland*, 373 U.S. 83 (1963)."  JA117.

This ruling should be affirmed.  *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."  373 U.S. at 87. Evidence is material "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  *Smith v. Cain*, 132 S.Ct. 627, 630 (2012) (citation omitted).

In connection with Mehanna's motion in this Court, the government has already submitted under seal information relating to Mehanna's *Brady* claim. That sealed submission (which the government incorporates by reference) confirms that the district court did not abuse its discretion in rejecting Mehanna's discovery request. *See United States v. Innamorati*, 996 F.2d 456, 488 (1st Cir. 1993) (finding no *Brady* violation after reviewing sealed materials); *see also United States v. DeCologero*, 530 F.3d 36, 65 (1st Cir. 2008) (abuse of discretion standard applies to *Brady* claims).

C.  *The District Court Did Not Abuse Its Discretion In Excluding Expert Testimony.*

1.  **Background**

The district court permitted Mehanna to offer testimony of six expert witnesses. On appeal, Mehanna argues that the court abused its discretion in excluding testimony from two more experts who, Mehanna claims, would have undermined the substance of and methodology underlying opinions of government expert Evan Kohlmann. The district court acted well within its discretion in excluding these experts, whose testimony was cumulative and, at most, marginally relevant.

Durlauf:  Mehanna argued that he should be permitted to offer testimony from defense expert Dr. Durlauf, who would present mathematical formulas

purportedly showing that Kohlmann's method for defining who was an Al-Qa'ida adherent was inconsistent with scientific standards. JA1822/21-23. The district court excluded Durlauf's testimony, noting initially that the affidavit through which Mehanna had provided the required notice of expert testimony did not "come[] close" to adequately summarizing the proffered testimony. JA1822/23. The court further concluded that Durlauf's testimony did not satisfy the "fit" requirement of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), because Kohlmann did not claim that his conclusions about who was an Al-Qa'ida adherent were based on the kind of strict "experimental science" standards that, according to Durlauf, Kohlmann's work failed to satisfy. JA1823/24.

<u>Williams</u>: Mehanna claimed that Williams would have rebutted Kohlmann by testifying about the relative ineffectiveness of jihadi videos in generating recruits for Al-Qa'ida, and by opining that the purpose of such videos was not to recruit jihadists but to improve Al-Qa'ida's image and "provide[] for young Muslims a sense of winning." JA1847/148.[39] The district court concluded that

---

[39]Contrary to Mehanna's claim (Br. 59), Kohlmann did not "opine that reviewing a video in English is substantially likely to cause actual recruits to join al Qa'ida." He testified (1) that Al-Qa'ida issues calls for support (money, weapons, recruits, terrorist acts, translation services ...) through videos and other media, JA1777/139-1778/141, JA1779/4, JA1781/14; and (2) that, without

this testimony would not be helpful because, regardless of whether the videos actually succeed in generating recruits, producing videos for general propaganda and morale purposes is still "material" support.  JA1846/146, JA1847/149.

### 2.    Discussion

This Court reviews the district court's rulings for abuse of discretion only. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999); *United States v. Shay,* 57 F.3d 126, 132 (1st Cir. 1995) (decision to exclude expert testimony afforded "great deference").

Under *Daubert*, a trial court considering whether to admit expert testimony under Federal Rule of Evidence 702 must determine, among other things, whether the proffered testimony is sufficiently closely tied to the facts that it will "assist the trier of fact."  509 U.S. at 591-93.  For the testimony to "fit" the facts and issues in the case, there must be "a valid connection" between "the expert's testimony and a disputed issue."  *Shay*, 57 F.3d at 132-33 & n.5.

Here, it was within the district court's discretion to find that Durlauf's opinion – that Kohlmann's method for determining who was an Al-Qa'ida adherent fell short of the mathematical precision of experimental science – did not

---

English language versions of these materials, Al-Qa'ida can't have "an effective recruitment, propaganda or communications strategy."  JA1804/107.

"fit" the evidence, because Kohlmann did not claim that his work was scientific in that sense. *See* JA1771/112-15 (Kohlmann describing his method of reviewing and comparing sources as a "comparative analysis form of social science").

Similarly, the court reasonably excluded Williams's testimony about the effectiveness of jihadi videos as a recruiting tool. Whether these videos were effective as a recruitment tool did not matter given that (1) Al-Qa'ida used them for this purpose (whether wisely or not); and (2) it was undisputed that Al-Qa'ida also considered them useful for other purposes, including propaganda and boosting morale. JA1857/113. In addition, Williams's testimony had no bearing on whether Mehanna *intended* to provide material support by helping Al Qa'ida produce these videos – and that is the relevant question where, as here, the material support counts charge conspiracy, attempt, or aiding and abetting.

In any event, the excluded expert testimony was cumulative – and any error in excluding it was harmless – because other defense experts, particularly Dr. Marc Sageman, provided expert testimony on both of these issues. Sageman aggressively dismissed Kohlmann's methods, contrasting his own scientific approach with what he described as Kohlmann's results-oriented collection of anecdotes. *See, e.g.,* JA1859/130-31 ("I test [my theories] on different independent databases" while Kohlmann "tells stories"). Mehanna contends (Br.

59) that he needed Durlauf's testimony to refute Kohlmann's alleged reliance on

the "comparative analysis form of social science," but Sageman directly made that

point. *See* SJA143 (testifying that, while Sageman himself properly conducted

comparative analysis according to social scientific standards, Kohlmann merely

"accumulates cases"). Sageman also identified himself as an "expert" on the

"effect" of Al-Qa'ida propaganda videos, JA1857/114, and made the same points

about the videos' purposes and limited effectiveness, especially as a recruiting

tool, that Williams would have made. *See* JA1854/80-1856/89, JA1857/113-

1858/117.[40] Thus, assuming that the actual effectiveness of videos as a

recruitment tool mattered, the defense experts who testified at trial addressed this

point.

## IV. MEHANNA'S LIES ABOUT MALDONADO WERE MATERIAL.

In Count VI, the jury convicted Mehanna of making false statements to

federal agents concerning Maldonado's whereabouts and terrorist activities, in

violation of 18 U.S.C. 1001(a)(2). Section 1001 prohibits "knowingly and

willfully… mak[ing]… materially false, fictitious, or fraudulent statement[s] or

representation[s]" to the government. Mehanna concedes (Br. 64, 67) that he

---

[40]In closing argument, Mehanna emphasized Sageman's criticisms of
Kohlmann as a "storyteller," as well as Sageman's opinion about the
ineffectiveness of the videos. JA1943/102-04.

knowingly lied to FBI agents but claims that his statements were not material because the FBI knew they were false. Existing law forecloses this claim.[41]

The test for materiality is "well-settled." *United States v. Sebaggala*, 256 F.3d 59, 65 (1st Cir. 2001). A false statement is material when it "ha[s] a natural tendency to influence, or [is] capable of influencing, a governmental function." *Id.* A false statement may have the "natural tendency to influence" even if there is no possibility that it will have any actual influence. *See United States v. Edgar*, 82 F.3d 499, 510 (1st Cir. 1996) (false statements on worker's compensation forms were material even though the forms were filed late and therefore could not influence the agency's decision); *see also Kungys v. United States*, 485 U.S. 759, 771 (1988) (rejecting a test based on the probability of actual influence). Rather, the "natural tendency to influence" depends on "the *intrinsic* capabilities of the false statement itself[.]" *United States v. Service Deli Inc.*, 151 F.3d 938, 941 (9th Cir. 1998) (citation omitted); *accord United States v. McBane*, 433 F.3d 344, 350-51 (3d Cir. 2005) (false statements are material if they "would naturally tend to influence a reasonable decisionmaker").

---

[41]This argument was preserved below, JA85, JA189, and is subject to *de novo* review. *United States v. Stevens*, 640 F.3d 48, 51 (1st Cir. 2011).

False statements provided to a federal agent regarding the subject of an investigation are, by their very nature, capable of negatively influencing the investigation. *Brogan v. United States*, 522 U.S. 398, 401-02 (1998); *see, e.g.*, *United States v. Turner*, 551 F.3d 657, 664 (7th Cir. 2008) (attempt to misdirect agents through false statements was "enough to satisfy the materiality requirement of [Section] 1001"); *McBane*, 433 F.3d at 352 (same). The law, thus, does not excuse Mehanna's lies simply because they failed to sidetrack the government's investigation. *See, e.g.*, *United States v. Safavian*, 649 F.3d 688, 691-92 (D.C. Cir. 2011); *United States v. Najera Jimenez*, 593 F.3d 391, 400 (5th Cir. 2010); *United States v. White*, 270 F.3d 356, 365 (6th Cir. 2001); *United States v. Neder*, 197 F.3d 1122, 1128 (11th Cir. 1999); *see also Brogan*, 522 U.S. at 402 ("[M]aking the existence of this crime [*i.e.* Section 1001] turn upon the credulousness of the federal investigator (or the persuasiveness of the liar) would be exceedingly strange.").

Mehanna acknowledges none of this law. Instead, he cites two district court cases and a Ninth Circuit decision, all decided before 1974. Br. 66. These authorities are not current. *See, e.g.*, *United States v. Hirst*, 2012 WL 3583044, at *3-4 (N.D. Cal. Aug. 20, 2012) (noting that *United States v. Bedore*, 455 F.2d 1109 (9th Cir. 1972), on which Mehanna relies, was "abrogated" by *Brogan*).

Mehanna contends (Br. 65-66) that this settled interpretation of Section 1001 exceeds "the original purpose of the statute" and allows federal agents to manipulate citizens into lying so as to give "law enforcement leverage."  The Supreme Court rejected the same arguments in *Brogan*, concluding that any argument that Section 1001 sweeps too broadly was best directed to Congress. 522 U.S. at 400, 405 ("By its terms, [Section] 1001 covers 'any' false statement… 'of whatever kind.'") (citation omitted).

## V.   MEHANNA'S "SPILLOVER" CLAIM LACKS MERIT.

Mehanna argues (Br. 68-69) that if some of his convictions are reversed, all must be reversed due to "prejudicial spillover from evidence."  This argument does not appear to add anything to his Rule 403 claim, *see supra* at 79-88, as Mehanna fails to identify any evidence that was relevant to some counts of conviction but not others.  In fact, evidence that Mehanna and his group immersed themselves in violent propaganda (the principal subject of the Rule 403 claim) related to all counts and demonstrated Mehanna's intent with respect to the Yemen trip *and* his media activities.  Accordingly, Mehanna fails to prove any "prejudicial spillover" of evidence from one count to another, let alone "prejudice so pervasive that a miscarriage of justice looms."  *United States v. Trainor*, 477 F.3d 24, 36 (1st Cir. 2007).

## VI.    MEHANNA'S BELOW-GUIDELINES SENTENCE SHOULD BE UPHELD.

### A.    *The Sentencing Proceeding*

A presentence report (PSR) prepared by the Probation Office used the 2011 Guidelines Manual.  It grouped all seven counts of conviction together and assigned the group a base offense level of 33.  (Counts II, III and IV started with a base offense level of 33 under Guidelines § 2A1.5 (conspiracy to commit murder)).  *See* Guidelines Ch.3, Pt.D (Grouping Rules); PSR ¶¶ 68, 69, 80, 89, 97B, 98, and 107.  After applying various adjustments, the PSR assigned Mehanna a total offense level of 53, PSR ¶¶ 78, 88, 97, 97(J), 106, 116, which it then reduced to 43 (the highest level in the Guidelines chart) pursuant to Guidelines § 5, Part A, n.2.  These calculations resulted in a Guidelines sentencing range of life imprisonment.  PSR ¶ 182.

Mehanna objected to the PSR on the ground that, because his Yemen trip occurred in February 2004, the 2003 manual should apply.  PSR 59.  Applying the 2003 manual would have reduced the base offense level for Counts II, III, and IV from 33 to 28.

At the April 12, 2012 sentencing hearing, the district court concluded that using the current manual did not violate the Ex Post Facto Clause.  JA1959/8.  It then determined that Mehanna's total offense level for Counts II, III, and IV was

47, less than the PSR's calculation of 53 because it found a six-level enhancement where the intended victims were government employees (Guidelines § 3A1.2(a)(1)(A)) to be inapplicable. JA1959/8-1960/9. The district court's calculations still resulted in a Guidelines sentencing range of life imprisonment.

Before the district court pronounced sentence, Mehanna allocuted. JA1969/47-1971/60. He explained that, since his early exposure to Batman comic books, he viewed the world through a simple paradigm: oppressors vs. oppressed. JA1970/49. Mehanna saw "what was happening to Muslims" through this lens. JA1970/52. He then blamed America for supporting Israel and blamed the 9/11 attacks on American economic sanctions that had killed Iraqi children. JA1970/52-1971/53. Mehanna recited atrocities committed by U.S. soldiers, and described "Islam" as "one large body who must protect each []other." JA1971/53-54. He mocked his trial as "childish bickering" over his translation activities and criticized America's "mentality of colonialism," which "trickles down to everyone," including "my own lawyers." JA1971/55-1972/57. He also questioned the impartiality of his jury. JA1972/58. Finally, Mehanna stated that "this business of ... who is and isn't a terrorist" is "subjective," and reaffirmed "support" for the "mujahedin." JA1972/59.

In reviewing the factors in 18 U.S.C. 3553(a), the district court concluded that Mehanna's conduct "warrant[s] a substantial criminal sanction," JA1973/64, and that both retribution and deterrence were "significant [interests] in this case." JA1974/65. The court found Mehanna's "history and characteristics" a "confounding factor," and noted that Mehanna had become "consumed with a religious enthusiasm that was at once partly admirable and partly horrifying." JA1974/65. In addressing the need to protect the public from future crimes, the court noted its concern with Mehanna's "quality of defiance" and his "absence of remorse notwithstanding the jury verdict." JA1974/67.

The district court then concluded that the Sentencing Guidelines did not do "an adequately reliable job in balancing the relevant sentencing factor[s]" because they failed to address "the unique facts of the given case." JA1974/68-1975/70 (criticizing 12-level terrorism adjustment and the automatic assignment of CHC VI). After engaging in a calculation which adjusted the Guidelines to eliminate "the principal defects" it had identified, the district court derived a "hypothetical or 'ghost' guideline" of 168-210 months (Level35/CHC(I)), which, it concluded, eliminated unwarranted disparities with similar defendants. JA1975/72-1976/73. The district court then imposed a below-Guidelines sentence of 210

months on Count IV, and concurrent sentences of 180 months on Counts I-III, and
60 months on Counts V-VII.  D439/74.

B.    *Discussion*

Mehanna's claim (Br. 70-71) that his sentence violates the Ex Post Facto
Clause has no merit. This Court reviews this constitutional challenge *de novo*.
*United States v. Goergen*, 683 F.3d 1, 3 (1st Cir. 2012).  The Sentencing
Guidelines provide that the district court should apply the Guidelines manual in
effect at the time of sentencing, unless doing so would raise ex post facto
concerns.  Guidelines § 1B1.11(a) & (b)(1); *United States v. Rodriguez*, 630 F.3d
39, 42 (1st Cir. 2010).  Mehanna's sentence raises no such concerns, for several
reasons.

First, the record refutes the factual foundation of Mehanna's claim.
Mehanna asserts (Br. 70) that a November 2004 amendment to Guidelines § 2A1.5
could not constitutionally be applied to his sentence on Counts II-IV because his
return from Yemen in February 2004 effectively terminated his participation in the
conspiracy to attack U.S. soldiers overseas.  He fails to note, however, that the
offenses charged in Counts II and III also involved his 2005-2006 propaganda
campaign.  But even setting that aside, after their return from Yemen, Mehanna
and Abousamra continued to conspire to fight abroad with Al-Qa'ida against

-101-

Americans. *See supra* at 19. Because Mehanna's conspiracy continued after November 2004, application of an amendment adopted on that date raises no ex post facto concerns.

Second, even if the conduct underlying Counts II, III, and IV ended before November 2004, the conduct underlying Counts V, VI, and VII – including making and conspiring to make false statements to cover up the purpose of the Yemen trip – occurred, *inter alia*, in December 2006. When a defendant commits multiple offenses that predate and postdate a revision of the Guidelines, the "one-book rule" requires the district court to apply the version in effect when the defendant committed the latest offense. Guidelines § 1B.11(b)(2)-(3); *see also United States v. Gilman*, 478 F.3d 440, 449-50 (1st Cir. 2007) (rejecting ex post facto challenge to "one-book rule").

Mehanna argues (Br. 71) that his other offenses were not sufficiently "related" to the Yemen conduct for application of the one-book rule. But that argument cannot be squared with *United States v. Cruzado-Laureano*, 404 F.3d 470, 488 (1st Cir. 2005). In that case, the Court held that the proper Guidelines manual for ex post facto purposes was the one in effect at the time the defendant tampered with a witness, even though all the conduct (which the tampering was intended to conceal) underlying other counts of conviction antedated that version.

*Ibid.* Moreover, the overwhelming majority of other circuits have held that the one-book rule does not violate the Ex Post Facto Clause where, as here, the rule is applied to a series of offenses that are properly "grouped" under the Guidelines. *See, e.g., United States v. Siddons*, 660 F.3d 699, 707 (3d Cir. 2011); *United States v. Weiss*, 630 F.3d 1263, 1277-78 (10th Cir. 2010); *United States v. Kumar*, 617 F.3d 612, 624-31 (2d Cir. 2010) (collecting cases from the Fourth, Fifth, Seventh, Eighth, and Eleventh Circuits); *but see United States v. Ortland*, 109 F.3d 539, 547 (9th Cir. 1997).[42]

Finally, any error in applying the more recent Guidelines was harmless because the district court would have imposed the same sentence in any event. *Tavares*, 705 F.3d at 27-28. The court's calculations yielded an advisory Guidelines sentence of life, JA1960/11-12, while application of the 2003 Guidelines would have resulted in a Guidelines range of 360 months to life. The district court clearly stated that the Guidelines, in its view, were not a "reliable" measure in this case, and the sentence the court imposed was based not on a departure from that range but on an independent analysis of the sentencing factors

---

[42]The government recently argued in the Supreme Court, *see Peugh v. United States*, No. 12-42 (argued Feb. 26, 2013), that the now-advisory Sentencing Guidelines present no ex post facto concerns. If this position prevails, it further forecloses Mehanna's claim.

-103-

in Section 3553A.  JA1960/12, JA1973/61-1976.  Accordingly, the court

considered the parties' arguments and evidence regarding an appropriate sentence

vis-a-vis those factors – including Mehanna's "absence of remorse" and

"defiance" (which his allocution amply demonstrated) – and imposed a sentence of

210 months.  JA1972/59, JA1975/69, JA1976/74.  It is true that, in exercising its

discretion under Section 3553A, the court considered the amended version of

Guidelines § 2A1.5 in a "hypothetical" Guidelines calculation, JA1976/73, but this

Court has made clear that consulting post-offense Guidelines revisions in this

manner does not implicate ex post facto concerns.  *Rodriguez*, 630 F.3d at 42.

## <u>CONCLUSION</u>

For the reasons discussed above, the judgment of the district court should be

affirmed.

Respectfully submitted,

CARMEN M. ORTIZ
 United States Attorney
 District of Massachusetts

MYTHILI RAMAN
 Acting Assistant Attorney General
 Criminal Division

JOHN P. CARLIN
 Acting Assistant Attorney
  General
 National Security Division

DENIS J. MCINERNEY
 Acting Deputy Assistant Attorney General
 Criminal Division

s/ Elizabeth D. Collery

s/ Joseph F. Palmer
 JOSEPH F. PALMER
 Attorney
 National Security Division
 U.S. Department of Justice

ELIZABETH D. COLLERY
 Attorney, Appellate Section
 Criminal Division
 U.S. Department of Justice
 950 Pennsylvania Ave., N.W., Room 1264
 Washington, DC 20530
 (202) 353-3891
 liza.collery@usdoj.gov

Date: May 15, 2013

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 32(a)(7)(C), the undersigned counsel of record certifies that the foregoing Brief for the United States was prepared in a 14-point, proportionally spaced, serif font (Times New Roman), using WordPerfect X4; the brief contains 22,224 words; and, accordingly, the brief complies with the requirements of Fed. R. App. P. 32(a)(7) and this Court's order of April 1, 2013, granting the government leave to file an oversized brief not to exceed 22,500 words.

s/ Elizabeth D. Collery
ELIZABETH D. COLLERY
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Room 1264
Washington, DC  20530
(202) 353-3891
liza.collery@usdoj.gov

# CERTIFICATE OF SERVICE

I certify that on May 15, 2013, I electronically served a copy of the foregoing Brief for the United States on the following registered participants of the CM/ECF system:

Janice Bassil, Esq.
J. W. Carney, Jr., Esq.
Carney & Bassil
20 Park Plaza, Suite 1405
Boston MA 02116-0000

Peter Sabin Willett, Esq.
Bingham McCutchen, LLP
One Federal Street
Boston, MA   02110-1726

Matthew R. Segal
Sarah R. Wunsch
American Civil Liberties Union of Massachusetts
211 Congress Street
Boston, MA   02110

Alex Abdo
Hina Shamsi
American Civil Liberties Union Foundation
125 Broad Street,
18th Floor
New York, NY   10004

Amna Akbar
Ohio State University
Moritz College of Law
55 W. 12th Avenue
Columbus, OH   43201

Pardiss Kebriaei
Baher Azmy
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY   10012

Joshua Rosenkranz
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY   10019

David M. Porter
National Association of Criminal Defense Lawyers
1600 L Street
12th Floor
Washington, DC   20036

Nancy Gertner
Professor of Law
Griswold 301
1525 Massachusetts Avenue
Cambridge, MA   02138

Steven R. Morrison
Assistant Professor
University of North Dakota School of Law
215 Centennial Drive
Stop 9003
Grand Fork, ND   58202

s/ Elizabeth D. Collery
ELIZABETH D. COLLERY
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Room 1264
Washington, DC  20530
(202) 353-3891
liza.collery@usdoj.gov

# ADDENDUM

# US v. Tarek Mehanna, No. 12-1461

## Chart of Identities

- **Tarek Mehanna**

  - Abu Sabaayaa (Tr. 6-14)
  - Sayf Maslool (Tr. 8-22)
  - Ibnul_Khattab82 (Tr. 12-25)
  - Aboo Sabaayaa (Tr. 16-79)
  - tariq.mehanna@yahoo.com (Tr. 17-72)

- **Ahmad Abousamra**

  - ahmadas72@yahoo.com (GX 350)
  - ahmadas81@yahoo.com (Tr. 15-92)
  - Abu Hurarah (Tr. 16-34)
  - Abu Fadl (Tr. 20-19)
  - Ahmad Shukri (Tr. 20-86)
  - Shukri al-Fadl (Tr. 20-95)

- **Kareem Abuzahra**

  - Ibn Abishaiba (Tr. 23-77)
  - Prof (23-100)

- **Hassan Masood**

  - alghurabaa@yahoo.com (GX 350)

- **Daniel Maldonado**

  - Umm Muhammad (Tr. 18-22)

- **Jason Pippin**

  - Abu Omar (Tr. 3-56)
  - Abul Muthanna (Tr. 15-57)
  - Abu Umar (Tr. 16-80)

- **Daniel Spaulding**

  - Brother Mujahid (Tr. 20-18)

- **<u>Omar Hammami</u>**

  - al-Mizzi (Tr. 3-51)
  - Alexander Buddy (Tr. 17-72)
  - [friend_of_afriend@hotmail.co.uk](mailto:friend_of_afriend@hotmail.co.uk) (17-72)

- **<u>Tariq al-Daour</u>**

  - Abu Dujanah (Tr. 15-62)

- **<u>Younis Tsouli</u>**

  - Irhaby007 (Tr. 13-11)

- **<u>Waseem Mughal</u>**

  - Ismiyy (Tr. 13-17)
  - yesyes (Tr. 13-20)

- **<u>Ehsanul Sadequee</u>**

  - [almuwahhid@hotmail.com](mailto:almuwahhid@hotmail.com) (Tr. 6-59)
  - Khubayb al-Muwahhid (Tr. 13-19)
  - Abu Khubayb (Tr. 21-101)

- **<u>Abu Mahmoud al-Muraabit</u>**

  - [sbualy@gmail.com](mailto:sbualy@gmail.com) (Tr. 13-24)
  - Abu Mu'ndhir (Tr. 35-74)